UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| WELLS FARGO & COMPANY, on behalf of itself and the members of its affiliated group filing a consolidated return,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 09-CV-2764 (PJS/TNL)<br><br><br><br>ORDER |

Walter A. Pickhardt and Martin S. Chester, FAEGRE BAKER DANIELS LLP; B. John Williams, Jr., Julia M. Kazaks, Alan Swirski, Cary Pugh, and Bryon A. Christensen, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP; Mark A. Hager, Andrew T. Gardner, Jeffrey A. Sloan, and William K. Wilcox, WELLS FARGO & COMPANY, for plaintiff.

Dennis M. Donohue, John L. Schoenecker, Kari M. Larson, William E. Farrior, and Alan S. Kline, UNITED STATES DEPARTMENT OF JUSTICE, for defendant.

This matter is before the Court on the objection of plaintiff Wells Fargo & Company ("Wells Fargo") to the special master's March 20, 2012 order and report [Docket No. 222]. In the order and report, the special master denied Wells Fargo's motion for partial summary judgment on Count 4 of its amended complaint. The Court has conducted a de novo review pursuant to ¶ 8 of the Court's order appointing a special master. *See* ECF No. 102. Pursuant to that review, the Court overrules the objection, affirms the order, and adopts the report.[1]

Every year, Wells Fargo pays California state taxes for the privilege of doing business in California. The amount of the state taxes is calculated on the basis of Wells Fargo's income in a

---

[1] The Court is grateful for the parties' and the special master's assistance in clarifying and simplifying the issues before the Court.

particular year — what the special master referred to as the "income year," and what the Court will refer to as "Year 1" — but the state taxes are paid for the privilege of conducting business in the following year — what the special master referred to as the "return year," and what the Court will refer to as "Year 2."

Up until 2003, Wells Fargo regularly took a deduction for the taxes that it paid for the privilege of conducting business in California in Year 2 on the federal tax returns that it filed for Year 2. Wells Fargo now contends that, as an accrual-method taxpayer, it ought to be able to take a deduction for those taxes on the federal tax returns that it files for Year 1.[2] According to Wells Fargo, it should be able to deduct the taxes in Year 1 because, even though they are paid for the privilege of conducting business in California in Year 2, the obligation to pay those taxes and the amount of those taxes become fixed by the end of Year 1. Not only that, but Wells Fargo actually pays the taxes (in the form of estimated taxes) during Year 1.

Ordinarily, an accrual-method taxpayer such as Wells Fargo would be able to deduct a liability (such as its liability for California taxes) in Year 1 if what is known as the "all events" test is met. The elements of that test are: (1) all the events that establish the fact of the liability must have occurred; and (2) the amount of the liability must be capable of being determined with reasonable accuracy. *United States v. Hughes Properties, Inc.*, 476 U.S. 593, 600 (1986).

California changed its tax laws in 1972. Both California law as it existed before 1972 and California law as it has existed since 1972 require a corporation to pay taxes calculated on

---

[2]There was initially some dispute over whether Wells Fargo had followed proper procedures when it elected to change its treatment of California taxes. The government now concedes, however, that Wells Fargo's election was procedurally proper; the only question is whether it was substantively proper.

the basis of its Year 1 income for the privilege of conducting business in Year 2. Prior to 1972, however, the amount of the corporation's California tax liability would be reduced if the corporation stopped doing business in California at some point during Year 2 — and, if the corporation did not do any business in California in Year 2, the corporation would not have any California tax liability. (Presumably, in either case, payments that the corporation made in Year 1 would be refunded to the corporation after Year 2.) That changed in 1972. Under California law as it has existed since 1972, a corporation must pay taxes for the privilege of doing business in Year 2 — and cannot have any part of its liability reduced — whether or not the corporation actually does any business in California during Year 2. Wells Fargo and the government agree that if Wells Fargo's tax treatment depended on California law as it has existed since 1972, then Wells Fargo would be able to take a deduction for its payment of California taxes on its Year 1 return because its liability for those taxes would become "fixed and absolute" in Year 1. *Brown v. Helvering*, 291 U.S. 193, 201 (1934).

Here's the rub: Thanks to an arcane provision in the Internal Revenue Code — specifically, 26 U.S.C. § 461(d) — Wells Fargo's tax treatment does *not* depend on California law as it has existed since 1972. Rather, Wells Fargo's tax treatment depends on California law as it existed on December 31, 1960. Section 461(d) is awkwardly worded, but the parties agree about what it says: If a state changes its tax laws after 1960 — and, as a result of that change, the accrual date of the payment of state taxes is moved up — then the change in the state tax laws is ignored for purposes of federal tax law. Time stands still in this tiny corner of the federal tax world.

The parties agree, then, that Wells Fargo's ability to deduct California taxes in Year 1 depends on California law as it existed before 1961. The parties also agree that longstanding pre-1961 precedent from the Tax Court and the Ninth Circuit requires that Wells Fargo deduct the California taxes in Year 2. *See Cent. Inv. Corp. v. Comm'r*, 9 T.C. 128 (T.C. 1947), *aff'd*, 167 F.2d 1000 (9th Cir. 1948) (per curiam). *Central Investment Corp.* relied primarily on the fact that, under pre-1961 California law, a business's liability for California taxes depended on whether, and for how long, the business operated in Year 2. *Id.* at 133. Because liability for California taxes did not become fixed and absolute until the business actually operated in Year 2, the court reasoned, liability for the taxes did not accrue in Year 1. *Id.* at 133-35.

As noted, California changed its tax laws in 1972, and both the Tax Court and the Ninth Circuit have recognized that, as a result of the change, a business in the position of Wells Fargo could deduct the California taxes in Year 1 if it were not for the operation of § 461(d). But, as also noted, § 461(d) renders the 1972 change in California law irrelevant. What matters is California law as it existed before 1961, and both the Tax Court and the Ninth Circuit have adhered to their precedent interpreting pre-1961 California law to require that the deduction be taken in Year 2. *See Charles Schwab Corp. v. Comm'r*, 495 F.3d 1115, 1119 (9th Cir. 2007); *Epoch Food Serv., Inc. v. Comm'r*, 72 T.C. 1051, 1054-55 (T.C. 1979).

In this proceeding, Wells Fargo argues, quite simply, that the Tax Court and the Ninth Circuit were and are wrong. Again, Wells Fargo does not dispute that, by virtue of § 461(d), its ability to take a deduction for California taxes turns on California law as it existed before 1961. Where the Tax Court and the Ninth Circuit have erred, argues Wells Fargo, is in holding that under California law *as it existed prior to 1961* businesses in the position of Wells Fargo could

not take a deduction for California taxes until Year 2. In support of its argument, Wells Fargo relies primarily on the Supreme Court's application of the "all events" test in *United States v. Hughes Properties, Inc.*, 476 U.S. 593 (1986). The parties' dispute, therefore, comes down to whether this case is distinguishable from *Hughes Properties*.

In *Hughes Properties*, the taxpayer was a Nevada casino that operated progressive slot machines. Essentially, the amount of the jackpot for a progressive slot machine increased each time the slot machine was played. *Id.* at 595. Nevada regulated the machines very tightly to prohibit casinos from reducing the jackpot before it was won and to require casinos to keep a cash reserve sufficient to pay the jackpot when it was won. *Id.* at 596. Casinos carried the amounts of the progressive jackpots on their books as an accrued liability. *Id.* at 597.

The casino in *Hughes Properties* attempted to take a deduction for the net year-to-year increase in its progressive-jackpot liability. *Id.* at 597. The government disallowed the deduction on the ground that the casino did not incur any liability until a patron actually won the jackpot. *Id.* As the government pointed out, if the casino were to surrender its license or file for bankruptcy, there would be no creditor who could claim the jackpot. *Id.* at 601. In the government's view, then, the first prong of the "all events" test had not been met during the tax year because the liability had not yet been established.

The Supreme Court sided with the casino and rejected the government's reasoning. The Court first held that the effect of the Nevada regulations was to irrevocably fix the casino's liability for the jackpot. *Id.* at 601-03. The only unknowns were the timing of the payment — which is irrelevant for accrual-method taxpayers — and the identity of the eventual winner, which, from the casino's point of view, is also irrelevant. *Id.* at 602, 604. The Supreme Court

also noted the remote possibility that the jackpot would never be won, but treated that as so speculative and unlikely as not to be worth taking into account. *Id.* at 601-02. As to the government's argument that the casino could avoid liability by going out of business or declaring bankruptcy, the Court said:

> There is always a possibility, of course, that a casino may go out of business, or surrender or lose its license, or go into bankruptcy, with the result that the amounts shown on the jackpot indicators would never be won by playing patrons. But this potential nonpayment of an incurred liability exists for every business that uses an accrual method, and it does not prevent accrual.

*Id.* at 605-06. Wells Fargo argues that this reasoning essentially abrogates *Central Investment Corp.* and its progeny.

This is a very close question, and both Wells Fargo and the government have made good points. In the end, though, the Court predicts that the Eighth Circuit will find *Hughes Properties* distinguishable and side with the longstanding position of the Internal Revenue Service, the Tax Court, and the Ninth Circuit. The Court reaches this conclusion because it appears that the obligation of the casino in *Hughes Properties* was materially different from the obligation of a business under pre-1961 California tax law.

Rightly or wrongly, in *Hughes Properties* the Supreme Court found that "[t]he effect of the Nevada Gaming Commission's regulations was to fix [the casino's] liability." *Id.* at 601. In the Court's view, the "actual event that would create the liability" was not the payment of the jackpot, but "the last play of the machine before the end of the fiscal year . . . ." *Id.* at 602. That "last play," the Court said, "fixed the jackpot amount irrevocably." *Id.* at 602-03. The Court recognized that future events — such as the casino closing or losing its license — might mean

that, as a practical matter, the casino would not *pay* its progressive-jackpot liability; the Court referred to this as the "potential *nonpayment* of an incurred liability." *Id.* at 606 (emphasis added). But the *liability itself*, the Court said, was "definitely fixed" as of the end of the tax year. *Id.* at 604. As the Court remarked, "'The existence of an absolute *liability* is necessary; absolute certainty that it will be discharged by *payment* is not." *Id.* at 606 (quoting *Helvering v. Russian Fin. & Constr. Corp.*, 77 F.2d 324, 327 (2d Cir. 1935)) (emphasis added).

The obligation of a business in California prior to 1961 appears to be different, though. The business would never become liable to pay for the privilege of operating in Year 2 unless it actually *operated* in Year 2. The corporation's liability — that is, its legal obligation to pay taxes for the privilege of conducting business in California in Year 2 — was thus contingent on its actually conducting business in California in Year 2. The "actual event that would create the liability" was not anything that happened in Year 1, but the corporation's doing business in California in Year 2. True, the business may have been required in Year 1 to essentially "prepay" the taxes that it *expected* to become liable for in Year 2. But the business's liability for California taxes did not become "fixed and absolute" until the last day of Year 2. If a corporation did no business in California in Year 2, the corporation was not merely excused from "discharg[ing]" a liability "by payment"; a corporation that did no business in California in Year 2 had no *liability* to pay taxes to the State of California — period.

It is worth noting that, in *Hughes Properties*, the Supreme Court did not hold that the continued operation of a business can never be an "event" that is necessary to create liability. Indeed, the government did not even contend that the casino's continued operation — in and of itself — was an event necessary to fix the casino's liability. Instead, the government contended

that a different event — the winning of the jackpot — was the final event necessary to fix liability.  True, the casino's continued operation was one of many things that would need to occur to bring about that final event.  But the focus of the government's "all events" argument was the winning of the jackpot, not the continued operation of the casino.  Indeed, it bears mentioning that, from the government's perspective, it would not have mattered whether or how long the casino operated during any particular year, so long as, at some point, a winner was identified.  In rejecting the government's argument, therefore, the Court was not holding that the continued operation of a business can never be an "event" that is necessary to create liability.

Here, unlike in *Hughes Properties*, it is the continued operation of the business that itself gives rise to liability for taxes under pre-1961 California law.  And unlike *Hughes Properties*, in which the timing of the casino's continued operations would not have mattered, here the timing of the business's continued operation is crucial:  To be liable, the business not only has to operate, but it has to operate in Year 2.  Indeed, as already described, operating during Year 2 is the *only* "event" that renders the business liable for the California taxes; before that event, it simply cannot be said that the business had any obligation (other than to "prepay" the taxes that it *anticipates* becoming liable for in Year 2).

For these reasons, the Court agrees with the special master — and with the reasoning of the Tax Court and the Ninth Circuit — that because (under pre-1961 California law) Wells Fargo's liability for the California taxes does not accrue until it operates during Year 2, Wells Fargo cannot take a deduction for California taxes in Year 1.  Wells Fargo's motion for partial summary judgment is therefore denied.

ORDER

Based on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Plaintiff's objection [ECF No. 227] is OVERRULED.

2. The special master's order and report [ECF No. 222] are AFFIRMED and ADOPTED.

3. Plaintiff's motion for partial summary judgment [ECF No. 149] is DENIED.

Dated: August 10, 2012

 Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge