UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| WELLS FARGO & COMPANY, et al., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | Civil No. 09-cv-02764-PJS-TNL |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | **Report of Special Master** |
| Defendant | ) | |

**REPORT RESPONDING TO  EIGHT MOTIONS BY PLAINTIFF
AS LISTED AND DESCRIBED HEREIN**

## I.     Introduction

### 1.  Motions Addressed in This Report

The principal focus of this case is upon the U.S. income tax consequences

of  the STARS transaction implemented by the Plaintiff ("Wells Fargo") and a

British bank.  Wells Fargo claims a number of U.S. tax benefits from the

transaction, most importantly foreign tax credits attributable to income taxes paid

to the United Kingdom under U.K. tax law and expenses attributable to the

transaction.[1]  The Defendant (the "Government") contends that the STARS

arrangement is a "sham transaction" the consequences of which should be

disregarded under  U.S. tax law.  Wells Fargo claims that the Government has

wrongfully denied the tax benefits to which it is legally entitled and has sued to

recover for tax payments that were been made and not refunded.[2]

Wells Fargo has filed the following eight motions in connection with this

case:

--Renewed Motion for Determinations of U.K. Law.

--Motion for Partial Summary Judgment that "Bx" Was Pretax.

--Motion for Partial Summary Judgment that the STARS Transaction Was

Motivated by an Economic Purpose Outside of Tax Considerations.

--Motion for Partial Summary Judgment that 26 U.S.C. § 269 Does Not

Apply to the STARS Transaction as a Matter of Law.

.      --Motion for Partial Summary Judgment that Wells Fargo's Tax Reporting

Position Had a Reasonable Basis.

--Renewed Motion to Exclude Expert Testimony of Dr. David LaRue.

---

[1]  The STARS transaction has a number of parts.  Unless otherwise indicated, they are referred to herein collectively as the "STARS transaction."

[2]  The taxable year of this case is 2003, but the result of the case will apply to subsequent years during which the STARS transaction was being implemented.

--Motion to Exclude Expert Testimony of Dr. Ira Kawaller.

--Motion To Exclude Expert Testimony of Dr. Michael Cragg.

This Report responds to each of the eight motions.  They are addressed in the order indicated in the foregoing listing.  The Report is accompanied by a series of Orders giving effect to the determinations explained herein.

The motions have been thoroughly briefed by both parties.  Sometimes lengthy hearings have been held with respect to each of them.  It might be noted that the approaches and strategies taken by the parties to the issues raised in the case have been somewhat different.  As this Report will demonstrate, the motions here addressed are part of a continuing effort by Wells Fargo to focus upon specific issues with respect to the tax treatment of the STARS transaction.  By contrast, the Government has tended to rely upon a more broadly structured line of argumentation that challenges the transaction in more general terms.  This difference of strategies occasionally produces some apparent non-sequiturs and inconsistencies which the Report will endeavor to identify and explain.

While many of the facts and arguments raised by these motions have been described, explained and discussed in Reports responding to prior motions, many are repeated here for purposes of coherence and clarity.

Each motion is addressed separately in the Report even though some

considerations and some sources of law are common to more than one motion.   It is recognized that this approach involves a degree of unavoidable repetition. However, it is very likely that some or all of the decisions reflected in the Report will be challenged to the Court.   The separate, though sometimes repetitious, explanations of the context and analysis of the different motions are intended to provide a sharper focus to facilitate the resolution of any such challenges.

Unless otherwise indicated, the decisions contained in this Report are not interdependent.  Each is a specific response to a specific motion advanced and opposed by specific arguments.  Should any of the decisions set forth in the Report be successfully challenged to the Court, it is intended that the other decisions remain unless they are successfully challenged.

As the Report is rather long and somewhat complex, a table of contents is set forth on the following page.

## 2.  Table of Contents of This Report

**Title**                                                                    **Page Number**

I.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     The STARS Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.    Some General Observations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.     Motion to Determine Issues of U.K. Law . . . . . . . . . . . . . . . . . . .24

V.      Motion that the Bx was "Pre-Tax" . . . . . . . . . . . . . . . . . . . . . . . .27

VI.     Motion that the STARS Transaction Had a

        Business Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

VII.    Motion for Partial Summary Judgment that Code § 269

        Does Not Apply to the STARS  Transaction . . . . . . . . . . . . . . . . 80

VIII.   Motion That Its Tax Reporting Had a Reasonable

        Basis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .97

IX.     Motion to Exclude Expert Testimony of Dr. David LaRue . . . 114

X.      Motion to Exclude Expert Testimony of Dr. Ira Kawaller . . . 119

XI.     Motion to Exclude Expert Testimony of Dr. Michael Cragg  . 122

XII.    Summary of Orders Issued . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

**II.  The STARS Transaction**

**1.  In Brief**

The STARS transaction was implemented by a highly structured series of steps taken by Wells Fargo and Barclays Bank PLC ("Barclays" is a financial services corporation headquartered in the United Kingdom) in which both Wells Fargo and Barclays were to receive tax benefits (Wells Fargo in the United States and Barclays in the United Kingdom) as a result of income taxes paid to the United Kingdom by a trust with a U.K. trustee (the "U.K. Trust") that was treated as a part of Wells Fargo for U.S. tax purposes.  The transaction as conceived would thus exploit differences in the tax laws and practices of the United States and the United Kingdom to provide benefits to both banks from the same U.K. income tax payments.   There follows a brief summary of the principal elements of the STARS transaction relevant to the consideration of these motions.  A more detailed description of specific steps taken to implement the transaction is set forth thereafter.

In the STARS arrangement, Wells Fargo[3] effectively transferred income-producing assets to the U.K. Trust.  The assets so transferred  did not arise in the

_____

[3]  The reference to "Wells Fargo" herein includes all entities that are included in the calculation of its U.S. income tax liability.  Many of the steps in the STARS transaction involve subsidiaries and disregarded entities that are so included.  Some were "special purpose" entities created to implement the STARS transaction.

United Kingdom, had no relationship to the United Kingdom and in general were assets already owned by Wells Fargo.  The U.K. Trust was deemed to be a U.K. resident under U.K. law.  As such, the income realized by the U.K. Trust from the contributed assets was subjected to a U.K. income tax of about 22 percent.   As the U.K. Trust was treated under U.S. law as a part of Wells Fargo, the income realized by the U.K. Trust and the U.K. income taxes paid by it were treated as received and paid by Wells Fargo for purposes of its consolidated U.S. income tax return.  The Government concedes that the U.K. income taxes paid by the U.K. Trust would normally be eligible for a foreign tax credit under Section 901 of the Internal Revenue Code (the "Code") and U.S.-U.K. income tax treaties,[4]  but denies the availability of such credits and other U.S. tax benefits in this STARS transaction because it has been determined by the IRS to be a sham.

Barclays was provided with certain beneficial interests in the U.K. Trust.  Under U.K. law, almost all of the after-U.K. tax income of the trust was treated as a distribution to Barclays.   Despite the allocation of income for U.K. purposes, however, there was no material transfer of monies by the U.K. Trust to Barclays.  The after-U.K. tax trust income allocated to Barclays was immediately credited to a blocked account in the name of Barclays that was maintained by

---

[4]  September 17, 2013 Hearing Transcript, pages 44-47.

7

Wells Fargo and then reinvested in the trust.  These amounts  were  eventually to

be recovered by Wells Fargo at the conclusion of the STARS arrangement for a

pre-determined fixed price.  The result was that almost all of the trust income, net

of the U.K. income taxes paid by the trust, eventually accrued to the benefit of

Wells Fargo (although having been allocated to Barclays).

The application of U.K. tax law to Barclays was a bit complex.  Barclays

was required to report as income for U.K. tax purposes the net trust income

allocated to it plus the 22 percent U.K. tax paid by the trust in respect of such

income (an arithmetic practice often referred to as "grossing up" in tax parlance).

The total amount resulting from the gross up was subject to a 30 percent U.K. tax.

Barclays was then entitled to a credit of the 22 percent tax that had been paid by

the trust.  As a result, Barclays was required to pay an additional amount which

was approximately 8 percent of the grossed up trust income deemed under U.K.

law to have been allocated to it.

If the analysis ended at this point, the transaction would obviously have been

highly undesirable for Barclays.   However, the income allocated to Barclays (but

maintained in the blocked account and then credited to the U.K. Trust for the

eventual benefit of Wells Fargo) was deducted by Barclays in the calculation of its

U.K. income tax liability imposed at the rate of 30 percent.

Another degree of complexity was added because Barclays was obligated to pay consideration to Wells Fargo of a fixed  amount each month that was calculated to be a percentage of the U.K. tax credits that Barclays expected to enjoy as a result of the allocation of trust income.   This consideration (called the "Bx payments or amounts" throughout these proceedings) was approximately 47.5 percent of the U.K. tax credits (for the 22 percent tax) to be enjoyed by Barclays, as described in the previous paragraphs.  Barclays also  deducted the Bx amounts in the calculation of its U.K. income tax liability.  The combination of U.K. tax credits and U.K. deductions (for the amounts allocated to the blocked account and contributed back to the trust and the Bx payments) created a net profit to Barclays under U.K. tax law as a result of its involvement in the STARS transaction.  This favorable result for Barclays was not challenged by U.K. tax authorities.

Barclays effectively loaned $1.25 billion to Wells Fargo at an interest rate of LIBOR plus 20 points (.2 percent).  The periodic payments from Barclays to Wells Fargo (described as the Bx in the previous paragraph) were netted against interest owed by Wells Fargo to Barclays in respect of the loan, thereby reducing the interest burden on the loan by about 2 percent.  However, because LIBOR (a rate that varies periodically) was sometimes very low, the periodic Bx payments from Barclays sometimes exceeded the interest owed by Wells Fargo.  In either event,

Wells Fargo received an economic benefit from the periodic payments, either as a

reduction in its net interest payments to Barclays (that were deducted for U.S. tax

purposes), as a reduction in unrelated interest expense (that was deducted for U.S.

tax purposes)  or as net payments to Wells Fargo (that were included in its income

for U.S. tax purposes).[5]

## 2.  Detailed Description of Transactional Steps

The detailed implementation of the STARS transaction was even more

complex than the summary description suggests.  Many of the detailed steps were

required by Barclays so that it would enjoy the U.K. tax benefits which made the

transaction beneficial to it.  The steps involved a number of entities owned and

controlled by Wells Fargo, some of which were specially created to implement the

transaction.  However, each of the entities was considered to be part of Wells

Fargo for purposes of its U.S. consolidated tax return.  As such, the consequences

of transactions between and among them were generally eliminated in the

determination of its consolidated tax liability.  However, some of the motions

---

[5]  The treatment of the payments from Barclays to Wells Fargo in the periods when LIBOR was very low has been described in several ways.  At one hearing, it was described as an increase in income.  September 17, 2013, Hearing Transcript, pages 77-78.  The Memorandum submitted by Wells Fargo in support of its motion for partial summary judgment regarding the characterization of the Bx payment, addressed in a subsequent portion of this Report, indicates that it was applied to reduce "unrelated interest expense."  Memorandum, page 16.  The effect on the taxable income of Wells Fargo is the same in either case.

addressed in this Report require an examination of specific steps in the transaction and the role of the specific entities.  The steps described below are not disputed by the parties.

The trust was initially organized in the United States.  There were several classes of interests in the trust (labeled Class A through Class E Units).  Carnation Asset Management, Inc. ("Carnation"), an existing  U.S. subsidiary of Wells Fargo, subscribed to the Class A and B Units by transferring about $6.638 billion of income-producing assets to the trust.  The assets included debt, cash, and shares of Sirius LLC ("Sirius"), a Delaware limited liability company that elected to be treated as a partnership for U.S. tax purposes (as a transparent entity for tax purposes, its actions were attributed to Wells Fargo).   These assets, already owned by Wells Fargo or its related entities, had no particular connection to the United Kingdom.

Barclays subscribed for the Class C and E Units and transferred $1.225 billion to the trust.  It subscribed for the Class D Unit and transferred $25 million to the trust.  As a result, Barclays transferred a total of $1.25 billion to the trust.

The trust redeemed the Class B Unit from Carnation by transferring $1.25 billion to Carnation.  The Class B Unit was not reissued.  Carnation then transferred approximately 50 percent of its Class A Units to Rigil Finance, LLC

("Rigil") in exchange for all of the membership interests in Rigil.   Rigil was a

newly created limited liability company that elected to be treated as a corporation

for U.S. tax purposes and was also deemed to be part of Wells Fargo for purposes

of its U.S. consolidated tax return.

At this point, the trust was transformed into the U.K. Trust by the

appointment as trustee of  Arcturus Trustee Limited, a U.K. incorporated company

that was also controlled by Wells Fargo.

The holders of the various trust units were entitled to:

Class A (held by Carnation and Rigil)–monthly distributions of 1 percent of

the Trust income;

Class D (held by Barclays)–monthly distributions at a floating interest rate

on $25 million;

Class C (held by Barclays)–entitled to the distribution of the remaining Trust

income;

Class E (held by Barclays)–entitled to no distributions.

The Class B Units were not reissued.

Wells Fargo, through its related entities, was required to assure that the U.K.

Trust would realize sufficient amounts of income needed to generate the amount of

U.K. taxes that would provide the benefits required by Barclays in the deal.  The

distributions to Barclays in respect of its Class C Units were deposited in the blocked account maintained by Wells Fargo that were then used to make further subscription payments for the Class E Units held by Barclays (even though the Class E Unit holder was not entitled to any distribution of trust income).

As a result of these steps, Wells Fargo had the use of the $1.25 billion provided by Barclays and was required to pay interest to Barclays of LIBOR plus .2 percent and Barclays was required to provide the Bx consideration. While the Bx amount was negotiated by reference to the U.K. tax credits anticipated by Barclays, its obligation to pay the Bx was not dependent upon the realization of the U.K. tax benefits. However, the transaction could be terminated by either party with relatively short notice (5 to 30 days). Further, Wells Fargo was obliged to make some payments to Barclays in certain circumstances if the U.K. tax expectations were not fulfilled.

Unless either party elected to terminate the arrangement, at the end of five years Carnation was to buy the Class C and E Units from Barclays for $1.225 billion and the Class D Units for $25 million, resulting in total payments of about $1.25 billion, which was the amount originally invested by Barclays in the trust. These prices were fixed and would apply regardless of the additional amounts considered to have been contributed by Barclays for the Class E Units. Neither

party elected to terminate the arrangement before its planned termination.

### 3. Reporting for U.S. Tax Purposes

There are many cases in which the government has argued that the substance of a transaction (rather than its form) should determine its tax consequences.  In this case, Wells Fargo did not report the transaction according to its form (for example, the purchase and sale of interests in the trust), but rather according to its substance.  The transaction was treated and  reported by Wells Fargo for U.S. tax purposes as a borrowing of $1.25 billion at a rate of interest of LIBOR plus .2 percent less the Bx amount.  As indicated previously, the effect of the Bx payment generally was to reduce the interest expense deducted or increase income reported by Wells Fargo.  In either event, the taxable income of Wells Fargo for U.S. tax purposes was increased.

Wells Fargo reported the U.K. Trust income for U.S. tax purposes and claimed foreign tax credits equal to the amount of U.K. taxes that had been paid or accrued by the U.K. Trust.

As indicated previously, the Government's position is that the STARS arrangement was a sham and that, as a result, Wells Fargo is not entitled to foreign tax credits in respect of the U.K. income taxes paid by the trust and is not entitled to any deductions in respect of the transaction.

## III.  Some General Observations

## 1.  Treatment of Motions for Partial Summary Judgment

Motions for summary judgment and partial summary judgment are specifically authorized by FRCP 56.  They provide a significant avenue for expediting the process of litigation by resolving issues at earlier stages of the litigation process to reduce its complexity and costs.

Rule 56 prescribes standards and methods that apply in determining such motions.  Rule 56(a) provides that "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

In response to most of the Wells Fargo motions for partial summary judgment addressed in this Report, the Government contends that there are "genuine disputes as to . . . material facts."  The motions determined in this Report have been addressed with a full recognition of the utility of summary judgments and an understanding of the burden that is placed upon the movant to show that there are no material facts in dispute affecting the disposition of the motion.

## 2.  The Sham Transaction Doctrine in Brief

The sham transaction doctrine is one of several defense mechanisms that have evolved over time through a series of judicial decisions to defend against the

16

unacceptable exploitation of generally applicable tax provisions.    Such doctrines

are sometimes characterized as the "common law of federal taxation" even though

the basic source of federal tax law is the particularly long and complex Internal

Revenue Code (the "Code").   When such doctrines are applied, tax benefits sought

by taxpayers are generally denied even though a transaction satisfies the technical

requirements normally applicable with respect to the issue.  If the transaction is

regarded as a sham, the tax consequences are generally ignored as if the transaction

had never occurred.  The sham transaction doctrine has been explained and applied

in many cases over the years.  There follows in a subsequent portion of this Report

a brief review of the evolution of the doctrine and its application in specific cases

of particular relevance to the issues raised by the motions here considered and by

this case generally.

### 3.  Background:  International Tax Planning and the Foreign Tax Credit

The Government emphasizes several general arguments in support of its

view that the STARS transaction is a sham.  They include:

—The attempted exploitation of the foreign tax credit provisions by Wells

Fargo is inconsistent with the legislative purpose for which they were

adopted.

—The provision of the Bx consideration by Barclays means that Wells

Fargo has not borne the financial incidence of the U.K. income taxes paid by

the U.K. Trust.

The purpose of this portion of the Report is to provide some context for the

evaluation of these arguments.

The foreign tax credit has been a part of the federal income system for a very

long time.  It was introduced in 1918, just five years after the original adoption of

the modern income tax. The basic purpose was clear: to mitigate the double

taxation of income derived primarily by domestic taxpayers from international

transactions in which the same income was subject to tax by other countries.  A

further intended consequence of the foreign tax credit mechanism was to reduce

the importance of differing tax burdens on decisions as to where to invest and

undertake business activities.  The foreign tax credit rules are prescribed by Code

§§ 901 et seq.

Since the 1930's, the United States has concluded many bilateral income tax

treaties with other countries.  At the present time there are more than 60 such

treaties in force.  A principal objective of these treaties is to allocate primary taxing

jurisdiction between the two countries, both of which are entitled under principles

of customary international law to tax the same income to the same taxpayer.  In

virtually all of these treaties, the United States undertakes to provide tax credits for

income taxes imposed  by the other country as permitted by the terms of the treaty.

The Government vigorously argues that Wells Fargo is claiming foreign tax credits in circumstances vastly different from those contemplated by Congress when the foreign tax credit was adopted.  It contends that the legislative purpose of the foreign tax credit is to mitigate the total income tax burdens arising from truly international transactions.  Allowing Wells Fargo to enjoy the benefit of foreign tax credits in the contrived STARS transaction is inconsistent with that legislative purpose because Wells Fargo has voluntarily subjected income to U.K. tax that did not arise in and had no connection with the United Kingdom and that would otherwise be considered to be U.S.-source income under the generally applicable provisions of Code.

The Government's description of the legislative purpose is generally correct. However, the way in which the foreign tax credit mechanism actually applies in some instances provides considerable opportunity for tax planning that may go beyond that simple statement of the legislative purpose.

Two examples of relatively common international tax planning techniques provide a bit of context.   First, it is possible for a U.S. taxpayer to benefit from the foreign tax credit mechanism even when no foreign taxes have been paid in respect of certain foreign income in some circumstances.   Through a process known as

19

cross-crediting, a U.S. corporation may apply foreign taxes paid in a highly taxed country to reduce the U.S. tax on income deriving from a low- or no-tax country. Such opportunities are subject to limitations too technical to pursue here as they do not arise in this case. It is obvious that there is no problem of double income taxation with income realized by a domestic taxpayer in a foreign country that imposes no income tax. Nevertheless, Congress has explicitly authorized a reduction in U.S. taxes arising from that untaxed country if opportunities for cross-crediting are present.

The Government emphasizes that the payment of the Bx amount means that Barclays assumed at least a portion of the financial burden arising from the imposition of U.K. income taxes on the U.K. Trust (considered to be part of Wells Fargo) in the STARS transaction. It characterizes the Bx as an "effective rebate" of the U.K. taxes and strongly argues that the assumption of the financial burden by Barclays is a prime element in demonstrating that the transaction is a sham so that the U.S. tax benefits claimed by Wells Fargo should be denied. However, the assumption of the financial burden of foreign taxation by other parties in several circumstances has been found not to jeopardize the availability of foreign tax credits. As a result, and of particular relevance to the transaction here under consideration, a U.S. taxpayer may be entitled to a foreign tax credit on foreign

taxes actually paid by other parties to a transaction.

A simple example can demonstrate this phenomenon. In many international lending arrangements, it is not uncommon for a borrower to be responsible for withholding taxes imposed on interest payments to a foreign lender. Suppose, for example, that a U.S. bank lends $1,000 to a foreign borrower and that the loan agreement requires the borrower to make an interest payment to the U.S. lender of $100 each year, regardless of any taxes imposed by the borrower's country. Suppose further that there is a 20 percent withholding tax on such interest payments imposed by the borrower's country. Such taxes are generally deemed to be an income tax imposed on the lender even though the obligation is expected to be satisfied by the payment of the tax by the borrower (sometimes called the "withholding agent"). Under the terms of the loan agreement, the foreign borrower makes a payment of $100 to the U.S. lender and a payment of $20 to the tax administration of the foreign country. Under long-standing authority, the net result is that the U.S. lender is treated as having realized income of $120 (the cash received plus the satisfaction of its foreign tax obligation); but the U.S. lender is also entitled to a foreign tax credit of $20. In other words, the result is the same as if the U.S. lender had received $120 and then paid a foreign income tax of $20. Treas. Reg. § 1.901-2(f)(2)(ii), Ex. 1. This result has applied even in

circumstances in which the borrower was an agency of the tax-collecting foreign government.  Riggs Nat'l Corp. v. Commissioner, 295 F.3d 16 (D.C. Cir. 2002).

Another example is set forth in the regulations.  In that instance, a U.S. corporation contracts with a foreign party to perform services in another country. The foreign party agrees to pay any income taxes that may be owing by the U.S. corporation to the foreign country.   The regulations make it clear that the taxes paid must be considered to be additional income to the U.S. company, but also make clear that the U.S. corporation is entitled to a foreign tax credit.   Treas. Reg. § 1.901-2(f)(2)(ii), Ex. 3.  This result was upheld by the Tax Court[6] and the Court of Appeals for the Seventh Circuit even when the foreign contractor was an agency of the Egyptian Government.  Amoco Corp. v. Commissioner, 138 F.3d 1139 (7th Cir. 1998).

As indicated previously, such practices form a part of the context in which this case should properly be considered.  They demonstrate that, while the objectives of the foreign tax credit provisions are perfectly clear–to mitigate double income taxation of international transactions– certain accepted practices that go well beyond that basic purpose have been sanctioned by the Code.  Moreover, the failure to bear the full financial burden of a foreign tax obligation by a taxpayer

---

[6]  T.C. Memo. 1996-159, 71 T.C.M. (CCH) 2613.

does not automatically deny the benefit of a foreign tax credit.

The Government, of course, contends that neither of these practices is relevant to this case because the STARS transaction goes so far beyond such relatively common forms of international tax planning and avoidance that it amounts to a "sham" that must be wholly disregarded for federal income tax purposes.

### IV.   Motion to Determine Issues of U.K. Law

### 1.        The Motion

Wells Fargo has moved for renewed "consideration of its request for determinations of U.K. law." (Doc 426)  For the reasons explained below, this motion is addressed in the context of specific issues raised by other motions addressed in this Report.

### 2.        Context of the Motion

In March, 2013, Wells Fargo moved under FRCP 44.1 for a number of determinations of U.K. law. (Doc 299)  The motion correctly noted that questions of foreign law are now treated as questions of law in federal courts, a change from an earlier time when questions of foreign law were regarded as questions of fact.

The earlier motion was based upon the expectation that many issues of U.K. law would be relevant, if not determinative, of issues arising in this case even though the case depends primarily upon principles of U.S. tax law.  The Government opposed the motion on several grounds.  It argued that "this case does not present any issue requiring a definitive determination of U.K. law."[7] Therefore, the process, which might include eliciting expert testimony from U.K. legal experts, would be unnecessarily time consuming and expensive.  Further, it

---

[7] Government Memorandum in Opposition to Motion, page 1.

argued that any attempt to decide the issues of U.K. law in a vacuum (that is, with no specific relationship to the issues in this case) was likely to be confusing and could lead to erroneous conclusions.

The earlier motion was denied with leave granted to renew all or a part of the requests for foreign law determinations at a later point.  Report of Special Master, dated June 18, 2013.  (Docs 339 and 340)  The Report explained:

> "The better course . . . will be to consider specific U.K. legal issues as they
> are raised by either Party in the context of motions or other matters in this
> case.  That procedure will allow the court fully to consider the relevance of
> the U.K. laws in question and their impact on this case.  It will also avoid the
> necessity of asking and answering U.K. legal questions that may not
> contribute to the resolution of U.S. tax issues that must be determined in this
> case."

Among the motions made by Wells Fargo that are being addressed in this Report, Wells Fargo has moved again under FRCP 44.1 for  determinations of U.K. law on the grounds that they are "necessary and appropriate."   It emphasizes that contested issues of U.K. law are of particular relevance to its challenges to three of the expert witnesses used by the Government and cite U.K. law determinations in connection with several other motions.

After a discussion of the issues raised by this motion and the process of reaching any required determinations, it still seemed inadvisable to consider the proposed determinations in a vacuum.  Therefore, counsel for Wells Fargo were directed during hearings on the various motions to identify any specific issues of U.K. law they believed to be necessary to the determination of any particular motion.  Counsel for the Government were directed to indicate whether they agreed with any formulations of U.K. law asserted by Wells Fargo and, if not, to state their position with respect to the relevance and necessity of rendering determinations with respect to the U.K. law question in issue.[8]

The procedure outlined in the preceding paragraph was followed during the hearings with respect to the motions here under consideration.   In the discussions that follow, the Report will identify determinations of U.K. law urged by Wells Fargo and explain the resolution of the issues raised thereby.  As explained in subsequent portions of this Report, no determinations of U.K. law are deemed to be necessary at this time to resolve the motions addressed herein.

---

[8]  Transcript of telephone conference of March 3, 2014, pages 9 et seq.

## V.  Motion That the Bx Was "Pre-Tax"

## 1.  The Motion

Wells Fargo has moved "for partial summary judgment that the 'Bx' was pre-tax." (Doc 386)  The intended object of the motion is that the so-called Bx consideration would be regarded as an item of income for purposes of applying the economic substance test and perhaps the business purpose test as part of the sham transaction analysis.  For the reasons set forth below, the motion is granted.

## 2.  Context of This Motion

A principal element in the application of the sham transaction analysis is the reasonability of profit expectations for the taxpayer participating in the challenged transaction. Wells Fargo previously moved for a partial summary judgment that there was a reasonable possibility of pre-tax profit arising from the STARS arrangement because the net cost of the loan from Barclays (interest less the Bx amount) and the costs of implementing the STARS transaction were substantially less than the average return on capital invested by Wells Fargo.  That motion was denied by the Special Master primarily because of factual issues raised by the Government with respect to the transaction, including whether the use of the U.K. Trust and the loan are properly to be treated a single transaction for purposes of the sham transaction tests (sometimes called the "bifurcation issue"), whether the loan

in fact added to the profit of Wells Fargo and whether certain other aspects of the

detailed implementation of the transaction distinguished it from an earlier decision

by the Court of Appeals for the Eighth Circuit.

While it may seem to be obvious, it should be noted that the denial of the

motion for partial summary judgment meant only that the motion was denied.  That

decision did not constitute a determination that Wells Fargo's position could not be

sustained at trial.  Rather, the motion raised disputed issues of fact that in a case

bound for a possible jury trial could not properly be decided in favor of the moving

party at that stage of the proceedings.  Report of the Special Master Report, dated

October 25, 2013.  (Doc 384)

The motion here considered is the second motion directed to the

determination of profit expectations as part of the economic substance doctrine.[9]

However, this motion differs from the prior motion.  It is narrowly focused on

another aspect of the STARS transaction: the treatment of the Bx consideration.

The motion is neither based upon the loan from Barclays nor is it dependent in any

way on the loan or profits that may have been derived from investing the proceeds

of the loan.  Further, the denial of Wells Fargo's prior motion for partial summary

---

[9]  The Government criticizes Wells Fargo's strategy as a piecemeal approach that is calculated to produce distorted results.  The various motions addressed in this Report have been considered with an awareness of these concerns.

judgment based upon the use of the loan proceeds does not affect the analysis of this motion.  As both motions were directed at the same principle and invoke common elements of legal analysis, a portion of the analysis and explanation here will be familiar.

The basic elements and the steps required for the implementation of the STARS transaction have been described in this Report.  Importantly for purposes of the motion here under consideration, as a part of the STARS transaction Wells Fargo was to receive the Bx consideration (a specific amount negotiated by the two banks) every month.  Whether the Bx consideration resulted in the reduction in interest paid by Wells Fargo to Barclays or payment from Barclays to Wells Fargo, the taxable income reported by Wells Fargo (and the affiliates that were included in the preparation of its consolidated tax return) for U.S. income tax purposes was increased.  Wells Fargo's motion here under consideration asks that this effect be recognized and applied primarily in determining whether the STARS transaction has economic substance.  It should be noted that the motion does not ask for a judgment that the economic substance test has been satisfied.

The Government opposes the motion essentially on the grounds that the STARS transaction is a sham, that the Bx amount is simply an "effective  rebate" of U.K. income taxes paid by Wells Fargo (through the U.K. Trust that is included

in its consolidated U.S. tax return) and that the transaction is simply a series of circular payments having no economic substance.  As such, the Bx payment cannot properly be construed to be pre-tax income for purposes of the economic substance test that is part of the sham transaction doctrine.

### 3.  Evolution of the Sham Transaction Doctrine

As noted previously, the sham transaction doctrine is one of several judicially created limitations on the entitlement to tax benefits that have been a part of U.S. income tax jurisprudence for many years.  When such doctrines apply, tax benefits are denied even though the challenged transactions satisfy the technical requirements of the Code and other relevant sources of tax law.

A foundational source of the current version of the sham transaction doctrine is the U.S. Supreme Court decision in Frank Lyon Co. v. United States, 435 U.S. 561 (1978).  In that case, the taxpayer had taken depreciation and other deductions with respect to a building in a sale-leaseback transaction.  The IRS challenged the deductions on the ground that the taxpayer was not the real owner of the building (a substance-over-form line of analysis).  The District Court held  the tax benefits being contested to be allowable.  The Court of Appeals for the Eighth Circuit reversed that decision and held for the IRS.  The Supreme Court noted that the Eighth Circuit had undertaken "its own evaluation of the facts" to support its

decision.  The Supreme Court in turn set forth its own analysis, agreed with the

conclusions of the trial court, reversed the Court of Appeals decision and held that

the sham transaction doctrine did not apply.   In so doing, it outlined the nature of

the sham transaction doctrine in language that has been cited in many later

decisions and is often considered to be the cornerstone articulation of the modern

application of the doctrine:

> " . . . [W]e are not condoning manipulation by a taxpayer through arbitrary
>
> labels and dealings that have no economic significance. . . . In short, we hold
>
> that where, as here, there is a genuine multiple-party transaction with
>
> economic substance which is compelled or encouraged by business or
>
> regulatory realities, is imbued with tax-independent considerations, and is
>
> not shaped solely by tax avoidance features that have meaningless labels
>
> attached, the Government should honor the allocation of rights and duties
>
> effectuated by the parties."[10]

The Court observed that " the underlying pertinent facts [were] undisputed"[11]  and

explained that "[t]he general characterization of a transaction for tax purposes is a

question of law subject to review.  The particular facts from which the

_____

[10]  435 U.S. at 583-4.

[11]   Id. at 563.

characterization is to be made are not so subject."[12]

The Supreme Court decision in the *Frank Lyon* case was interpreted in many courts to contemplate two areas of inquiry that were characterized in some later decisions as a "two-pronged test":  whether the transaction had "economic substance" and whether the taxpayer acted with a "business purpose."

In Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1984), the IRS challenged depreciation and certain interest deductions taken in another sale-leaseback transaction.  The Tax Court ruled for the IRS.  The Court of Appeals affirmed and explained the Supreme Court decision in *Frank Lyon* in the following way:

> "To treat a transaction as a sham [as the Tax Court had held], the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists. . . .  We agree that such a test properly gives effect to the mandate of the Court in *Frank Lyon* that a transaction cannot be treated as a sham unless the transaction is shaped solely by tax avoidance considerations." [13]

---

[12]  Id. at 584, fn 16.

[13]   752 F.2d at 91-92.

The court then affirmed a Tax Court decision that the taxpayer had flunked both

tests:

> "Hence, we affirm as not clearly erroneous the tax court's finding that Rice's
>
> transaction is a sham because Rice subjectively lacked a business purpose
>
> and the transaction objectively lacked economic substance."[14]

The decision in *Rice's Toyota World* has been widely cited as an explanation

of the consequences of *Frank Lyon*.  Different circuit courts of appeal have,

however, applied the two tests in different ways.  Some have held that taxpayers

must pass both tests.  Others have held that the taxpayer must pass at least one of

the tests.  Others have held that the economic substance test must be satisfied

regardless of the taxpayer's subjective intentions.  Still others have held that the

two tests are part of an integrated analysis in determining whether a transaction is a

sham.[15]

In the *IES*[16] case, discussed in detail in the next section of this Report, the

---

[14]   Id. at 95.

[15]   A lengthy summary of the different ways that different circuit courts had dealt with the question of how the two tests apply that has been noted by a number of courts can be found in Gerdau Macsteel, Inc. v. Commissioner, 139 T.C. 67, at 168-69 (T.C. 2012).

[16]   IES Industries, Inc. v. Commissioner, 253 F.3d 350 (8th Cir. 2001).

Court of Appeals for the Eighth Circuit in 2001 concluded that a definitive determination of the posture of the two tests  had not then been made in that circuit.  Moreover, it was unnecessary to make the determination because the transaction had *both* economic substance *and* business purpose.

   A recent decision by the Court of Appeals for the Eighth Circuit confirmed that both tests are applicable in this circuit, but the court again found it unnecessary to indicate whether the taxpayer must prove that both tests have been satisfied. WFC Holdings Corporation v. United States, 728 F.3d 736 (8th Cir. 2013).  In this decision, the court noted again that different approaches to the posture of the two tests  have evolved in different circuits.  The court concluded that the Eighth Circuit "has not yet adopted a particular approach to the sham transaction test" and that it was not necessary to "definitively resolve that issue" because the transaction under review had *neither* economic substance *nor* business purpose.  The decision of the District Court to that effect was affirmed.  The Court of Appeals did not expressly indicate the extent to which it considered the matter to constitute questions of fact or questions of law.

## 4.  Eighth Circuit Precedent: The *IES* Case

   The principal case upon which Wells Fargo's motion for partial summary judgment is based is IES Industries, Inc. v. Commissioner.  253 F.3d 350 (8th Cir.

2001).   In that case the taxpayer, a U.S. corporation, in effect purchased shares of stock in foreign corporations[17] just prior to record dates for dividend distributions. At virtually the same time, the taxpayer contracted to resell the shares back to the original seller on a closing date just after the dividend had been paid.  As a result, the taxpayer was the shareholder on the record date for the dividend distributions. The dividends were distributed to the taxpayer, but were subject to foreign withholding taxes.  The taxpayer thus received a payment equal to the amount of the dividend less the amount of the taxes withheld and paid over to the foreign governments.  Corporations paying the dividends were organized in the United Kingdom, the Netherlands and Norway.  The withholding tax rate in each instance was 15 percent, as authorized by applicable bilateral income tax treaties.

As explained previously in this Report, although such withholding taxes are actually paid by the corporations making the dividend distributions, the taxes are considered to be income taxes imposed on the shareholder to which the dividends are being distributed.  Such withholding taxes on dividend income are generally creditable under the Code.  However, the original owners of the shares were entities, such as pension funds, that were exempt from U.S. tax and that could not

---

[17]   The taxpayer in fact purchased American Depository Receipts, or ADRs, which represent shares of a foreign corporation held in trust by a U.S. bank.

benefit from a foreign tax credit because the credit must be subtracted from income taxes otherwise payable.

The purchase and resale prices of the shares were based upon the market trading price of the stock.  The stock was originally purchased for a price equal to the market plus 85 percent of the dividend (which was the net amount to be received after the withholding tax had been subtracted).  The resale price was the market price of the shares after the dividend had been paid.  In general the difference between purchase and selling price would approximate the amount of the dividend distribution, thereby generating a loss to the taxpayer when the shares were sold.  In addition, certain fees and commissions were paid to an intermediary that effected the transaction and interest was paid because the shares were purchased by the taxpayer on a margin account.  At the end of the related series of steps, the tax exempt entities once again owned the shares in question.

The principal tax results reported by the taxpayer were:

1.  The gross amount of declared dividend was ordinary income (which is the dividend actually paid to the shareholder plus the foreign tax liability satisfied by the withholding mechanism);

2.   A foreign tax credit equal to the withholding tax was claimed;

3.  A short-term capital loss was taken, which derived from the resale

of the stock after the distribution of the dividend.[18]   (Capital losses

may only be deducted against capital gains.  The taxpayer had realized

capital gains in prior years.  The capital losses realized in the

challenged transactions were applied to those capital gains, thereby

generating additional tax savings.)

The net results of the transactions in purely monetary terms were losses.

When the foreign tax credits and capital loss deductions were taken into account,

however, the taxpayer's financial position had been substantially enhanced.  The

Government contended that the transaction was a sham transaction driven by the

desire of a tax exempt entity to market tax benefits to a taxable entity and denied

the availability of the foreign tax credits, the short-term capital losses and the

deduction for the expenses of the transaction.

The case was submitted to the District Court on the basis of stipulated facts

and cross motions for summary judgment.  The District Court granted summary

judgment against the taxpayer and concluded that the transactions constituted

shams that would not be recognized for tax purposes because the transactions

---

[18]   The taxpayer treated commissions as a part of the cost of the shares or as a reduction
of the proceeds of the sale and deducted the interest expense attributable to the margin account.

"were shaped solely by tax avoidance considerations, [and] had no other practical economic effect . . . ."   In reaching its decision, the court compared the income generated by the linked transactional steps to the costs of the transaction, which included the foreign income taxes paid through the withholding mechanism.  The result of this calculation for the taxpayer was a clear financial loss.

As noted previously, the Court of Appeals for the Eighth Circuit observed that the posture of the two-pronged test described in *Rice's Toyota World* had not been determined for that circuit.  It applied both tests and concluded that  the transactions had both economic substance and a business purpose, so it was not necessary to prescribe the relationship between the two tests.  As the transactions were not properly characterized as shams, the decision of the District Court was reversed.  The taxpayer was thus entitled to the foreign tax credits and other tax benefits.

The application of the economic substance doctrine by the Court of Appeals was based in substantial measure upon an examination of the "economic benefit" realized by the taxpayer in the related transactions.  The Government had argued that the foreign taxes should not be considered in this analysis because it was exactly those taxes whose creditability was being challenged:

"The government insists that, 'absent the tax benefits that were the sole

reason for the transactions, each series of ADR trade pairs resulted, as pre-planned, in an economic loss.' . . . Under that view, economic benefit accrues to IES *only* if it receives the foreign tax credit.  In other words, the government would have us regard only 85% of the dividends as income to IES, notwithstanding that the IRS treats 100% as income for tax purposes."

The Court of Appeals disagreed:

"We reject the government's argument and agree with IES that the law supports our contrary conclusion: the economic benefit to IES was the amount of the *gross* dividend, before the foreign taxes were paid.  IES was the legal owner of the ADRs on the record date.  As such, it was legally entitled to retain the benefits of ownership, that is, the dividends due on the record date.  While it received only 85% in cash, 100% of the amount of the dividends was income to IES."[19]

The court concluded that the trades "did not, as a matter of law, lack business purpose or  economic substance."[20]

---

[19]  253 F.3d at 354.

[20]  Id. at 356

## 5. *IES* and the STARS Transaction

Wells Fargo's present motion for partial summary judgment is largely based the decision of the Eighth Circuit in the *IES* case. It contends that *IES* has not been modified and must, therefore, be applied by a District Court in the Eighth Circuit. Because the Court of Appeals held "as a matter of law" that the foreign taxes should not be considered as a cost in the calculation of the economic substance (profit expectations) of the transaction, Wells Fargo in this action seeks a ruling at this time that the Bx consideration is appropriately considered to be a pre-tax item of income in determining potential profitability in the context of the economic substance test.

The Government concedes that the Eighth Circuit decision must be followed in litigation before the District Courts of the Circuit, but contends that the *IES* decision does not support the proposition asserted by Wells Fargo in its motion.

The details of the STARS transaction obviously differ from the transactions that occurred in the *IES* case in a number of material respects. It is, therefore, necessary to consider whether these differences might support the conclusion that the Eighth Circuit decision in the *IES* case with respect to the treatment of foreign taxes does not automatically apply to the foreign taxes paid in the STARS transactions.

Several elements of the *IES* decision raise questions about its applicability to the STARS transaction. First, the court explicitly stated that:

> "It also is important to note that these were not transactions conducted by alter-egos of IES or straw entities created by IES simply for the purpose of conducting ADR trades. . . . All of the parties involved–the foreign corporations, the trusts issuing the ADRs, the tax-exempt ADR owners . . . other brokers involved, the counterparties–were entities separate and apart from IES, doing legitimate business before IES started trading ADRs and (as far as we know) continuing such legitimate business after that time."[21]

Some of the entities involved in the implementation of the STARS transaction were created specifically to implement the transaction. Moreover, at a hearing with respect to an earlier motion, counsel for Wells Fargo was not certain whether such entities continued to exist after the STARS transaction was completed.[22]

The court in the *IES* case also emphasized that:

> "'[T]he transaction[s] must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant.' *Comm'r v. Court Holding Co.*, 324 U.S. 331 . . . (1945). Each trade was an

---

[21]  Id. at 356.

[22]  October 14, 2011, Hearing Transcript, page 50.

41

arm's-length transaction: 'what was actually done is what the parties to the transaction purported to do.'  Gran v. IRS (In re Gran), 964 F.2d 822, 825 (8th  Cir. 1992)."[23]

In this respect the court seemed to be relying upon the fact that the prices paid and received for the ADRs in the paired transactions were determined by public trading. In the STARS transaction, Wells Fargo observes that the interest rate arrangements between it and Barclays reflected market interest  rates, but does not contend that the financial arrangement between it and Barclay's with respect to the magnitude of the Bx consideration was fixed by an identifiable and independently determined market rate.  Again, it was a negotiated amount calculated on the basis of U.K. tax benefits expected by Barclays.

Finally, the court in the *IES* case concluded that its decision rested upon a broad analysis of the transactions under review: "We hold, *considering all the facts and circumstances of this case*, that the ADR trades in which IES engaged did not, as a matter of law, lack business purpose or economic substance.[24]

There are differences in the way in which the foreign taxes paid by IES and the U.K. taxes effectively paid by Wells Fargo occurred.  The foreign taxes paid by

---

[23]  253 F.3d at 356.

[24]  253 F.3d at 356 (emphasis added).

IES (through the withholding mechanism in place in the foreign countries) took place as the dividend income was distributed by foreign corporations to IES as a shareholder.  In other words, once IES was a shareholder of the foreign corporation on the dividend date and once a withholding obligation had been satisfied by the foreign corporation (paying a tax imposed upon IES as the shareholder), then IES was a domestic taxpayer that had paid a foreign creditable tax.  This conclusion was, moreover, supported by an early "classic" decision of the U.S. Supreme Court in which the Court held that the payment by a corporation of its president's income taxes constituted income to the president.  Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929).

In the STARS transaction, Wells Fargo placed existing U.S. assets into a U.K. Trust solely for the purpose of subjecting such income to the U.K. income tax. Like IES, Wells Fargo's rationale for such an apparently peculiar decision was that it would realize economic benefits from doing so.  As indicated,  Wells Fargo in its previous motion identified the use of the proceeds of the loan from Barclays as providing such economic benefits and moved for a partial summary judgment based upon a comparison of the net cost of the loan and other costs of the transaction with its average return on investments (an argument that will presumably be made to the jury at trial).  Wells Fargo now proffers an alternative financial benefit argument to

support the argument for economic substance: the Bx consideration paid by

Barclays to Wells Fargo either as a reduction in interest paid to Barclays or as an

occasional payment from Barclays.

Certain facts are clear and undisputed.  Wells Fargo chose to subject U.S.

assets that it owned and controlled to U.K. income tax.  The assets had no

connection with the United Kingdom.  The U.K. tax was imposed because the trust

was a U.K. resident under U.K. law because it had a U.K. trustee.   Income tax

treaties between the United States and the United Kingdom authorized treatment of

the trust as a U.K. resident if U.K. law so provided.  The U.K. Trust was treated as a

part of Wells Fargo for purposes of its consolidated U.S. tax return.  The U.K. Trust

(and, therefore, Wells Fargo) was subjected to and paid U.K. income taxes at the

rate of 22 percent.  Under the terms of the U.K. Trust arrangement, Barclays was

treated under U.K. tax law as the recipient of almost all of the after-U.K.-tax

income.  For U.K. tax purposes, Barclays was thus treated as having realized

taxable income equal to the U.K. Trust income so allocated plus the U.K. tax

attributable thereto.  The total income deemed to have been so realized was subject

to a U.K. income tax in the hands of Barclays at a rate of 30 percent.  Barclays was

entitled to a credit against that tax equal to the 22 percent  U.K. tax paid (or owing)

by the U.K. Trust that was attributable to the trust income so allocated.  Most of the

trust income "distributed" to Barclays was not in fact paid to Barclays.  Rather, it

was treated as a deposit in a blocked account maintained by Wells Fargo and then

treated as an additional contribution to the U.K. Trust by Barclays that would enure

to the benefit of Wells Fargo at the end of the transaction.  Wells Fargo effectively

borrowed $1.25 billion from Barclays at an interest rate of LIBOR plus .2 percent.

Barclays then paid consideration on a regular basis to Wells Fargo equal to

approximately 47.5 percent of the U.K. income taxes paid by U.K. Trust. This was

the Bx amount.

## 6.  Role of U.K. Law in Determining This Motion

Wells Fargo has twice moved under FRCP 44.1 for determinations of U.K.

law that it contends are necessary for the resolution of issues raised in this case.

The prior motion was denied with leave to raise such arguments in the context of

specific issues.  The renewed motion, as explained previously in this Report, is

being addressed in the context of specific motions being considered in this Report.

Wells Fargo here urges  that it is necessary to address a number of potentially

contested determinations of U.K. law in order to rule on this motion for partial

summary judgment.  During the Hearing with respect to this motion, Wells Fargo

submitted that the following determinations were appropriate and necessary:

1.     The U.K. Trust qualified as a Collective Investment Scheme under

U.K. law and was "unauthorized unit trust."

2.     Because the trust was an unauthorized unit trust under U.K. law, the

U.K. trustee was subject to a U.K. income tax of 22 percent.

3. and 4"The specific aspects of the transaction, Rigil and the D unit, ensured

– or were designed to ensure - - that the arrangement was a CIS."

5.     "Under U.K. law the income arising on the assets held in the trust

[included] any income from the securities held directly in the trust

including distributions on the Sirius shares."

6.     The U.K. income tax owed by the U.K. trustee on the income arising

on the assets held in trust was a liability of [the] U.K. trustee and not of

any of the unit holders.

7.     By operation of U.K. law Barclays was deemed to receive annual

payments from the U.K. trustee equal to the income available for

distribution.

8.     Barclays was subject to U.K. corporation tax at rate of 30 percent on

deemed annual payments.

9.     Barclays was entitled to a U.K. tax credit of 22 percent.

10.    Barclays could claim the credit against either of two U.K. tax

obligations.

46

11.    Barclays could deduct payments of further subscription amounts to the

trust for the Class E Unit.[25]

The Government argues that such determinations are unnecessary.[26]  We

agree with the Government.   Wells Fargo, while considering the STARS

transaction, was responding to representations about the application of U.K. law in

particular to the U.K. Trust and to Barclays.  If tested, these representations may or

may not have been correct.  They were not tested because the U.K. tax authorities

chose not to challenge the benefits asserted by Barclays in the various STARS

transactions in which it participated.  In any event, the issues raised by the Bx

motion here considered are directed to the expectations of Wells Fargo at the time

the transaction was negotiated and concluded.  Those expectations are not contested

by the Government in this case.  Indeed, the very same expectations form a major

element of the Government's rationale for denying tax benefits to Wells Fargo.

## 7.  Analysis of the Bx Consideration

The appropriate response to the motion here under consideration obviously

requires a determination of the origin of the foreign tax credits that are in issue.

They clearly derive from the subjection of U.S. assets to a foreign tax.  If no assets

---

[25]  March 19, 2014, Hearing Transcript,  pages 28-40.

[26]  March 19, 2014, Hearing Transcript, page 111.

were contributed by Wells Fargo to the U.K. Trust, no U.K. income tax liability would have been incurred.

If the analysis were to stop at this point, there could be no economic substance to the transaction. Wells Fargo realized no income from the U.K. Trust itself that would not otherwise have been realized from the previously owned assets contributed to the trust. Whether or not the U.K. taxes themselves should be considered to be costs, there were substantial transactional costs involved. If marginal revenue is zero and there are *any* costs, no profit is possible.

It would, however, be inappropriate to end the analysis at this juncture. Even the Government does not argue for such an approach. While not deciding at this point whether the loan constitutes a separate transaction for purposes of the sham transaction analysis, it must be noted that Wells Fargo was clearly paid for establishing the U.K. Trust, undertaking the other steps to implement the STARS transaction and for submitting U.S. income to the grasp of the U.K. tax administration. That compensation came in the form of the Bx consideration.[27]

The Government contends that the Bx consideration proves the STARS transaction to be a sham in large measure because of the view that Barclays bore a

---

[27] This conclusion is quite consistent with a statement set forth in the Government's Memorandum in Opposition to this Motion: "The evidence establishes beyond doubt that Barclays made the Bx payments to compensate Wells Fargo for subjecting its income from its U.S. based assets to a U.K. tax." Memorandum, page 34.

portion of the economic incidence of the U.K. tax.  But the Government's position

is not limited to the portion of the U.K. tax that was not borne by Wells Fargo.

That position seems strained in light of the clear authority for the proposition

(evidenced in the regulations and judicial decisions cited previously) that a foreign

tax credit is not denied even when an unrelated foreign party to the transaction pays

100 percent of the foreign tax for the U.S. taxpayer--not merely 47.5 percent as in

this case.

The Government's position would seem to invite the conclusion that the use

of a mechanism such as the U.K. Trust would not be a sham if no consideration was

received from another party.  For example, suppose that a U.S. corporation was in

an excess credit position and chose to establish a trust in a low–tax country with a

treaty having the same provisions as the U.S.-U.K. tax treaties for the sole purpose

of trying to use the excess credits.  When asked whether the possible use of a

foreign trust for such tax avoidance purposes would be considered to be a sham, the

Government declined to respond, noting that such a transaction was factually

different from the STARS case.[28]

The example is, of course, materially different from the STARS case.  In

STARS, Wells Fargo was paid the Bx consideration for taking the steps necessary

---

[28] March 19, 2014, Hearing, pages 128 et seq.

to implement the transaction.  If a U.S. corporation were able to place U.S. assets in

a foreign trust solely to enlarge its entitlement to foreign tax credits, the only

financial return would be those enlarged tax credits.  This suggests that any

vulnerability in the STARS transaction is primarily attributable to the use of the

U.K. Trust itself and not to the compensation paid by Barclays to Wells Fargo

(albeit measured by reference to the magnitude of U.K. income taxes paid by the

U.K. Trust).

Neither counsel nor the Special Master has been  able to cite a case in which

the "pure" use of a foreign trust to achieve tax benefits has been contested.  It thus

seems appropriate to consider the Bx consideration to be income to Wells Fargo at

least for purposes of applying the economic substance test.  The Bx consideration,

after all, increases the taxable income to Wells Fargo, one way or another.  As a

result, the total income tax burden on Wells Fargo is increased, even though a

portion of that income tax burden is attributable to the payment of U.K. income

taxes.

This result places the STARS transaction on a dramatically different footing

from almost all other cases involving the sham transaction doctrine.  In most of

those cases, the taxable income of the taxpayer has been reduced, usually by

questionable deductions or losses.  In this case, the taxable income of Wells Fargo

has been increased even without considering any profits generated from the use of

the loan proceeds.  But tax credits are, of course, arithmetically different than tax

deductions exactly because credits do not reduce taxable income.  There follows a

summary of the limited number of decisions in which the sham transaction doctrine

has been used to challenge foreign tax credits.

**8.  Challenges to Foreign Tax Credits under "Common Law" Doctrines**

The sham transaction doctrine and other "common law" defense mechanisms

have been asserted to challenge foreign tax credits in very few cases.  One, of

course, is the *IES* case determined by the Court of Appeals for the Eighth Circuit

and discussed in detail in an earlier portion of this Report.  In the same year, another

court of appeals ruled on virtually the same transaction.  Compaq Computer Corp.

v. Commissioner, 277 F.3d 778 (5th Cir. 2001), involved a transaction almost

identical to the *IES* transactions.  The taxpayer purchased ADRs representing

ownership of stock in a foreign corporation just prior to a dividend distribution.

The dividends were paid, but were subject to foreign withholding taxes.  The shares

were immediately resold after the dividends had been paid.  The transaction was

proposed by a firm specializing in arbitrage transactions.  The purchase price of the

ADRs was about $887.6 million.  The ADRs were resold for about $868.4 million.

The gross dividend was about $22.5 million, but $3.4 million was paid in

withholding tax to the Netherlands.  The cost of the transaction was about $1.5 million.  The resulting capital losses were used to offset capital gains.

As in the *IES* case, the IRS denied the tax benefits of the transaction on the ground that the arrangements constituted a sham transaction.  The Tax Court ruled in favor of the IRS and disallowed the gross dividend income, the foreign tax credit, the capital losses and the claimed deductions for expenses.  The court of appeals reversed, expressly agreeing with the analysis of the Eighth Circuit in the *IES* case. The court proffered the following explanation of the mix of legal and factual issues that inhere in the application of the sham transaction doctrine.

"The general characterization of a transaction for tax purposes is a question of law subject to review.  The particular facts from which the characterization is to be made are not so subject.  . . . This is true even though the Tax Court has characterized some of its determinations as "[u]ltimate findings of fact."[29]

The Government in this case cites Pritired 1, LLC v. United States, 816 F. Supp. 2d 693 (S.D. Iowa 2011), as an analogous case in which a taxpayer's entitlement to foreign tax credits was successfully challenged.[30]  The case involved

---

[29]  277 F.3d at 781.

[30]   March 19, 2014, Hearing Transcript, pages 153-4.

a complex arrangement that included the establishment of a partnership with French banks in which U.S. corporations were allocated foreign tax credits. The District Court reached its conclusion on several grounds. One ground was that the supposed "equity investment" upon which the foreign tax credits were based was in substance "debt" which would not support the allocation of credits. So the substance of the transaction prevailed over its form. But the court also added the conclusion that the transaction in question did not pass either the economic substance or business purpose test cited and applied in *IES*. No appellate court decision has been rendered in that case.

Three courts have addressed challenges by the government to STARS transactions undertaken by other banks. While none of the three is determinative of this case, they have been cited by both parties (for obviously different propositions), so it is appropriate to note them here. The Tax Court and the U.S. Court of Federal Claims ruled in favor of the government after a trial in each case. The District Court for the District of Massachusetts granted a motion by the taxpayer for partial summary judgment that the Bx payment constituted pre-tax income.

In Bank of New York Mellon Corp. v. Commissioner, 140 T.C. 15 (2013), a STARS transaction challenge was tried in the Tax Court. The Tax Court stated that "The ultimate determination of whether a transaction lacks economic substance is a

question of fact."[31]  It applied the approach used in the Second Circuit (to which any

appeal would be taken) that considered both the objective and subjective tests

together (rather than as separate and distinct "prongs") in deciding whether a

transaction is a sham.  It concluded that the transaction was a sham and that tax

benefits be denied to the bank.  Although stating that it was not required to do so

under the approach employed in the Second Circuit, the Tax Court went on to

conclude that the transaction lacked both economic substance and a business

purpose.  The court explicitly stated that it was not bound by the *IES* decision of the

Eighth Circuit or the *Compaq Computer* decision of the Fifth Circuit.[32]

The Tax Court concluded that the legislative intention of the Congress in

enacting the foreign tax credit provisions did not extend to the STARS transaction:

"The STARS transaction was a complicated scheme centered around

arbitraging domestic and foreign tax law inconsistencies.  The U.K. taxes at

issue did not arise from any substantive foreign activity.  Indeed, they were

produced though pre-arranged circular flows from assets held, controlled and

managed within the United States.  We conclude that Congress did not intend

---

[31]  140 T.C. at page 33.

[32]  140 T.C. 35 at footnote 9.

to provide foreign tax credits for transactions such as STARS."[33]

The U.S. Court of Federal Claims also ruled in favor of the government after a trial in a  STARS transaction case.  Salem Financial, Inc. v. United States, 112 Fed. Cl. 543 (2013).  The court applied a substance-over-form analysis,  held that the transaction had neither economic substance nor non-tax business purpose, and concluded that the Bx payments constituted a "U.S. tax effect" which was a rebate of U.K. taxes to the taxpayer.

In the third judicial decision that has been rendered in connection with a STARS transaction, the District Court in Massachusetts granted a motion for partial summary judgment on the ground that the Bx payment constituted pre-tax income to the taxpayer in determining whether it had a reasonable prospect of profit in the transaction.  Santander Holdings USA, Inc. v. United States, 977 F.Supp. 2d 46 (2013).  The court explicitly rejected the argument that the Bx consideration constituted a rebate of U.K. taxes to the taxpayer.  It cited both *IES* and *Compaq Computer* in support of its decision.

All three cases are being appealed as this Report is being written.  Again, these decisions are not binding for purposes of this case.

---

[33]  Id. At page 47.

## 9.  The Impact of Treaty Law

Wells Fargo contends that tax treaties in force between the United States and the United Kingdom explicitly authorized the United Kingdom to impose a tax on the income of the U.K. Trust and obligated the United States to grant a foreign tax credit in respect of such U.K. taxes.  Two treaties are relevant to these contentions: a treaty concluded in 1975 applied to the first months of the STARS transaction in 2003; and a successor treaty signed in 2002 that came into force during 2003 and applied during the remainder of the implementation of the STARS transaction.  In some instances they are referred herein collectively as "the Treaties."

An income tax treaty is essentially a deal between two governments that allocates primary taxing jurisdiction between them.  Such treaties commit both governments to take steps (either by exempting income or providing credits) to mitigate double taxation when the other country has permissibly taxed a resident of the treaty partner.  The failure to satisfy the commitment in a treaty is generally regarded as a violation of international law by the treaty partner.

The Treaties shared some common provisions relevant to the treatment of the STARS transaction.  Article 4(1)(a)(i) of the 1975 Treaty defines a "resident of the United Kingdom" to include "a . . . trust . . . to the extent that the income derived by such . . . trust is subject to United Kingdom tax as the income of a resident, either in

56

its hands or in the hands of its . . . beneficiaries."  Article 3(1)(a) of the 2002 Treaty

defines a "person" to include a "trust."  Article 3(1)(j)(ii)(B) defines a "national" of

the United Kingdom to include "any . . . entity deriving its status as such from the

laws in force in the United Kingdom."  The parties to this dispute agree that the

U.K. Trust was treated as a U.K. person under the laws of the U.K.

The Treaties authorize the United Kingdom to "tax its residents . . . and its

nationals as if this Convention had not come into effect."  Article 1(3) of the 1975

Treaty; Article 1(4) of the 2002 Treaty.

The Treaties commit the United States (with certain exceptions not here

relevant) to allow a credit for U.K. income taxes permissibly imposed on U.S.

domestic taxpayers under the Treaties.  Article 23(1) of the 1975 Treaty; Article

24(1)(a) of the 2002 Treaty.

As a result of the Treaties, the deal was that the U.K. could, if it chose to do

so, tax all of the income of trusts that were regarded as U.K. residents under U.K.

law.  The Government does not challenge that proposition.  However, the

Government argues that treaty provisions cannot apply to a transaction with no

substance (such as a sham transaction).   In support of that position, it cites the

Technical Explanation of the 2002 Treaty issued by the U.S. Treasury Department,

which included the following cautionary note:

"Article 23 and the anti-abuse provisions of domestic law complement each other, as Article 23 effectively determines whether an entity has a sufficient nexus to the Contracting State to be treated as a resident for treaty purposes, while domestic anti-abuse provisions (e.g., business purpose, substance-over-form, step transaction or conduit principles) determine whether a particular transaction should be recast in accordance with its substance."

The impact of this portion of the Technical Explanation to this case is not self evident.  It refers to Article 23 of the treaty, which deals with the problem of "treaty shopping," and contains the so-called "limitation of benefits" provision.  Such provisions have become a standard element of bilateral tax treaties concluded in the past several decades.  Their purpose generally is to defend against the unacceptable exploitation of treaty benefits by nonresidents of the treaty country, for example, through simply organizing investments and/or  businesses in corporations organized in the treaty country (thus the term "treaty shopping"). However, it is Article 24 of the 2002 treaty that obligates the United States to give a credit for income taxes properly imposed by the United Kingdom as authorized by the treaty.  It is not clear whether the Technical Explanation refers to that U.S. obligation and other parts of the treaty as well as Article 23.

There is a second ambiguity as well.  The Technical Explanation refers to the issue of "substance over form."  As noted previously, Wells Fargo reported the STARS transaction on the basis of its substance, rather than its form.  In the *Bank of New York Mellon* case, the Tax Court explicitly concluded that the Treaties  did not protect the taxpayer in that case because "U.S. tax laws and treaties do not recognize sham transactions or transactions that have no economic substance as valid for tax purposes."[34]  The Federal Claims Court did not address the status and effect of the Treaties in its decision in the *Salem Financial* case.

The application of treaty benefits has been rejected in some cases on the basis of judicially created doctrine.  The Tax Court opinion in the *Bank of New York Mellon* case cited Del Commercial Properties, Inc. v. Commissioner, 251 F.3d 210 (D.C. Cir. 2001), in support of its ruling.  In that case a U.S. corporation borrowed from a related Dutch corporation that in turn borrowed from a Canadian corporation.  Interest was thus paid by the U.S. borrower to a Dutch lender.  The Dutch company then paid interest to the Canadian lender.   Under the Code, such interest paid by a U.S. borrower to a foreign lender is generally subject to a 30 percent withholding tax.  However, the U.S.-Netherlands Treaty exempted interest payments from a U.S. borrower to a Dutch lender.  The U.S.-Canada Treaty reduced

---

[34]  140 T.C. at page 48.

withholding rates, but did not exempt such interest payments from the withholding

tax. The court applied the step-transaction doctrine (another example of the

"common law of taxation") to treat the transaction as an interest payment from a

U.S. borrower to a Canadian lender that was subject to a withholding tax. The court

explained:

> ". . . [I]f the sole purpose of a transaction with a foreign corporation is to
>
> dodge U.S. taxes, the treaty cannot shield the taxpayer from the fatality of the
>
> step-transaction doctrine. For the taxpayer to enjoy the treaty's tax benefits,
>
> the transaction must have a sufficient business or economic purpose."[35]

Although not arising under the U.S-U.K. Treaties, the *Del Properties* case seems

clearly to come within the ambit of the portion of the Technical Explanation cited

by the Government. Other cases have applied a similar step-transaction analysis to

deny treaty benefits where an intermediary entity has been established in a treaty

country and used to avoid U.S. withholding taxes. See, e.g., Aiken Industries, Inc.

v. Commissioner, 56 T.C. 925 (1971).

The step-transaction doctrine has not been asserted in this case.

## 10.  Factual Disputes

As indicated previously, the earlier motion by Wells Fargo directed to the

---

[35]  251 F3d at 214.

economic substance of the transaction was narrowly limited to the profitable

investment of the loan proceeds.  That motion was rejected because it raised a

number of factual issues, including the linkage between the loan and the use of the

U.K. Trust and the relative financial benefits of the arrangement to Wells Fargo.

With respect to such questions, the Court of Appeals in the *IES* case had

emphasized that "all of the facts and circumstances" must be weighed in applying

the sham transaction tests.

Wells Fargo argues that this particular motion is sharply focused and raises

no relevant factual issues.   The issues specifically cited by the Government and

characterized as factual include the differences between the form and substance of

the transaction; whether Wells Fargo did what it purported to do; differences

between STARS and the IES transaction; the effect of using special purpose

entities; the role of artificial features in implementing the transaction; and the

impact of the "make whole" provisions (which would come into play in some

circumstances if anticipated results for the transaction were not realized).   The

Government further argues that the transaction was a tax shelter driven by tax

considerations; the Bx amount was an "effective rebate" of the U.K. tax; the

transaction had been marketed as a tax shelter by KPMG and Barclays to banks and

other U.S.  corporations; and the net financial consequences (putting aside the usage

of the loan proceeds) was a clear loss when the costs of the transaction including the unnecessarily incurred U.K. income taxes were compared to the zero additional income realized by Wells Fargo from the use of the U.K. Trust (as all of its income would have been realized by Wells Fargo in any case).

The Government's arguments clearly raise questions about the transaction. However, after careful consideration, these arguments do not persuade that there are material factual differences with respect to the calculation, substance and effect of the Bx consideration. Accordingly, a determination of the motion here under consideration is not prohibited by FRCP 56.

## 11.  Decision:  Plaintiff's Motion for Partial Summary Judgment is Granted

Wells Fargo argues that the Bx consideration was an unconditional payment which Barclays was required to make under the applicable contracts. Therefore, it concludes, the Bx payment cannot properly be regarded as conditioned upon the realization of tax benefits. While the terms of the contracts appear so to provide, the virtually unlimited ability of either party to terminate the transaction on very short notice (5 to 30 days) suggests that it would be unrealistic to conclude that this factor was an appropriate basis for ruling in favor of Wells Fargo.

Unlike most of the tax shelter cases that have been cited in these proceedings, Wells Fargo realized benefits from the STARS transaction because it was paid by

Barclays for its participation in the deal.  The payment came in the form of the Bx

consideration.  As a result of the Bx consideration, the taxable income of Wells

Fargo was increased.   Its income tax burden was also increased, even though a

portion was paid to the United Kingdom.  It must be emphasized again that this

conclusion is reached without reference to Wells Fargo  profits arguably supported

by the loan proceeds (which was the subject of its earlier motion).

No legal authority has been cited or found to support the view that payments

from one bank to another constitute tax rebates or tax refunds.  It is absolutely clear

that the magnitude of the Bx clearly was derived by reference to anticipated U.K.

tax benefits to Barclays, but that reference does not convert the private payment into

some kind of government disbursement or refund.

Wells Fargo frequently cites the decision of the U.S. Court of Federal Claims

in Doyon v. United States.  37 Fed.Cl. 10 (1996), rev'd on other grounds, 214 F.3d

1309 (Fed. Cir. 2000)   In that case, the government successfully argued to the trial

court that a payment by another corporation to an Alaska Native Corporation in

return for the use of net operating loss carryovers and tax credits was not treated as

a tax rebate or refund to the taxpayer even though the actual use of those loss

carryovers would have reduced its tax liability.   We note, but do not rely upon, that

decision here as it was focused upon a particular statutory provision that does not

arise in this case.  More telling is the absence of any legal authority (other than the

decisions in two of the three other STARS cases)  for the conclusion asserted here

by the Government that a payment by one bank to another is a tax rebate.

It should also be noted that the treatment of the Bx consideration as income

(rather than a rebate or refund of taxes) does not necessarily mean that the economic

substance test has been satisfied.  The Government bases it challenge in part upon

the ground that nothing foreign actually happened in the STARS transaction.  There

was no substance to the use of the U.K. Trust as all of the income was  derived from

the United States.  There were no meaningful distributions ever made from the U.K.

Trust to Barclays.  The transaction was implemented through circular bookkeeping

entries of the type criticized by the court's language in the *IES* case.   Since nothing

foreign happened to generate the foreign taxes, the transaction must be a sham.  In

that sense, this is truly a case of first impression.  The decision on the specific

motion here under consideration does not address these arguments.

The Government  makes a further argument that the face amount of the

interest obligation on the loan from Barclays (not counting the impact of the Bx

consideration) was higher than the rate of interest otherwise available and usually

paid by Wells Fargo.  It must be noted that this places the Government in a

somewhat ambiguous  position.  It has argued forcefully that the loan arrangement

is separable from the trust for purposes of applying the sham transaction doctrine

(the bifurcation argument).  In any event, while a comparison of the cost of the loan

to alternative sources of capital may raise relevant issues in the case, it does not

alter the appropriate characterization of the Bx consideration.

There appears to be no authority with respect to the consequences of simply

using a foreign trust to exploit treaty provisions to generate foreign tax credits.

Taking into account the considerations outlined here and the arguments advanced in

the written submissions and oral arguments of the parties, the decision of the Eighth

Circuit in the *IES* case and the absence of contrary authority, Wells Fargo's motion

for partial summary judgment that the Bx consideration is properly considered to be

pre-tax income is GRANTED.  An Order giving effect to this decision is being

transmitted herewith.

## VI.   Motion That the STARS Transaction Had a Business Purpose

## 1.  The Motion

Wells Fargo has moved (Doc 401) for "partial summary judgment that the STARS transaction was motivated by an economic purpose outside of tax considerations."   The purpose of this motion is to address the so-called "business purpose" test that (along with the "economic substance" test discussed in the prior sections of this Report) has evolved as an element in the application of the sham transaction doctrine.  For the reasons set forth below, the motion is denied.

## 2.  The Business Purpose Test

As indicated previously, a foundational source of the current version of the sham transaction doctrine is the U.S. Supreme Court decision in Frank Lyon Co. v. United States, 435 U.S. 561 (1978).  That case was discussed in detail in a prior section of this Report.  The Supreme Court decision in the *Frank Lyon* case was interpreted in many courts to contemplate two areas of inquiry that were characterized in some later decisions as a "two-pronged test":  whether the transaction had economic substance and whether the taxpayer acted with a business purpose.   These factors have been applied in different ways in different circuits.  Some have held that taxpayers must pass both tests.  Others have held that the taxpayer must pass at least one of the tests.  Others have held that the economic

substance test must be passed.  Still others have held that the two tests are part of an

integrated and not clearly differentiated analysis in determining whether a

transaction is a sham.

In 1990, the Court of Appeals for the Eighth Circuit proffered the following

formulation, citing *Frank Lyon* and *Rice's Toyota World*:

> " . . . [A] transaction is a sham if (1) it is not motivated by any economic
>
> purpose outside of tax considerations, *and* (2) is without economic substance
>
> because no real potential for profit exists."[36]

This formulation suggests that a transaction is a sham only if both tests have been

flunked.  However, in the *IES* case, discussed in detail in the previous section of

this Report, the Court of Appeals for the Eighth Circuit concluded that a definitive

determination of the posture of the two tests  had not then been made in that circuit.

The relatively recent decision by the Court of Appeals for the Eighth Circuit in

*WFC Holdings* confirmed that both tests are applicable in this circuit, but the court

again found it unnecessary to indicate whether the taxpayer must prove that both

tests have been satisfied

The reason why the court in *IES* and *WFC Holdings* was not required to

specify the method of applying the two tests or describing how they might differ

---

[36]  Shriver v. Commissioner, 899 F.2d 724 (8th Cir. 1990), at 725-26 (emphasis added).

was that the two tests generated the same answers.  In *IES*, the court found that

there was both economic substance and business purpose.  In *WFC Holdings*, the

court found that there was neither economic substance nor business purpose.  In fact

the difference between the two tests is not always readily ascertainable because

courts almost always seem to answer the two questions in the same way.

The two prongs of the sham transaction doctrine are sometimes described as

the objective (profit expectations) and subjective (business purpose) test.  As the

subjective test, the existence of a business purpose raises a clearly factual question.

The business purpose test was articulated by the Eighth Circuit in the *Shriver* case

(again citing *Frank Lyon)* in the following way:  ". . . [A] transaction is a sham if it

is not motivated by *any* economic purpose outside of tax considerations. . . ."  The

court (further quoting *Frank Lyon*) stated that the test asked whether a taxpayer's

motivation in concluding a transaction was "shaped *solely* by tax avoidance

features."[37]  In any event, it is generally accepted that the presence of a tax motive

will not disqualify the transaction if non-tax motives are also present.

The two prongs of the sham transaction test are thus often mentioned, but the

difference between them is almost never fully explained.  Neither party cites a case

in which a court finds a business purpose, but no economic substance or economic

---

[37]  899 F.2d 724, 725 (8th Cir. 1990).

substance, but no business purpose.  One possible construction is that any transaction that passes the economic substance test (based upon reasonable  profit expectations) is by definition motivated by a business purpose.  In that event, the subjective test would only become relevant if there was no economic substance.  If that analysis is appropriate, however, it would be reasonable to expect clear authority to that effect.

The *IES* case provided just such an opportunity.   Having concluded that the transactions had economic substance, the court could have announced that the business purpose test had thereby been satisfied.  Instead, the court went on to explain why the business purpose test had been satisfied by describing some of the steps taken by IES leading to the conclusion of the challenged transactions:

"As for the business purpose test, the *Shriver* court explained that the proper inquiry is 'whether the taxpayer was induced to commit capital for reasons only relating to tax considerations or whether a non-tax motive, or legitimate profit motive, was involved'. . . . In other words, the business purpose test is a subjective economic substance test. . . . The *Shriver* Court considered the district court's 'subjective analysis of the taxpayer's intent' and the court's review of such factors as the depth and accuracy of the taxpayer's investigation into the investment. . . . To the extent the taxpayer's subjective

intent is material, we too will consider factors that are arguably relevant to
the inquiry.  We do so, however, mindful of the fact that '[t]he legal right of a
taxpayer to decrease the amount of what otherwise would be his taxes, or
altogether avoid them, by means which the law permits, cannot be doubted.'
Gregory v. Helvering, 293 U.S. 465 . . . (1935).  A taxpayer's subjective
intent to avoid taxes thus will not by itself determine whether there was a
business purpose to a transaction.

 "In their briefs, both parties discuss the risk of loss inherent in the
trades, evidently presuming that the degree of risk goes to IES's subjective
intent in engaging in the transactions.  The government argues that the
transactions must be characterized as shams because there was no risk of loss.
We disagree.  The risk may have been minimal, but that was in part because
IES did its homework before engaging in the transactions."[38]

The court noted that IES officials had met with representatives of an intermediary,
studied the materials provided and consulted with outside accountants and its
securities counsel with respect to the legality of the transactions and tax
consequences.  Further IES had rejected some of the proposed trades.

 The court concluded:

---

[38]  253 F.3d at 355.

"We are not prepared to say that a transaction should be tagged a sham for tax purposes merely because it does not involve excessive risk.  IES's disinclination to accept any more risk than necessary in these circumstances strikes us as an exercise of good business judgment consistent with a subjective intent to treat the ADR trades as money-making transactions." [39]

The recent decision of the Eighth Circuit in the *WFC Holdings* case, provided further insight into appropriate methodology for determining whether the business purpose test was satisfied.  As indicated previously, the court stated again that the relative posture of the two tests had not been determined for the circuit.  However, after concluding that the challenged transaction in question had no economic substance, the court proceeded to consider whether there was a business purpose for it.  One might reasonably infer from the court's analysis that the existence of a business purpose might have produced a decision for the taxpayer despite the absence of economic substance.

The court addressed the possible existence of a business purpose by summarizing and analyzing the taxpayer's asserted business rationales for the transactions.  The taxpayer had argued that the transactions were motivated by a

---

[39] Id. at 355.

desire to avoid certain governmental regulations, to strengthen its hand with good bank customers and to create management efficiencies.   The court of appeals rejected challenges to the trial judge's methodology in addressing the issue and concluded that "the district court did not err in finding that WFC failed to prove by a preponderance of the evidence" that any of the reasons asserted by the taxpayer were its business purpose.

**3.  Arguments For and Against  Business Purpose for the STARS Transaction**

Wells Fargo urges two grounds to support its motion that there were non-tax motives leading to its participation in the STARS transaction.  It relies heavily upon the $1.25 billion loan from Barclays as proof of a non-tax economic purpose.  It contends that the  need to finance the banking activities in which it was engaged demonstrates a very common non-tax purpose for the transaction, a proposition that would apply to any banking business.

Alternatively, Wells Fargo contends that the receipt of the Bx consideration analyzed in the previous section of this Report proves the existence of a non-tax business purpose.

Wells Fargo contends that there is no factual dispute with respect either to the existence of the loan or the realization of the Bx consideration.  Therefore, it concludes that it has demonstrated that the STARS transaction was not undertaken

"solely" for purposes of tax avoidance, and that it was clearly motivated by "any economic purpose outside of tax considerations."   It asserts, therefore, that the motion here under consideration must be granted as a matter of law.

As with respect to other motions addressed in this Report, the Government contends here that the loan must be separated from the use of the U.K. Trust for purposes of applying the sham transaction doctrine.  Therefore, it argues, the loan and the use of its proceeds are not proof of a business purpose for the voluntary subjection of U.S. income to U.K. tax through the use of the U.K. Trust.

The Government also contends that there are factual issues that must be answered in its favor under the customary procedure for dealing with summary judgment motions.   Most importantly, it contends that the "only logical inference that can be drawn is that Wells Fargo's only purpose . . . was to obtain U.S. tax benefits."[40]  It argues that the evidence submitted by Wells Fargo, including particularly memoranda prepared for its Board of Directors, is not conclusive with respect to the purpose of the STARS transaction, noting the description of the STARS transaction as a "tax motivated financing transaction."  Wells Fargo cites exactly the same language to prove the existence of dual motivation so that tax considerations are not the "sole" reason for the transaction.

---

[40]  Government Memorandum Opposing Motion, page 2.

The Government's expert witnesses suggest that the cost of the loan from Barclays (not counting the value of the Bx consideration) exceeded the cost of loans from other sources, thereby at least putting into question whether the loan element of the STARS transaction could have been motivated by a business purpose.   This contention, as well as the question of whether the loan is a separate transaction, raises factual questions with respect to the purpose of the loan arrangement.

As indicated earlier, the court in the *IES* case discussed the potential impact on the business purpose test of the degree of risk undertaken by the taxpayer.  It is not clear whey a higher risk suggests a stronger business purpose.  In the STARS transaction, Wells Fargo endured almost no risk as it controlled the income producing assets (less the U.K. taxes paid by the U.K. Trust) at all times.  We do not consider that this aspect of the transaction impairs any finding of business purpose based upon other relevant considerations.

## 4.  Effect of Prior Decisions in This Case

The Government further supports its argument by reference to earlier decisions of the Special Master and a decision of the Court.  In particular, motions by Wells Fargo to disqualify an expert witness and for partial summary judgment that the income supported by the loan proceeds proves the existence of reasonable profit expectations have been denied by the Special Master.  The denial of the

motion challenging an expert witness was affirmed by the Court after a challenge.

Such denials should not be too broadly interpreted.  They simply mean that the

particular motion based upon the particular line of argumentation was denied at the

time each was made.  Neither of those decisions is determinative of the possible

presence or absence of a "business purpose," as that term is used in the context of a

sham transaction analysis.

## 5.  Analysis:  Application of the Business Purpose Test

The issue of motivation is a consummate question of fact.  Answering the

question depends upon identifying the transaction whose motivation is in question.

The Eighth Circuit in *IES* held that the application of the sham transaction doctrine

will depend upon "all of the facts and circumstances."  Whether it is appropriate to

consider that there was only one or more than one transaction in this case depends

upon such an analysis.  The Tax Court held that  bifurcation was appropriate.  The

U.S. Court of Federal Claims held that it didn't matter because the taxpayer lost

either way.  While those decisions are not determinative in this case, they support

the view that a partial summary judgment based upon the loan and the use of the

proceeds of the loan is inappropriate at this time in a case in which a jury trial is

contemplated.

The previous portion of this Report concludes that the Bx consideration

should be treated as pre-tax revenue for purposes of applying the economic substance test.  While that conclusion is not necessarily determinative of the economic substance test because revenue is only one part of the determination of probable profitability, it seems likely on the basis of data to which both parties agree that the transaction as contemplated had a reasonable possibility of profit.  In that event, it seems logical to conclude that there was a business purpose to the transaction.[41]  However, the language of the Eighth Circuit leaves open a line of inquiry.  The *Shriver* court said that the test asked whether a taxpayer's motivation in concluding a transaction was "shaped *solely* by tax avoidance features;" and the *IES* court said ". . . [A] transaction will be characterized as a sham if 'it is not motivated by *any economic purpose  outside of tax considerations.'*" (emphasis added)

The U.S. tax benefits being contested derive from the willingness of Wells Fargo voluntarily to subject income produced by U.S. assets to a U.K. income tax. The Government implies that such an act alone cannot possibly be regarded as a business purpose other than to generate foreign tax credits, and that such a motive

_____

[41]  Such a proposition seems to have be been accepted by Government counsel during a hearing in respect of this motion.  Asked whether "the two motions [economic substance and business purpose] have to be decided exactly the same way," Government Counsel responded "I think in this instance, yes.  On the Bx issue, yes."  March 25, 2014, Hearing Transcript, pages 119- 120.  However, no concession to this effect is found in any of the written submissions of the Government.

cannot be regarded as "outside of tax considerations."   Further, even if the

borrowing has a business purpose, that conclusion does not necessarily extend to

the voluntary subjection of U.S. income to a foreign tax, which is the immediate

source of the foreign tax credits.

There is no question that the STARS transaction was solidly based upon "tax

considerations."  This Report concludes that the Bx consideration was

compensation to Wells Fargo for taking the steps necessary to provide benefits to

Barclays, including the voluntary subjection of its U.S.-source income (as defined

by the Code without considering the impact of the U.K.-U.S. Treaties) to U.K. tax.

While generating revenue for Wells Fargo, the revenue derives from a transaction

having "tax avoidance features" and is motived by "tax considerations," as reflected

in a memorandum prepared for the Board of Wells Fargo that characterizes the

transaction as a "tax motivated financing transaction."  Wells Fargo and the

Government disagree about the meaning of "tax motivation."  The Government

contends that the term refers to the U.S. tax motives of Wells Fargo.  Wells Fargo

contends that the term refers to the U.K. tax motives of Barclays.

## 6.  Decision: the Motion Is Denied

The STARS transaction presents a very unusual vehicle for testing the "two

prongs" of the sham transaction doctrine.  A STARS transaction was accurately

characterized by the Tax Court as "a case of first impression."[42]  As noted

previously, almost all tax shelter cases deal with losses.  In this case, Wells Fargo

has made a profit, albeit a profit that would not be realized if foreign taxes were

regarded as a cost of the transaction.  Unless and until the Eighth Circuit or the

Supreme Court modifies the conclusion in *IES* or concludes that the factual

differences between that case and the STARS transaction require another line of

analysis, one is left at least with the possibility that Wells Fargo made a profit, but

that transactions generating compensation for subjecting U.S. income to foreign tax

do not satisfy the business purpose test.

No authority has been cited or found for the proposition that voluntarily

submitting to the taxation of another country is itself a "business purpose."  It has

not yet been determined whether the STARS transaction passes the economic

substance test.  Even if it has, there is no clear authority for the proposition that a

business purpose exists whenever there is economic substance.

In light of the decisions of the Eighth Circuit that there are two identifiable

tests (albeit without an explanation of their relationship and impact) and in light of

the burden imposed upon the moving party to demonstrate that there are no relevant

factual issues,  the motion here under consideration is DENIED.  This denial should

---

[42]  140 T.C. at 30.

not be regarded as a decision that there is no  business purpose to the STARS transaction.  Rather, it leaves open for further proceedings the question of defining the way in which the "two prongs" of the sham transaction analysis should properly apply and the factual questions attending the intention of Wells Fargo in concluding the transaction.

An Order implementing this decision is attached hereto.

**VII.  Motion for Partial Summary Judgment that Code § 269 Does Not Apply to the STARS Transaction**

**1.  Plaintiff's Motion**

Wells Fargo has moved (Doc 396) under FRCP 56 "for  partial summary judgment that 26 U.S.C.[Code] § 269 does not apply to the STARS transaction as a matter of law."   The Government opposes the motion, effectively arguing that a transaction such as STARS was the reason why Section 269 was enacted by Congress.  For reasons set forth below, the motion is granted.

**2.  Code Section 269**

Section 269(a) of the Code provides that if:

"(1) any person or persons acquire, or acquired . . . directly or indirectly, control of a corporation, or

(2) any corporation acquires, or acquired . . . directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation,

and the principal purpose for which such acquisition was made is evasion or

avoidance of Federal income tax by securing the benefit of a deduction,

credit, or other allowance which such person or corporation would not

otherwise enjoy, then the [IRS] may disallow such deduction, credit, or other

allowance."

Control is defined to be "the ownership of stock possessing at least 50 percent of

the total combined voting power of all classes of stock entitled to vote or at least 50

percent of the total value of shares of all classes of stock of the corporation."

## 3.  Portions of the STARS Transaction Are within the Potential Ambit of Section 269

Three primary questions arise with respect to the possible application of

Section 269:

1.    Are there any acquisitions of control or property as described in the

section?

2.    If so, is the principal purpose of the acquisition the evasion or

avoidance of Federal income taxes by securing tax benefits?

3.    If so, would taxpayers in the transaction have enjoyed the tax benefits

if the acquisitions had not occurred?

There are several transfers made in connection with the implementation of

the STARS transaction that come within the general ambit of Section 269: the

transfer of assets from Wells Fargo to Carnation with a carryover basis and the

acquisition of control of Rigil by Carnation and the transfer of assets thereto.[43]

The Government argues that the principal purpose of the STARS transaction

was the "evasion or avoidance of Federal income taxes."  Its argument does not,

however, focus on the special tax consequences of the acquisition of control or

transfer of assets referred to in the preceding paragraph.  In fact, it concedes that

these are not taxable events because the entities are part of Wells Fargo for purposes

of its consolidated return.[44]   Rather, the Government contends that, since there were

such transfers as part of the implementation of the STARS transaction, the entire

transaction is tainted by Section 269  so that Wells Fargo must be denied the foreign

tax credits and other possible tax benefits arising from it.

Wells Fargo denies that tax evasion or avoidance was the principal purpose

of any portion of the STARS transaction.  However, even if it were (an assumption

necessary for its motion for partial summary judgment),  it argues that the

acquisition of control and asset transfers to which Section 269 is arguably

applicable did not themselves establish entitlement to any tax benefit that Wells

Fargo would not have enjoyed if it had participated directly in the transaction

---

[43]  March 25, 2014, Hearing Transcript, pages 10 and 23.

[44]  March 25, 2014 Hearing Transcript, page 24.

instead of using subsidiary corporations and other controlled entities.   Thus, it

concludes, Section 269 is inapplicable.

## 4.  Application of Section 269: Regulations and Judicial Interpretations

The language of Section 269 is obviously very broad. Regulations

promulgated under Section 269 offer some guidance as to its specific objectives.

Treas. Reg. § 1.269-2(b) provides:

"Under the Code, an amount otherwise constituting a deduction, credit, or

other allowance becomes unavailable as such under certain circumstances.

Characteristic of such circumstances are those in which the effect of the

deduction, credit, or other allowance would be to distort the liability of the

particular taxpayer when the essential nature of the transaction or situation is

examined in the light of the basic purpose or plan which the deduction, credit,

or other allowance was designed by the Congress to effectuate.  The

distortion may be evidenced, for example, by the fact that the transaction was

not undertaken for reasons germane to the conduct of the business of the

taxpayer, by the unreal nature of the transaction such as its sham character, or

by the unreal or unreasonable relation which the deduction, credit, or other

allowance bears to the transaction.  The principle of law making an amount

unavailable as a deduction, credit, or other allowance in cases in which the

effect of making an amount so available would be to distort the liability of

the taxpayer has been judicially recognized and applied in several cases. . . ."

Treas. Reg. §1.269-3(a)(2) provides:

"In either instance [the acquisition of control or carryover basis transfer] the

principal purpose for which the acquisition was made must have been the

evasion or avoidance of Federal income tax by securing the benefit of a

deduction, credit, or other allowance which such other person, or persons, or

corporation, would not otherwise enjoy."

The regulations set forth three examples of transactions to which Section 269

would apply.  The first is a situation in which a corporation with net operating loss

carryovers acquires a profitable business (in the form of an asset acquisition) from

an individual who owns all of the stock of the acquiring corporation so that the

acquisition of the profitable business can absorb the loss carryovers.  Treas. Reg. §

1.269-3(b)(1).

The second example described in the regulations arises when investors form

two or more corporations instead of a single corporation to obtain the benefit of

multiple surtax exemptions under Section 11(c) of the Code or multiple minimum

accumulated earnings credits under Section 535(c)(2) and (3).  Treas. Reg. § 1.269-3(b)(2).

The third example set forth in the regulations involves a taxpayer with high earning assets who transfers them to a newly organized controlled corporation while retaining assets producing net operating losses that are used in an attempt to secure refunds from loss carrybacks.  Treas. Reg. § 1.269-3(b)(3).

In each of the three situations described in the regulations, the denial of tax benefits is directly attributable to the transaction described in Section 269: exploiting net operating loss carryovers; creating multiple surtax exemptions or minimum accumulated earnings credits; and disgorging a profitable business to create an opportunity to seek refunds through the generation of net operating losses. In other words, the acquisition itself created a tax benefit that would not otherwise have been available under the applicable federal income tax laws if the transaction had not occurred.

The Tax Court provided a relatively early interpretation of what is now Section 269. [Section 129 under prior law was identical in all material effects to the current Section 269.]   In so doing, the court noted the statement of legislative purpose that accompanied the adoption of the provision.   In Commodores Point Terminal Corp. v. Commissioner, 11 T.C. 411 (1948),  a controlling interest in

Piggly Wiggly Corporation was sold by an individual shareholder to another (not so successful) corporation wholly owned by the seller.  After the sale, dividends paid by Piggly Wiggly to the new corporate shareholder were eligible for a "dividends received credit" (then available under the Code) that would not have been available on dividends paid to an individual shareholder.

The IRS invoked the authority of then Section 129 to deny the dividends received credit and certain other deductions related to the transaction.  The Tax Court ruled in favor of the taxpayer and provided a lengthy description of the legislative history of the provision:

"Section 129 was introduced at the first session of the 78th Congress . . . . In the accompanying report of the Committee on Ways and Means of the House it was stated that 'this section is designed to put an end promptly to any market for, or dealings in, interests in corporations or property which have as their objective the reduction through artifice of the income or excess profits tax liability.' . . .

"In the Senate, this section . . . was amended . . . . [One] amendment was made by the addition of the phrase 'which such person would not otherwise enjoy.'  This qualification limited the applicability of the

section to those cases where the deduction, credit, or allowance resulted

from, or was attributable to, the acquired control.  The report of the Senate

Committee on Finance stated that the objective of the section was 'to

prevent the distortion through tax avoidance of the deduction, credit, or

allowance provision of the code, particularly those of the type represented

by the recently developed practice of corporations with large excess

profits (or the interests controlling such corporations) acquiring

corporations with current, past, or prospective losses or deductions,

deficits, or current or unused excess profits credits, for the purpose of

reducing income and excess profits taxes. . . ."

"The applicability of section 129, upon which respondent has based his

disallowance of the deductions in issue, is contingent upon the existence

of two conditions: (1) The 'person' [meaning the taxpayer] must have

acquired . . . control of a corporation, and (2) the principal purpose for

which the acquisition was made must have been the evasion or avoidance

of Federal income . . . tax by securing the benefit of a deduction, credit, or

other allowance which such person or corporation would not otherwise

enjoy."[45]

The court went on to explain the relationship between the two elements of

the rule:

> " . . . [C]ontrol in itself is not determinative.  This section condemns tax
>
> avoidance only when there is acquisition of control and the employment
>
> of that control for the principal purpose of avoiding or evading tax, the
>
> acquiring person thereby securing the benefit of a deduction, credit, or
>
> allowance 'which such person or corporation would not otherwise enjoy.'
>
> *The word 'otherwise' can only be interpreted to mean that the deduction,*
>
> *credit, or allowance, if it is to be disallowed, must stem from the acquired*
>
> *control"* [46]

The court noted that the availability of the dividends received credit did

not depend upon the acquisition of control:

> "There is no evidence, nor does the respondent suggest, that petitioner
>
> received its dividends by virtue of its controlling interest.  In this case the

---

[45]  11 T.C. at 415-17.

[46]  Id. (emphasis added).

88

number of shares held by petitioner was determinative only of the amount of dividends received, and the control acquired was incidental to the primary purpose of the acquisition which was to increase the petitioner's gross income."[47]

It must be noted that the decision of the court is not without a possible ambiguity. Having explained that the Code provision did not apply because no tax benefits were attributable to the acquisition of control, the court went on to conclude that there was a "real and substantial business purpose . . . and not a sham or unrealistic plan primarily designed for tax evasion or avoidance." Thus, the court seemed to confirm that the nonapplicability of Section 269 is not a defense for a taxpayer engaged in a sham transaction.

The earlier version of Section 269 seems to have been created in substantial measure to deal with the potential market in loss corporations and other ways in which losses realized by corporations can be set off against profitable operations.    See, e.g., Coastal Oil Storage Co. v. Commissioner, 242 F.2d 396 (4th Cir. 1957).[48]   In these cases, the tax benefits sought derived

---

[47]  11 T.C. at 417.

[48]  See Bittker and Lokken, Federal Taxation of Income, Estates and Gifts, ¶ 95.4.

directly from the challenged transactions and would not otherwise have been available.

Litigation with respect to the applicability of Section 269 is generally consistent with the examples in the regulations.  Section 269 has been used in  a number of cases to challenge the availability of multiple surtax exemptions where shareholders had established more than one corporation with no evident business purpose.  See, e.g., Your Host, Inc. v. Commissioner, 489 F.2d 957 (2d Cir. 1973); Concord Supply Corp. v. Commissioner, 37 T.C. 919 (1962).   In these cases, once again the tax benefits sought derived directly from the challenged transactions that would not otherwise have been available.

## 5.  Section 269 and the STARS Transaction

The Government's position in this case is somewhat different from the circumstances contemplated by the regulations and judicial decisions.  It expressly does not contend that the specific transfers of control or assets  treated by Section 269 themselves created tax benefits that would not otherwise be available to Wells Fargo.[49]  Rather, it takes the position that the inclusion of these steps in the STARS transaction invokes the adverse taxpayer consequences for the entire transaction.

---

[49]  March 25, 2014, Hearing Transcript, pages 23 et seq.

The Government asserts the usual principle that, in deciding a motion for summary judgment, any factual disputes must be assumed to be resolved against the moving party.  As such, it must be assumed that all factual questions in this instance must be resolved in the Government's favor.  Wells Fargo does not contest this principle, but argues that there are no factual questions raised by its motion.

There is no factual dispute about the acquisition of control of a corporation or of the transfer of assets to a corporation with a carryover basis as part of the STARS transaction.  Wells Fargo had acquired Carnation before the STARS transaction was even contemplated.  Carnation acquired Rigil as part of the implementation of the transaction.  Assets were transferred among corporations and other entities, all of which were treated for U.S. tax purposes as elements of Wells Fargo that gave rise to no immediate tax consequence as they were generally negated in the preparation of its consolidated tax return.

The Government contends that factual issues arise because Wells Fargo itself would have been incapable of participating in the STARS transaction.  First, U.K. tax law requirements would not have been satisfied so that the benefits sought by Barclays to make the transaction profitable to it would not have been available.  Secondly,  there is no evidence that Wells Fargo itself

could have satisfied the contractual requirements to make sufficient income available to the U.K. Trust. Therefore, the Government argues, the STARS transaction would never have been implemented, requiring the conclusion that the acquisition of control of Rigil by Carnation and the transfers of property to Carnation and Rigil were essential ingredients to the viability of the transaction. In other words, if the two entities had not been used in the way that they were used, Barclays would never have entered into the transaction. It concludes that whether Wells Fargo could itself have participated in the STARS transaction is a question of fact the answer to which for purposes of this motion must be assumed to be "no."

Wells Fargo responds that this motion presents an issue of U.S. tax law. If Wells Fargo had itself been subjected to U.K. income taxes without using a controlled entity, it would have been entitled to foreign tax credits. In fact, the entities used to implement the transaction were either treated as corporations included in the U.S. consolidated return of Wells Fargo or as transparent entities again included in its U.S. consolidated return. Therefore, from the perspective of U.S. tax law, Wells Fargo is claiming no potential U.S. tax benefits beyond those that would have resulted from its direct participation in the transaction.

**6. The Role of U.K. Law with Respect to this Motion**

As indicated previously, Wells Fargo has on several occasions moved for determinations of U.K. law under FRCP 44.1, *inter alia*, to the effect that the use of a new entity was necessary for Barclays to enjoy the U.K. tax benefits which it sought in the transaction. However, it was not created or used to exploit U.S. income tax benefits to which Wells Fargo would not otherwise be entitled. The Government has vigorously opposed Wells Fargo's motion for U.K. law determinations on the ground that they were irrelevant to the determination of the issues raised by Wells Fargo's other motions, including the one here under consideration.

Whether it was required under U.K. law or not, there is no disagreement with the proposition that the actions taken by Wells Fargo and its affiliates (treated as a part of Wells Fargo for U.S. tax purposes) to implement the STARS transaction were undertaken in order to assure Barclay's participation in it. It is not, therefore, necessary to determine whether Wells Fargo, as a corporate entity, could itself have transferred assets to the U.K. Trust and owned units of it. If it had done so and if the same U.K. taxes were paid, it would be in the same U.S. tax position that it currently occupies. As the Government generally argues in this case (although not on this motion), it is, therefore, unnecessary for purposes of this motion to determine the posture and application

of U.K. trust and tax law

## 7. Analysis of the Applicability of Section 269 to the STARS Transaction

As indicated previously, the Government correctly insists that all factual differences be resolved against Wells Fargo for purposes of this motion for partial summary judgment.  Therefore, it must be assumed that  Barclays would be unwilling to implement the STARS transaction directly with Wells Fargo.  It is quite possible that Barclays could not gain the U.K. tax advantages that it sought by dealing directly with Wells Fargo.  However, that is not the appropriate question.  Rather, the question raised by the Code is whether Wells Fargo gained any U.S. tax advantage specifically by the acquisition of control and/or  transfer of assets  when all of the relevant entities were treated as part of Wells Fargo in the preparation of its consolidated tax return.  We find that it did not.

The regulations and the litigation together indicate that the application of Section 269 should properly focus on whether the acquisition of control  or transfer of assets themselves created a tax benefit not otherwise available.  The STARS transaction may or may not turn out to be a sham transaction, as the Government contends.  If it is, Wells Fargo will not be entitled to the foreign tax credits which it has claimed.  If it is not, Wells Fargo will be entitled to those

foreign tax credits.  In either event, the acquisition of control of Rigil by

Carnation and the transfer of assets to related entities with a carryover basis did

not create the tax benefits under U.S. tax law which Wells Fargo here claims.

The Government further argues that the broad scope of the language of

Section 269 does not limit its application to the tax consequences of the transfers

that trigger its application.  However, while the language of Section 269 is

indeed very broad, the Government cites no authority for the proposition that the

relevant transfers themselves do not have to be the source of the U.S. tax

benefits at risk under Section 269.

## 8.  Decision:  the Motion is Granted

All of the entities involved in implementing the STARS transaction for

Wells Fargo were included in its consolidated tax return.  Thus, Wells Fargo

gained no apparent U.S. tax law advantages from the acquisition of control and

asset transfers covered by Section 269 that it would not have enjoyed if it had

directly participated in the STARS transaction.   Therefore, the  motion here

under consideration is GRANTED.  Section 269 does not apply in determining

the results of this controversy.  However, as implied in the decision of the Tax

Court in *Commodores Point Terminal Corporation*, issues with respect to the

application of the sham transaction doctrine generally to the STARS transaction

are not affected by the grant of this motion.

An Order implementing this decision is being transmitted herewith.

## VIII.   Motion That Its Tax Reporting Position Had a Reasonable Basis

## 1.  Plaintiff's Motion

Wells Fargo has moved (Doc 407) "for partial summary judgment that [its] . . .  tax reporting position had a reasonable basis."   For the reasons set forth below, the motion is granted.

## 2.  Context of the Motion

In addition to denying the right to recover any amounts in respect of the STARS transaction, the Government in its Amended Answer included a defense in the form of an offset or recoupment on the ground that Wells Fargo is subject to negligence penalties under Code § 6662(b)(1).  Wells Fargo's motion to strike the Government's offset or recoupment defense was denied by Order, dated July 15, 2010, of United States Magistrate Judge Arthur J. Boylan, leaving the issue of penalties to be resolved.  Wells Fargo's motion here under consideration would, if granted, eliminate the negligence issue and its consequences from this litigation.

## 3.  Liability for Negligence

The Code and regulations establish a somewhat complex array of penalties, the impact of which is raised by the Government's Amended Answer. Section 6662(a) of the Code imposes a penalty in certain situations equal to 20

percent "of an underpayment of tax required to be shown on a return."

The penalty is imposed for a series of reasons specified in Section 6662(b) of the Code.   Section 6662(b)(1) imposes the penalty for the underpayment of taxes attributable to "[n]egligence or disregard of rules or regulations."   The Government is contending that Wells Fargo was negligent in the preparation of its tax returns and is subject to the negligence penalty of 20 percent of the underpayment of taxes resulting from the wrongful claims to tax benefits. Section 6662(c) defines "negligence" to include "any failure to make a reasonable attempt to comply with the provisions of [the Code] . . . and the term 'disregard' includes any careless, reckless, or intentional disregard."

The statutory definition of negligence suggests that an inquiry into the reasonability of the "attempt to comply" will be determinative of the existence of negligence, thus compelling an examination of a taxpayer's behavior leading to the preparation and filing of its tax return.  However, the regulations further amplify the definition:

"The term 'negligence' includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return. . . . *A return position that has a reasonable basis as defined in paragraph (b)(3)*

98

*of this section is not attributable to negligence*."

Treas. Reg. § 1.6662-3(b)(emphasis added).  Thus, under the express language of the regulations, if there is a "reasonable basis" for the return position, there is no negligence.  If there is no negligence, no negligence penalty would seem to be authorized.

A number of different legal standards potentially come into play when possible penalties are at issue.  The regulations emphasize that the "reasonable basis" test imposes a very stringent standard and compares it to the rigor of other tests:

> "Reasonable basis is a relatively high standard of tax reporting, that is, significantly higher than not frivolous or not patently improper.  The reasonable basis standard is not satisfied by a return position that is merely arguable or that is merely a colorable claim.  If a return position is reasonably based on one or more of the authorities set forth in § 1.6662-4(d)(3)(iii) (taking into account the relevance and persuasiveness of the authorities, and subsequent developments), the return position will generally satisfy the reasonable basis standard even though it may not satisfy the substantial authority standard.  .  .  ."

Treas. Reg. § 1.6662-3(b)(3).

99

The regulations provide a long list of permissible and impermissible forms of authority that may be used in connection with the reasonable basis test.  The permissible authorities include "applicable provisions of the [Code]," "tax treaties" and "court cases."  However, "[c]onclusions reached in treatises, legal periodicals, legal opinions or opinions rendered by tax professionals are not authority."  Treas. Reg. § 1.6662-4(d)(3)(iii).

As suggested by the language of the regulations describing the gravity of the reasonable basis requirement, several other provisions of the Code and regulations establish other formulations with respect to applicable standards, some of which are more and some less rigorous than the "reasonable  basis" standard.  Code § 6662(d)(2)(B), for example, provides that penalties for "substantial understatement of income tax" (which are based upon a comparison of the tax reported on the return to the magnitude of the deficit, a provision not applicable in this case) will not apply to a "portion of the understatement which is attributable to . . . the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment."  As expressly stated in the Regulations, the "substantial authority" test is regarded as more rigorous than the "reasonable basis" test.

Code § 6664(c)(1)  provides that "No penalty shall be imposed under

section 6662 . . . with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."  This formulation is regarded as less stringent than the reasonable basis standard, but obviously requires an inquiry into the specific behavior of the taxpayer.  The regulations affirm this proposition by noting that, if there was negligence (meaning that there was no "reasonable basis," according to the regulations), the Code provides a further defense if the taxpayer has a "reasonable cause" for the negligence:

> "In addition, the reasonable cause and good faith exception in § 1.6664-4 may provide relief from the penalty for negligence or disregard of rules or regulations, even if a return position does not satisfy the reasonable basis standard."

Treas. Reg. § 1.6662-3(b)(3).  This "reasonable cause" defense depends generally upon an examination of the facts and circumstances leading to the negligence, which will normally include an analysis of the taxpayer's subjective efforts to comply with applicable standards.  Such an inquiry often includes the extent to which the taxpayer reasonably and in good faith relied upon the advice of reputable tax counsel or other tax professionals.  The Government has argued in connection with an earlier dispute with respect to the scope of permissible

discovery that a "reasonable cause" defense might even depend in part upon a pattern of dealing by a taxpayer that includes reference to other transactions that were based upon the availability of tax benefits.

**4.  U.S. Tax Reporting of the STARS Transaction by Wells Fargo**

There are many cases in which the government has successfully argued that the substance of a transaction should determine its tax consequences rather than its form.  In this case, Wells Fargo did not report the transaction according to its form (for example, the purchase and sale of interests in the U.K. Trust), but rather its substance.  The transaction was treated and  reported by Wells Fargo for U.S. tax purposes as a borrowing of $1.25 billion at a rate of interest of LIBOR plus .2 percent less the periodic amount due from Barclays to Wells Fargo called the Bx payment.  As previously described in this Report (several times) the effect of the Bx payment generally was to reduce the interest expense deducted by Wells Fargo.  However, in certain periods, it resulted in a payment from Barclays to Wells Fargo which was treated as an item of income or as a reduction in miscellaneous interest expense by Wells Fargo for U.S. income tax purposes.  In any event, the taxable income of Wells Fargo for U.S. tax purposes was increased.

Wells Fargo reported the results of the STARS transaction in its U.S.

consolidated return for the relevant tax years in the following way:

—The gross income realized by the U.K. Trust was reported as income.

—The  U.K. income taxes paid by the U.K. Trust were treated as having been paid by Wells Fargo.

—Foreign tax credits were claimed in respect of  the U.K. income taxes imposed upon the U.K. trust.

—Interest paid to Barclays on an effective borrowing of $1.25 billion was deducted.  The amount of interest so deducted was calculated at the rate of LIBOR plus .2 percent less the Bx payment.

—During periods when the Bx payment exceeded LIBOR plus .2 percent, the excess was reported as an addition to gross income or a reduction in unrelated interest expense.

—Expenses of implementing the STARS transaction were deducted.

## 5.  Stipulation to Narrow Defenses Available to Wells Fargo

After a rather extensive exchange between counsel about the scope of discovery, the following stipulation (Doc 94) was concluded on April 21, 2011:

"1.    Defendant's Penalty Claim pertains solely to its allegation of negligence under Section 6662(b)(1), and to no other penalty provision of the Internal Revenue Code.

2.      Wells Fargo's defenses to Defendant's Penalty Claim are as follows:

     a.      There is no underpayment of tax required to be shown on a return, within the meaning of Section 6662(a), attributable to the STARS transaction; and,

     b.      Objectively viewed, there is a "reasonable basis," as defined by Treas. Reg. § 1.6662-3(b)(3) and the authorities thereunder, for Wells Fargo's reporting of the STARS transaction.

3.      Wells Fargo agrees that it will not assert the following defenses to the Defendant's Penalty Claim:

     a.      Any contention that relies upon Wells Fargo's efforts to exercise ordinary and reasonable care in the preparation of its tax return, or Wells Fargo's efforts to determine its proper tax liability under the internal revenue laws arising out of the STARS Transaction, to establish reasonable basis;

     b.      Any contention pursuant to or based on Section 6664;

     c.      Any defense or argument not specifically identified in paragraph 2, above.

4.      This stipulation resolves any dispute regarding the adequacy of Wells Fargo's responses to the United States' Second Set of Interrogatories, served on January 5, 2011.

5.      Nothing in this stipulation limits the arguments, evidence, or contentions that Wells Fargo may present or rely upon with respect to the merits of counts one through three of Wells Fargo's Amended Complaint [which deal with the STARS transaction]."

The Government asserts that the stipulation amounts to a concession on the part of Wells Fargo that a negligence penalty is appropriate if the Court concludes that STARS is a sham transaction:

"Wells Fargo has admitted that in preparing its 2003 federal tax return it failed 'to exercise ordinary and reasonable care in the preparation of its tax return,' or 'determine its proper tax liability' in reporting the STARS tax benefits on it return.  It did so when it expressly stipulated that in defending against the negligence penalties, it waived the right to challenge the Government's position that it failed to meet these fundamental regulatory and judicial requirements defining the statutory concept of

negligence."[50]

The Government contends that the transaction has "no appreciable purpose beyond conferring tax benefits. . . . The law is clear, that, 'when the underlying merits determination is that transaction lacks economic substance, [a] taxpayer cannot cite authority . . . to support the claimed tax treatment.'"[51]  The Government further contends that "[T]he question of reasonable basis or substantial authority only becomes relevant and ripe once the fact finder determines whether STARS has economic substance."[52]  Moreover, *IES* is not authority because of factual differences in the transactions.

## 6.  Can There Be a Reasonable Basis for Reporting a Sham Transaction?

The Government's position with respect to this particular motion appears to be that a taxpayer found in the end to have participated in a sham transaction was necessarily negligent in its reporting of the transaction.  In other words, the legal obligation of reporting is congruent with the obligation to pay income taxes that are found to be owing.  If this position is correct, it is obvious that the

---

[50]  Government Memorandum in Opposition to Motion, page 14.

[51]  Government Memorandum in Opposition to Motion, page 16, quoting Stobie Creek Invs., LLC v. United States, 82 Fed. Cl. at 706, n.64, aff'd 608 F.3d 1366  (Fed Cir. 2010).

[52]  Government Memorandum in Opposition to Motion, page 19.

motion here under consideration must be denied as the issue of penalties for negligence cannot be resolved until the merits of the underlying case have been determined.

The Government's alternative position is that reporting that has a reasonable basis cannot avoid the negligence penalty unless there is proof that the taxpayer and its employees, counsel or other advisers actually analyzed and applied the sources leading to the reasonable basis conclusion. In other words, even though there was a reasonable basis for the tax return, it does not matter unless someone analyzed and thought about it.

Without strong support in the Code and regulations, legislative history or practice, the Government's position cannot be accepted. It seems clear that a negligence penalty is not applicable if there is no negligence. The regulations expressly state that there is "no negligence" if there is a "reasonable basis" for the taxpayer's reporting.  Therefore, it seems quite inappropriate to conclude that a taxpayer that eventually loses a sham transaction case cannot avoid the negligence penalty even when there was a reasonable basis for its reporting. That leaves the question for these purposes of whether Wells Fargo had a reasonable basis for reporting the STARS transaction as it did.

### 7. Basis for Reporting

Wells Fargo submits that four permissible sources of authority extant at the time its tax returns were prepared support the way in which it reported the STARS transaction: the Code; regulations; treaties; and judicial decisions.

First are the provisions of the Internal Revenue Code that authorize domestic taxpayers to take a credit for foreign income taxes or taxes in lieu of income taxes. Code §§ 901 et seq. The Government agrees (while challenging its availability in this particular case under the sham transaction doctrine) that the U.K. income tax paid by the U.K. Trust was in general a creditable tax.

Second are the regulations that explicitly state that there is no negligence if there is a reasonable basis for reporting and that identify permissible sources of authority.

Third is the text of U.S.-U.K. Tax Treaties. As explained previously, the 1975 Treaty applied to the first months in which the STARS transaction was being implemented. The 2002 Treaty applied to the remaining period during which the STARS transaction was being implemented.

The Treaties shared some common provisions with respect to the treatment of the STARS transaction. Article 4(1)(a)(i) of the 1975 Treaty defines a "resident of the United Kingdom" to include "a . . . trust . . . to the

extent that the income derived by such . . . trust is subject to United Kingdom tax as the income of a resident, either in its hands or in the hands of its . . . beneficiaries."  Article 3(1)(a) of the 2002 Treaty defines a "person" to include a "trust."  Article 3(1)(j)(ii)(B) defines a "national" of the United Kingdom to include "any . . . entity deriving its status as such from the laws in force in the United Kingdom."  The parties to this dispute agree that the U.K. Trust was treated as a U.K. person under the laws of the U.K.

The Treaties authorize the United Kingdom to "tax its residents . . . and its nationals as if this Convention had not come into effect."  Article 1(3) of the 1975 Treaty; Article 1(4) of the 2002 Treaty.

The Treaties obligate the United States to take steps to mitigate double taxation by providing a foreign tax credit for taxes appropriately paid to the United Kingdom under the authority of the Treaties.  Article 23(1) of the 1975 Treaty; Article 24(1)(a) of the 2002 Treaty.

The Treaties further  provide that income properly taxed by the United Kingdom would be treated as having been sourced there.  Article 23(3) of the 1975 Treaty; Article 24(2)(a) of the 2002 Treaty.   Sections 901 et seq. of the Code provide that a taxpayer is entitled to take a  foreign tax credit for income taxes paid in respect of foreign-source income.

The fourth sources cited by Wells Fargo are several judicial decisions, of which the most important was the *IES* decision rendered by the Court of Appeals for the Eighth Circuit shortly before the STARS transaction was closed.   The *IES* case has been discussed in great detail in earlier portions of this Report.  Importantly for purposes of this motion, it involved a series of pre-arranged transactions structured so that the taxpayer, a U.S. corporation, would be entitled to foreign tax credits.   There was no question but that the exploitation of tax rules for the benefit of the taxpayer was a major reason for the transactions.

In applying the economic substance test in the *IES* case, the court explained that it would "first consider whether there was a 'reasonable possibility of profit . . . apart from tax benefits.'"   Wells Fargo has argued that there were two sources of revenue supporting the conclusion that there was a reasonable basis for its reportage.  First, the proceeds of the loan from Barclays were used to finance its investments and investment income that returned a yield that was much higher than the cost of the loan.  Second, Barclays regularly provided consideration in the form of the Bx amount that effectively increased the taxable income of Wells Fargo by reducing interest expense or adding to its reported income.

The first contention has been challenged by the Government on the

ground, *inter alia*,  that the effect of the loan from Barclays to Wells Fargo should properly be analyzed separately from the use of the U.K. Trust.  A motion for partial summary judgment filed by Wells Fargo based upon the contention that the proceeds of the loan contributed to Wells Fargo's profits was denied because there were unresolved factual issues arising from the loan and other elements of the STARS transaction.  As noted previously, the denial of the motion for partial summary judgment did not constitute a final determination that the loan is a separate transaction.  As the court in *IES* indicated, the application of the sham transaction doctrine will depend upon an analysis of "all of the facts and circumstances."

The second contention (that the Bx consideration effectively increased taxable income) is the subject of the new motion for partial summary judgment that is addressed previously in this Report.  Regardless of the disposition of that motion if challenged, Wells Fargo's reporting finds support in the *IES* case. While the STARS transaction is materially different from the transactions contested in the *IES* case, the court there clearly concluded that the taxpayer was not required to consider foreign income taxes as a cost.   While the Government argues forcefully that *IES* does not require a decision in favor of Wells Fargo, the issue for purposes of the specific motion here under consideration is limited

to whether there was a reasonable basis for the method of reporting by Wells Fargo.

The Government acknowledges the existence of the authorities cited here, but contends that the result of the STARS transaction was simply "too good to be true" under the circumstances and that Wells Fargo "failed to exercise ordinary and reasonable care in preparing its tax returns and reporting the transaction."[53]  The Government cites the language of the Code and regulations in defining negligence as including "any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to  exercise ordinary and reasonable care in the preparation of a tax return" and is strongly indicated "where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return that would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances."  Treas. Reg. § 1.6662-3(b)(1)(ii).

## 8.  Decision on the Motion

The Government forcefully argues that a decision on the motion at this point is premature.  That argument is understood and appreciated.  However, in the absence of clear authority to the contrary, we conclude that the statement in

---

[53]  Government Memorandum in Opposition to Motion, page 9.

regulations that "there is no negligence if there was a substantial basis for the reporting" means what it says.

Wells Fargo cites four permissible sources of authority for its reporting: the Code, the regulations, the Treaties and judicial decisions dealing with the treatment of foreign tax credits in the context of the sham transaction doctrine. The sources were extant at the time the tax returns were prepared.   It may eventually be determined that the STARS transaction was a sham.  Even so, the sources cited above persuade that there was reasonable basis for reporting the results of the complicated transaction in a way that reflected its financial realities, as Wells Fargo endeavored to do.  Accordingly, the motion is GRANTED.

An order giving effect to this decision is being transmitted herewith.

## IX.  Wells Fargo's Motion to Exclude Expert Testimony of Dr. David LaRue

### 1.  Plaintiff's Motion

Wells Fargo has renewed an earlier motion under Federal Rules of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993) to exclude the expert testimony of Dr. David LaRue.  (Doc 421)  The same motion was made in 2013.  (Doc 281)   That motion was denied by the Special Master.  Report of Special Master, dated June 14, 2013.  (Doc 338) After a challenge, the decision of the Special Master was confirmed by the Court. (Doc 373)  This motion is one of three challenges to expert witnesses for the Government.

The memoranda and extensive array of exhibits submitted by both parties at this time and in connection with the prior challenge have been studied.  For reasons set forth below, a decision with respect to this motion is deferred at this time.

### 2.  Grounds for the Motion

Wells Fargo contends that Dr. LaRue's reports and testimony during depositions ignore the loan from Barclays, misconceives the impact of U.K. law, erroneously interprets the impact of the Bx consideration, disregards decisions of

the Eighth Circuit, includes tax policy analyses irrelevant to the issues in the case and asserts conclusions that are little more than advocacy on the part of the Government's position in the case.

Although Wells Fargo asserts somewhat different grounds for the motion here considered, similar arguments were made when the prior challenge to Dr. LaRue was initially made. The denial of that motion was based upon a number of considerations. Dr. LaRue's record indicated that he was highly qualified to analyze complex financial transactions. The decision of the Eighth Circuit in the *IES* case emphasized the need to examine the effect of "all facts and circumstances." Some of the grounds for the challenge went to the weight of Dr. LaRue's testimony, rather than to his qualifications or methodology. Finally, Dr. LaRue's likely testimony can be challenged during the trial, and did not derive from "deep scientific knowledge which might be beyond the comprehension of the jury."

### 3. The Government's Response

The Government in effect argues that the current motion to disqualify Dr. LaRue has already been determined by the prior decisions of the Special Master and the Court.

The Government further contends that the analyses of Dr. LaRue and the

two other experts challenged by Wells Fargo provide a useful explanation of the financial and economic consequences of the STARS transaction.  The experts, including Dr. LaRue,  are highly qualified in analyzing complex financial arrangements.  Their expert testimony must be restricted to questions of fact and not law.  There will be ample opportunity for Wells Fargo counsel to question and challenge them at trial.  Thus, even if the motion were permissible in light of the earlier decisions, it is inappropriate to disqualify Dr. LaRue from contributing to the trial process at this point.

## 4.  The Motion Is Not Barred

The renewed motion is not prohibited by the prior decisions.  The Report of the Special Master contemplated the possibility of a further challenge to Dr. LaRue at a later date if circumstances justified such a challenge:

"It should be emphasized that the foregoing conclusions are necessarily based only upon the argumentation and materials presented to the court at this time.  As the time for trial approaches, it is expected that further evidence will be developed with respect to the issues that are addressed by Dr. LaRue's report and potential testimony and the evidence proffered by other expert witnesses."

## 5.  Developments Since the Prior Decision

Since June, 2013, there have been several developments in the case that could justify reconsideration of the challenge to Dr. LaRue.

Wells Fargo moved for a partial summary judgment that there was a reasonable expectation of profits because the interest on the loan from Barclays and other expenses of the transaction were significantly less than its usual return on investment capital.  That motion was denied by the Special Master.  Report dated October 25, 2013.  One of the reasons for the denial was that there were disputed facts with respect to whether the loan was a separate transaction for purposes of the sham transaction doctrine (the bifurcation issue) and the marginal impact of the loan on Wells Fargo's overall profits.

Further developments are reflected in earlier portions of this Report which find that the Bx consideration can appropriately be considered to be pre-tax revenue for purposes of the economic substance test and that Wells Fargo is not entitled to a determination at this time that the business purpose test has been satisfied.  The treatment of the Bx consideration would tend to support Well Fargo's claim that portions of the report and testimony of Dr. LaRue are inconsistent with at least one of the legal premises of the case.  However, it is not clear that Dr. LaRue's analysis has no utility in explaining aspects of the complex STARS transaction.

## 5.  Decision on the Motion Is Deferred

As a result of the decisions summarized in the preceding portions of this Report, the posture of this case has been modified substantially.  Moreover, it is impossible at this time to predict how the inevitable challenges to various decisions of the Special Master (including those set forth in this Report) will be determined.  It seems prudent, therefore, to postpone decisions with respect to challenges to Dr. LaRue and the other expert witnesses until the posture of the case becomes clearer as a trial date approaches.

Therefore, the determination of the challenge to Dr. LaRue is deferred at this time.  When the results of a previous challenge to a decision of the Special Master and any challenges to decisions reflected in this Report have been determined, further consideration of the motion, if necessary and appropriate, will be undertaken.  Both sides will be provided an opportunity to submit further argumentation with respect to the issue at that time to take into account the then current status of the case.

## X.  Wells Fargo's Motion to Exclude Expert Testimony of Dr. Ira Kawaller

## 1.  The Plaintiff's Motion

Wells Fargo has also moved to exclude the expert testimony of Dr. Ira Kawaller under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc, 509 U.S. 579.  (Doc 414)  No previous motion to exclude Dr. Kawaller's testimony and report has been made.

Again, the submissions of memoranda and extensive array of exhibits by both parties with respect to Dr. Kawaller's status as an expert witness have been carefully reviewed.  However, for reasons set forth below, a determination with respect to the motion is deferred at this time.

## 2.  Grounds for the Motion

The grounds for challenge are slightly different with respect to each of the Government's expert witnesses.  Well Fargo cites five reasons for its challenge to Dr. Kawaller:

–Lack of analysis to support opinion regarding the bifurcation issue.

–Lack of analysis to support treatment of Bx as a rebate.

–Failure to apply the Eighth Circuit legal test for economic substance.

–Proffer of legal conclusions instead of factual analysis.

–Use of comparative analysis of hypothetical loans to determine marginal

119

profit.

## 3. Government Response

The Government asserts that Dr. Kawaller is eminently qualified as a financial expert, that his conclusions are of fact, not law, and that his analysis helps to explain the economics of the transaction.

## 4. Determination of Motion

Unlike the renewed challenge to Dr. LaRue, this is the first challenge by Wells Fargo to Dr. Kawaller.  Nevertheless, because a decision rendered previously by the Special Master and decisions rendered in other portions of this Report are subject to challenge to the court, it is impossible at this time to predict how the posture of the case may or may not be changed.  It seems prudent, therefore, to postpone decisions with respect to the challenges to Dr. Kawaller and the other expert witnesses until the posture of the case becomes clearer as a trial date approaches.

Therefore, the determination of the challenge Dr. Kawaller is deferred at this time.  When the results of the prior challenge to a decision of the Special Master and any challenges to the decisions reflected in this Report have been determined, further consideration of the motion, if necessary and appropriate, will be undertaken.  Both sides will be provided an opportunity to submit further

argumentation with respect to the issue at that time to take into account the then

current status of the case.

## XI.  Wells Fargo's  Motion To Exclude Expert Testimony of Dr. Michael Cragg

### 1.  The Plaintiff's Motion

Wells Fargo has also moved to exclude the expert testimony of  Dr. Michael Cragg under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc, 509 U.S. 579.  (411 )  No previous motion to exclude Dr. Cragg's testimony and report has been made.

The submissions of memoranda and extensive array of exhibits by both parties with respect to this motion have been carefully reviewed.  However, for reasons set forth below, a determination with respect to the motion is deferred at this time.

### 2.  Grounds for the Motion

Wells Fargo cites several reasons for its motion.  It contends that

--Dr. Cragg's work fails to conform to Eighth Circuit law with respect to the measure of profits.

-- His conclusions are of law and not of fact.

–His bifurcation of the loan from the trust creates a transaction that, in fact, did not occur.

–He uses an "opportunity cost" analysis that has no legal basis (thereby

introducing hypothetical, non-existent transactions into his analysis.

### 3.  Government Response

The Government asserts that Dr. Cragg is eminently qualified as a financial expert, that his conclusions are of fact, not law, and that his analysis helps to explain the economics of the transaction.

### 4.  Determination of Motion

This is the first challenge to Dr. Cragg's participation as an expert witness.   For the reasons explained in the prior portion of this Report, it seems prudent to postpone decisions with respect to challenges to Dr. Cragg and the other expert witnesses until the posture of the case becomes clearer as a trial date approaches.

Therefore, the determination of the challenge Dr. Cragg is deferred at this time.  When the results of the decisions reflected in this Report and any challenges to them have been determined, further consideration of the motion, if necessary and appropriate, will be undertaken.  Both sides will be provided an opportunity to submit further argumentation with respect to the issue at that time to take into account the then current status of the case.

## XII. Summary of Orders

The following Orders are being issued with respect to the motions made by Wells Fargo:

Motion that Bx is treated as pretax income is GRANTED.

Motion that the STARS transaction has a business purpose is DENIED.

Motion that Code § 269 does not apply to this case is GRANTED.

Motion that there was a reasonable basis for its reporting of the STARS transaction is GRANTED.

July 21, 2014

Charles H. Gustafson
Special Master