UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

WELLS FARGO & COMPANY, on behalf
of itself and the members of its affiliated
group filing a consolidated return,

Case No. 09-CV-2764 (PJS/TNL)

Plaintiff,

ORDER

v.

UNITED STATES OF AMERICA,

Defendant.

---

B. John Williams, Jr. and Alan Swirski, SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP; Charles F. Webber and Deborah A. Ellingboe, FAEGRE BAKER
DANIELS LLP; Jeffrey A. Sloan, WELLS FARGO & COMPANY, for plaintiff.

Dennis M. Donohue, John L. Schoenecker, and William E. Farrior, UNITED
STATES DEPARTMENT OF JUSTICE, for defendant.

In 2001, Barclays Bank, PLC—a British financial-services company—started

marketing to American banks a product called "Structured Trust Advantaged

Repackaged Securities" or "STARS."  Barclays proposed to American banks that they

partner with Barclays in a series of complicated transactions designed to exploit

differences between the tax laws of the United States and the tax laws of the United

Kingdom.  The plan had four key elements:  (1) the American bank would voluntarily

subject some of its income-producing assets to U.K. taxation; (2) the American bank

would offset those U.K. taxes by claiming foreign-tax credits on its U.S. returns;

(3) Barclays would enjoy significant U.K. tax benefits as a result of the American bank's

actions; and (4) Barclays would compensate the American bank for engaging in the STARS transaction.

Plaintiff Wells Fargo & Company ("Wells Fargo") was one of a handful of American banks who agreed to engage in a STARS transaction with Barclays. But when Wells Fargo and the other banks claimed foreign-tax credits to offset their tax payments to the United Kingdom, the Internal Revenue Service ("IRS") disallowed the credits on the grounds that the STARS transactions were shams that lacked economic substance and that existed solely to generate tax benefits. Litigation ensued, and four STARS-related cases ended up in the federal courts.

Two of those cases have resulted in very recent opinions by federal courts of appeals: *Bank of New York Mellon Corp. v. Commissioner*, 801 F.3d 104 (2d Cir. 2015), and *Salem Financial, Inc. v. United States*, 786 F.3d 932 (Fed. Cir. 2015). In both cases, the court of appeals held, in essence, that the STARS transactions were shams and that therefore the banks were not entitled to take foreign-tax credits in connection with those transactions. *See Bank of N.Y.*, 801 F.3d at 121-23; *Salem Fin.*, 786 F.3d at 940-55. A third case—*Santander Holdings USA, Inc. v. United States*, 977 F. Supp. 2d 46 (D. Mass. 2013)—is still pending in the United States District Court for the District of Massachusetts. To date, however, the taxpayer in *Santander* has fared better than the taxpayers in *Bank of New York* and *Salem Financial*.

This is the fourth case.  In this case, Wells Fargo seeks a refund of approximately

$177 million in taxes and deficiency interest for the taxable year ending on

December 31, 2003.  The bulk of this claimed refund is attributable to foreign-tax credits

that Wells Fargo claimed in connection with the STARS transaction but that the IRS

disallowed.  This matter is before the Court on the parties' objections to two reports of

the special master that collectively address nine motions by Wells Fargo.  The Court has

conducted a de novo review pursuant to ¶ 8 of the Court's order appointing a special

master.  *See* ECF No. 102.  Having conducted that review, having read hundreds of

pages of submissions by the parties, and having presided over a full day of oral

argument, the Court now sustains the government's objection in part and overrules

Wells Fargo's objections.  Specifically, the Court grants Wells Fargo's motion for partial

summary judgment that 26 U.S.C. § 269 does not apply to the STARS transaction and

denies the remainder of Wells Fargo's motions.

## I.  BACKGROUND

At oral argument, the parties confirmed that the basic structure of the STARS

transaction involved in this case is the same as the basic structure of the STARS

transactions involved in the other pending cases.  The parties also confirmed the Court's

understanding of the major features of the transaction and, in general, the parties did

not object to the special master's description of the transaction.[1]  The Court therefore

draws this factual summary from the special master's reports, the parties'

representations at oral argument, and judicial opinions issued in the other STARS cases.

The STARS transaction was extraordinarily complicated—so complicated, in fact,

that it almost defies comprehension by anyone (including a federal judge) who is not an

expert in structured finance.  At its core, though, the STARS transaction consisted of

Wells Fargo voluntarily subjecting some of its income-producing assets to U.K. taxation.

Wells Fargo paid those taxes to the United Kingdom, and then claimed a foreign-tax

credit to reduce its U.S. tax burden by the amount that it had paid to the United

Kingdom.  Thus, Wells Fargo effectively shifted some of its tax payments out of the U.S.

treasury and into the U.K. treasury.

In and of itself, this had no impact on Wells Fargo's bottom line.  It increased

Wells Fargo's tax obligation to the United Kingdom, but it decreased Wells Fargo's tax

obligation to the United States in the same amount.  The way that Wells Fargo profited

from the STARS transaction was by receiving payments from Barclays.  And Barclays

was willing to make those payments because Wells Fargo's willingness to engage in the

STARS transaction generated U.K. tax benefits for Barclays.  Indeed, as will be

---

[1]The government objected to a few of the special master's characterizations of the facts—such as the special master's conclusion that Wells Fargo's tax reporting reflected the substance of the transaction—but did not identify any inaccuracy in the special master's recitation of the components and function of the STARS transaction.

described below, the additional taxes that Wells Fargo paid to the United Kingdom were offset almost dollar-for-dollar by the additional U.K. tax benefits enjoyed by Barclays.

The parties achieved these results by using a trust established by Wells Fargo.[2] Because the trust had a U.K. trustee—a U.K.-incorporated company controlled by Wells Fargo—the trust was deemed to be a U.K. resident under U.K. law, and its income was therefore subject to U.K. taxation. Under U.S. law, however, the trust was deemed to be part of Wells Fargo, and its income was therefore also subject to U.S. taxation.

Wells Fargo contributed about $6.638 billion of income-producing assets to the trust. For the most part, those assets were already owned by Wells Fargo and had no connection to the United Kingdom. Barclays, for its part, contributed $1.25 billion to the trust. There were several classes of interests in the trust, which were referred to as "units" (labeled "Class A" through "Class E"). Both Wells Fargo and Barclays received units in return for their contributions of assets to the trust.

Wells Fargo agreed that, at the end of five years, Wells Fargo would repurchase all of Barclays' units in the trust for $1.25 billion. For this reason, the parties treated

_____

[2]Many steps in the STARS transaction were actually taken by subsidiaries of Wells Fargo. The Court's references to "Wells Fargo" are intended to include these subsidiaries. Where relevant to its analysis, the Court will identify those subsidiaries and their roles in the transaction.

Barclays' $1.25 billion contribution as a loan to Wells Fargo.  The loan carried an interest

rate of LIBOR[3] plus 20 points.

As noted, Wells Fargo was compensated by Barclays for engaging in the STARS

transaction.  Every month, Barclays would make a payment to Wells Fargo—a payment

that the parties called the "Bx payment."  The amount of the Bx payment was set at

47.5 percent of the amount of the U.K. tax credits enjoyed by Barclays.  The Bx payment

actually took the form of a reduction in the interest owed by Wells Fargo on the

$1.25 billion loan from Barclays.  Netting the Bx payment against Wells Fargo's interest

obligation sometimes had the effect of creating a negative interest rate—that is, the

*lender* (Barclays) had to pay the *borrower* (Wells Fargo).

As described above, the trust consisted of billions of dollars of income-producing

assets that were owned by Wells Fargo.  Nearly all of the trust's income was allocated to

Barclays.  Barclays did not actually receive this income, however; instead, the income

was credited to a blocked account that was in Barclays' name but that was controlled by

Wells Fargo.  The income was then immediately reinvested in the trust, in return for

which Barclays received more trust units.  These trust units were useless to Barclays,

---

[3]"The London InterBank Offered Rate (LIBOR) is a benchmark interest rate
disseminated by the British Bankers' Association based on the rate at which certain
banks predict they can borrow funds.  LIBOR is a reference point in determining
interest rates for financial instruments in the United States and globally."  *Gelboim v.
Bank of Am. Corp.*, 135 S. Ct. 897, 903 (2015).

however, because Barclays was contractually obligated to sell all of its trust units back to Wells Fargo at the end of the five-year period for $1.25 billion, regardless of how many units Barclays eventually accumulated.  For this reason, Barclays was able to treat its additional "investments" in the trust as losses that it could deduct on its U.K. tax return.

Tracing the flow of $100 of trust income helps to illustrate how STARS took money out of the pocket of the U.S. treasury and put that money into the pockets of Wells Fargo, Barclays, and the U.K. treasury:

For every $100 in income received by the trust, Wells Fargo paid approximately $22 in U.K. taxes and claimed a $22 foreign-tax credit in the United States.  Barclays was also required to report the entire $100 as income for U.K. tax purposes—that is, under U.K. law, Barclays was taxed both on the $78 of income that had been "paid" to it by the trust (by means of circulating the $78 through the blocked account) and the $22 of income that had been paid as taxes to the United Kingdom.  Barclays had to pay 30 percent in taxes on that $100 in trust income, but Barclays was also entitled to a $22 tax credit for the tax that the trust had already paid to the United Kingdom.  As a practical matter, then, Barclays paid $8 in U.K. tax on each $100 of income produced by the trust.

At this point, the STARS transaction is a wash for Wells Fargo; it has paid $22 in taxes to the United Kingdom, but it has cut its U.S. tax bill by $22 by use of the foreign-tax credit.  Barclays is down the $8 in taxes that it paid to the United Kingdom.  And the U.K. treasury is up $30 ($22 from Wells Fargo and $8 from Barclays).

As noted, Barclays "reinvested" the $78 that was paid to it by the trust back into the trust in exchange for additional units.  Because Barclays was spending $78 to purchase units that had no value to it, Barclays was able to deduct this $78 "loss" on its U.K. tax return.  Given a 30 percent tax rate, Barclays achieved a tax savings of $23.40 on this $78 deduction.  At this point, then, the STARS transaction is still a wash for Wells Fargo; Barclays is now up $15.40 ($23.40 in tax savings minus $8 in tax payments); and the U.K. treasury is up $6.60 ($30 in taxes received from Wells Fargo and Barclays minus $23.40 in tax savings for Barclays).

As described above, Barclays also made a monthly Bx payment to Wells Fargo in the amount of 47.5 percent of Barclays' $22 U.K. tax credit.  Thus, for every $100 of trust income, the Bx payment would be $10.45 (i.e., 47.5 percent of $22).  Barclays then took a deduction for the Bx payment on its U.K. tax return, resulting in an additional $3.14 in tax savings (i.e., 30 percent of $10.45).  So Barclays ends up $8.09 in the black ($15.40 in initial tax savings minus the $10.45 Bx payment plus the additional $3.14 in tax savings).

In sum, the STARS transaction had the following impact:  For every $100 in trust income, the U.S. treasury lost $22, which represented the taxes that Wells Fargo voluntarily shifted from the United States to the United Kingdom.  Everyone else made money:  Wells Fargo received the $10.45 Bx payment; Barclays received $8.09 in net tax savings; and the U.K. treasury held on to $3.46 of the original $30 in tax payments.  Notably, the three "gains" add up to $22—which, not coincidentally, is precisely the amount of revenue lost by the U.S. treasury.

From this vantage point, then, it seems clear that the U.S. treasury funded all of the profits of the STARS transaction.  Wells Fargo voluntarily shifted $22 in tax from the United States to the United Kingdom.  Barclays then managed to extract almost all of that $22 from the U.K. treasury and divvy it up with Wells Fargo.  (STARS was designed to leave a small amount of the $22 in the U.K. treasury, undoubtedly to dissuade the U.K. tax authorities from looking too closely at Barclays' reporting.)  The availability of foreign-tax credits was obviously crucial to this scheme, as those credits enabled Wells Fargo to shift the $22 in taxes from the United States to the U.K. without any impact on its bottom line.  The problem for Wells Fargo is that the U.S. government disallowed Wells Fargo's claimed foreign-tax credits on the ground that the STARS transaction was a sham.

Wells Fargo now brings multiple motions for partial summary judgment on various issues, as well as motions seeking to exclude portions of the expected testimony of the government's expert witnesses. The Court will address the various motions in turn.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255.

### B.  The Sham-Transaction Doctrine

The purpose of the sham-transaction doctrine is "'to distinguish between structuring a real transaction in a particular way to obtain a tax benefit, which is legitimate, and creating a transaction to generate a tax benefit, which is illegitimate.'" *Salem Fin.*, 786 F.3d at 942 (quoting *Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366,

1375 (Fed. Cir. 2010)).   Under the sham-transaction doctrine, a court must "disregard a transaction that a taxpayer enters into without a valid business purpose in order to claim tax benefits not contemplated by a reasonable application of the language and the purpose of the [Internal Revenue] Code or the regulations thereunder . . . ."  *WFC Holdings Corp. v. United States*, 728 F.3d 736, 742 (8th Cir. 2013) (citation and quotations omitted).   This is true even though the transaction complies with the literal terms of the relevant statutes and regulations that create the tax benefits.  *Id.* at 743.

In determining whether a particular transaction is a "sham," the Eighth Circuit has traditionally applied the two-part test set forth in *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91-92 (4th Cir. 1985).  Under that test, a transaction is a sham that should be disregarded for tax purposes if (1) it lacks economic substance because no real potential for profit exists apart from tax benefits and (2) it was not motivated by any economic purpose outside of tax considerations.  *WFC Holdings*, 728 F.3d at 743. Courts sometimes refer to the first (objective) part of this test as asking whether the transaction has "economic substance" and the second (subjective) part as asking whether the taxpayer had a "business purpose."  Because the Eighth Circuit has in the past found that challenged transactions either had *neither* economic substance *nor* a business purpose, or *both* economic substance *and* a business purpose, the court has

never "definitively resolve[d]" the question of whether a transaction that has one but not the other is a sham. *Id.* at 744.

In applying the sham-transaction doctrine, "'the transaction[s] must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant.'" *IES Indus., Inc. v. United States*, 253 F.3d 350, 356 (8th Cir. 2001) (quoting *Comm'r v. Court Holding Co.*, 324 U.S. 331, 334 (1945) (alterations in original)). Wells Fargo bears the burden of proving that the STARS transaction is not a sham. *Cf. Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1355 (Fed. Cir. 2006) (taxpayer claiming deduction bears burden of proving that the transaction has economic substance).

## C.  Bx Payment

The first component of the *Rice's Toyota World* test—the "economic substance" component—asks "whether there was a 'reasonable possibility of profit . . . apart from tax benefits' . . . ." *IES Indus.*, 253 F.3d at 354 (quoting *Shriver v. Comm'r*, 899 F.2d 724, 726 (8th Cir. 1990)); *see also Bank of N.Y.*, 801 F.3d at 115 ("The focus of the objective inquiry is whether the transaction 'offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits.'" (quoting *Gilman v. Comm'r*, 933 F.2d 143, 146 (2d Cir. 1991)); *Salem Fin.*, 786 F.3d at 948 (stating that the purpose of the "economic substance" component is "to assess a transaction's economic reality, and in particular its profit potential, independent of the expected tax benefits").  Thus, in determining

whether the STARS transaction had "economic substance," it is critical to distinguish between accretions of wealth that represent "profit" and accretions of wealth that represent "tax benefits."

"The characterization of the Bx payment is important to the resolution of this [issue]." *Salem Fin.*, 786 F.3d at 940.  If the Bx payment is an item of pretax income to Wells Fargo, then it will be easier for Wells Fargo to demonstrate that the STARS transaction offered a reasonable possibility of pretax profit.  If the Bx payment is merely a tax benefit, then Wells Fargo will have a more difficult time demonstrating the economic substance of the STARS transaction.

Wells Fargo moves for partial summary judgment that the Bx payment should be considered pretax income rather than a tax benefit.  Wells Fargo argues that, although the benefits that *Barclays* enjoyed from the STARS transaction were tax benefits, the benefits that *Wells Fargo* enjoyed were something quite different.  In essence, Wells Fargo contends, the Bx payment was money paid by one private party (Barclays) to another private party (Wells Fargo) as compensation for services rendered (Wells Fargo's voluntary exposure of its assets to U.K. taxation).  In Wells Fargo's view, the Bx payment that it received from Barclays is no different (for tax purposes) than, say, the payments that Barclays' attorneys or accountants received for their work on the STARS transaction.  Wells Fargo asserts that Barclays' obligation to make the Bx payment was

not contingent on Barclays' realization of tax benefits from the STARS transaction.  As a

result, Wells Fargo argues, the Bx payment cannot be considered a tax benefit or partial

rebate of the taxes that Wells Fargo paid to the United Kingdom.

The Court cannot deny that there is a certain logic to Wells Fargo's

characterization of the Bx payment.  Moreover, Wells Fargo's position on the nature of

the Bx payment was accepted by the special master and in part by the Federal Circuit.

The Federal Circuit agreed that the Bx payments were made by Barclays "in exchange

for services rendered."  *Salem Fin.*, 786 F.3d at 944.  The court explained:

> . . . BB&T realized an immediate economic benefit by
> receiving the Bx payments from Barclays, which payments
> effectively repaid half of BB&T's U.K. tax expenses.  The
> payments were made in consideration of BB&T's services
> rendered under the STARS transaction, including BB&T's
> acts of creating the STARS Trust and subjecting its U.S.-
> based assets to U.K. taxation. . . . [T]he reimbursements that
> BB&T received from Barclays must therefore be treated as
> income to BB&T, not tax effects.

*Id.* at 945.

This Court is not persuaded.  This Court agrees that the Bx payment was

consideration that Barclays paid in exchange for Wells Fargo's act of voluntarily

subjecting its assets to U.K. taxation.  But that act by Wells Fargo lacked any economic

substance whatsoever.  As the special master noted, the income-producing assets that

Wells Fargo placed in the trust had no connection to the United Kingdom and would

-14-

not have been subject to U.K. taxation but for Wells Fargo's act of placing them in the trust.  There was no substantive business reason for Wells Fargo to place those assets in the U.K. trust; it did so only to subject them to U.K. taxation, and it subjected them to U.K. taxation only to generate tax benefits for Barclays.  As even the Federal Circuit conceded, "[t]he Bx payment . . . does not represent profit from any business activity; it is simply the means by which Barclays and BB&T shared the tax benefits of the Trust transaction."  *Salem Fin.*, 786 F.3d at 952.

Wells Fargo is essentially arguing that, even if it engaged in a series of economically meaningless acts that accomplished nothing but the generation of tax benefits, the fact that it was *paid* by Barclays for engaging in this series of economically meaningless acts imbues those acts with economic substance.  Under Wells Fargo's theory, if a taxpayer acts alone in producing tax benefits for itself through economically meaningless activity, the transaction is a sham.  But if the taxpayer finds a partner, and the partner "compensates" the taxpayer for generating tax benefits through economically meaningless activity, the transaction is not a sham.

Perhaps this is true—it seems to be the position of the Federal Circuit, after all—but this Court believes that a jury could find that Barclays did not merely pay Wells Fargo to create tax benefits for Barclays, but that Wells Fargo actually funded those benefits with tax revenues extracted from the U.S. treasury.  A jury could find that the

STARS transaction was designed and implemented to take tax revenue away from the U.S. treasury, funnel most of that tax revenue through the U.K. treasury to Barclays (leaving a few dollars in the U.K. treasury to appease the British tax authorities), and then circulate a portion of that tax revenue back to Wells Fargo.  As described above, the cash-flow calculations support this view:  For every $22 of taxes taken out of the U.S. treasury, Wells Fargo ended up with $10.45, Barclays with $8.09, and the U.K. treasury with $3.46.  The fact that the benefits of the STARS transaction match to the penny the amount of taxes diverted from the U.S. treasury speaks volumes.

It is important not to lose sight of the forest for the trees.  As the Second Circuit stressed, "Congress's intent in creating foreign tax credits was to prevent double taxation of taxpayers conducting *business* in the United States and abroad."  *Bank of N.Y.*, 801 F.3d at 114.  Thus, a court must ask "whether a taxpayer's claim to foreign tax credits is tied to true 'business abroad' resulting in actual out-of-pocket tax payments, or whether its claim to a tax credit derives from sham transactions devoid of a business purpose beyond exploiting differences among foreign tax codes."  *Id.* at 113.  Putting aside the $1.25 billion loan to Wells Fargo, the STARS transaction did not create any real economic wealth; in the words of the Federal Circuit, "[r]ather than being a genuine business transaction involving economic risk, the STARS trust transaction was simply a

money machine." *Salem Fin.*, 786 F.3d at 951.[4]   That "money machine" moved money

out of the U.S. treasury and into the U.K. treasury, and then out of the U.K. Treasury

and into the pockets of Barclays and Wells Fargo.

Viewed this way, the Bx payment was not pretax revenue to Wells Fargo, but

instead Wells Fargo's "cut" of the tax benefits generated by the STARS transaction.   This

is exactly the conclusion reached by the Second Circuit in *Bank of New York*.   Referring to

the Bx payment as the "tax spread," the Second Circuit held:

> [I]n considering the overall economic effect of the
> transaction, the Tax Court did not err in excluding the tax-
> spread that Barclays paid BNY from calculated profit.   The
> Tax Court found that the tax-spread was a "tax effect . . .
> serv[ing] as a device for monetizing and transferring the
> value of anticipated foreign tax credits generated from
> routing income through the STARS structure."   BNY itself
> referred to the tax-spread as a "rebate from Barclays"
> which Barclays paid to share the tax benefits of STARS with
> BNY.

*Bank of N.Y.*, 801 F.3d at 121-22 (citation omitted); *see also id.* at 118 ("Barclays paid the

tax-spread to BNY to share the U.K. tax benefits of STARS between the parties"); *id.*

at 122 ("Barclays shared the tax benefits with BNY by paying BNY the tax-spread"); *id.*

---

[4]The Federal Circuit also described the STARS transaction as "[a]n elaborate
scheme set up solely to take advantage of a foreign tax system and involving no
'economically-based business transactions,'" *Salem Fin.*, 786 F.3d at 954 (quoting *N. Ind.
Pub. Serv. Co. v. Comm'r*, 115 F.3d 506, 512 (7th Cir. 1997)), and as "a transaction
involving no commerce or bona fide business abroad and having no purpose other than
to obtain foreign and domestic tax benefits," *id.*

("the tax-spread was a way for Barclays to share half of the pre-tax value of its expected U.K. tax benefits with BNY").

Wells Fargo contends that this analysis is flawed because the Bx payment was not contingent on Barclays obtaining any tax benefits. As a formal matter, this may be true. The entire point of the economic-substance doctrine, however, is to look behind the formalities of a transaction to determine its economic substance. Regardless of the formalities, a jury could find that, as a practical matter, it was extremely unlikely that Barclays would fail to obtain the tax benefits that it anticipated. The jury could also consider the various escape hatches that the parties built into the STARS transaction in determining whether there was any real possibility that Barclays would make the Bx payment without obtaining the tax benefits. And if the jury finds (as the Federal Circuit found in *Salem Financial*[5]) that, as a practical matter, there was almost no chance

---

[5]The Federal Circuit explained:

> [T]he Bx payments were not truly independent of Barclays'
> U.K. tax benefits. It is true that the amount of the payments
> was fixed in the transaction documents and was not
> conditioned on Barclays' actual receipt of any tax benefits.
> However, the transaction documents provided that an
> indemnity provision would be triggered if Barclays were
> unable to claim the expected U.K. tax credits, either because
> the Trust paid no tax or because the U.K. authority refused
> to recognize the Trust as a U.K. resident for tax purposes.
> BB&T would then be obligated to indemnify Barclays for
> approximately one half of the U.K. tax that the Trust paid,

(continued...)

that Barclays would not receive those tax benefits, then the jury could find that, as a

practical matter, the Bx payment simply represented Wells Fargo's cut of the tax

benefits achieved through a series of economically meaningless acts.

Wells Fargo nevertheless contends that this is a legally impossible result because

a payment obligation between two private banks can never be considered a tax benefit.

Wells Fargo points out that the government has offered no authority to support a

contrary view[6] and contends that the government's position contradicts case law and

pertinent provisions of the Code and regulations.

It is true that the government has not cited a case (outside of the STARS context)

holding that a payment made by one private party to another can be considered a tax

---

[5](...continued)
     which was roughly equal to the Bx payments. The effect of
     the indemnity provision was that if Barclays were unable to
     recover its expected U.K. tax benefits, BB&T would have to
     return an amount approximately equal to the Bx payments
     to Barclays. Therefore, the Bx payments were not
     independent of Barclays' expected U.K. tax benefits at all.
     BB&T's ability to benefit economically from the Bx payments
     depended on Barclays' receipt of its expected tax benefits,
     which in turn depended on the Trust's U.K. tax payments.

*Salem Fin.*, 786 F.3d at 943-44.

[6]The Federal Circuit made the same point in *Salem Financial*: "We are aware of
no authority, and the government has provided none, in which courts have treated
private payments as tax effects rather than income simply because the amount of the
payments was calculated based on a tax-based formula." 786 F.3d at 946.

benefit. This does not mean, however, that the government's position is necessarily erroneous. The endless ingenuity of taxpayers in attempting to avoid taxes means that there will be a first time for everything. Of more concern is Wells Fargo's contention that there is legal authority that affirmatively contradicts the government's position. Having looked carefully at the authorities cited by Wells Fargo, however, the Court disagrees that they foreclose a judge or jury from finding that the Bx payment is a tax benefit.

Wells Fargo first points to *IES Industries, Inc. v. United States*, 253 F.3d 350 (8th Cir. 2001) to support its characterization of the Bx payment. *IES Industries*, however, does not concern the issue of whether a payment obligation between two private parties can be considered a tax benefit. In *IES Industries*, the taxpayer purchased the right to dividend payments from foreign companies and claimed a foreign-tax credit for the amount of the dividend that was withheld and paid over to the foreign government as tax. *Id.* at 352. The government argued that, in calculating the pretax profits from the transaction, the court should not consider the amount of the gross dividend as income to the taxpayer. *Id.* at 354. Instead, the government argued, the court should only consider the net amount of the dividend—that is, the dividend minus the withheld tax—as income to the taxpayer. *Id.*

The Eighth Circuit rejected this argument because it conflicted with a long-established principle of tax law—recognized at least since *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716 (1929)—that a third party's payment of a taxpayer's tax obligation constitutes income to the taxpayer. *IES Indus. Inc.*, 253 F.3d at 354. As the Eighth Circuit observed, this situation is no different than an employer withholding a portion of its employees' wages to pay over to the government as income tax. *Id.* When an employer does so, *all* of the employee's pay—including the portion withheld by the employer and paid to the government—is treated as income to the employee. The government's position in *IES* thus contradicted a firmly entrenched principle, applicable in millions of ordinary daily transactions, concerning the basic task of attributing income to taxpayers.

Here there is no such problem because there is no such firmly entrenched principle at issue. *IES Industries* has little to say about the proper characterization of the Bx payment. The government is not arguing that any tax payment made by a third party on Wells Fargo's behalf should not be considered income to Wells Fargo. Instead, the government is arguing that a sum of money that was indisputably a tax benefit in Barclays' hands should *also* be considered a tax benefit when Barclays divvies it up with Wells Fargo. In essence, the government is asking the Court (or a jury) to recognize that the passage of a tax benefit through Barclays' hands and into Wells Fargo's hands does

not change its character as a tax benefit.  That is an entirely separate question from the

question presented in *IES*.  For that reason, the Court is not persuaded that *IES*

mandates a ruling in Wells Fargo's favor.

Wells Fargo next contends that the government's position contradicts the

principles for foreign-tax-credit eligibility established by 26 U.S.C. § 901 and its

implementing regulations.  In particular, Wells Fargo points to § 901(i), which provides

that no foreign-tax credit is available where (1) the foreign tax "is used (directly or

indirectly) by the country imposing such tax to provide a subsidy by any means to the

taxpayer, a related person . . ., or any party to the transaction" and (2) the subsidy is

determined, directly or indirectly, by the amount of the tax.

The regulations define "subsidy" broadly to include "any benefit conferred,

directly or indirectly, by a foreign country" including "a rebate, a refund, a credit, a

deduction, a payment, a discharge of an obligation, or any other method . . . ."  26 C.F.R.

§ 1.901-2(e)(3)(i), (ii).  It does not matter whether the subsidy is paid to the taxpayer or

merely to a party to the transaction (or even a party to a related transaction).  26 C.F.R.

§ 1.901-2(e)(3)(i)(A); *see Norwest Corp. v. Comm'r*, 69 F.3d 1404, 1409 (8th Cir. 1995) ("we

agree with the tax court that the degree of the actual economic benefit conferred upon

the taxpayer by the subsidy is not relevant under the regulation" (footnote omitted));[7]

---

[7]*Norwest* actually involved the application of a temporary regulation that is no

(continued...)

*Amoco Corp. v. Comm'r*, 138 F.3d 1139, 1145 (7th Cir. 1998) ("First, under this regulation it is clear that a subsidy to another person can be attributed to the U.S. taxpayer . . . . The fact that Amoco may have received no economic benefit from the credits EGPC enjoyed . . . is of no importance."). In any of these circumstances, the foreign tax is not considered paid and no foreign-tax credit is available.

Wells Fargo contends that § 901(i) and its implementing regulations represent Congress's judgment as to when an "effective rebate" of foreign taxes will disqualify a taxpayer from claiming a foreign-tax credit. As Wells Fargo points out, the government has never contended that § 901(i) applies in this case, and thus the government has effectively conceded that § 901(i) does not bar Wells Fargo from claiming foreign-tax credits. As a result, says Wells Fargo, the government is impermissibly using the economic-substance doctrine to subvert Congress's intent as embodied in § 901(i).

The Court does not agree. The question here is whether the Bx payment can be considered a tax benefit. Wells Fargo does not deny that the tax benefits that Barclays obtained were, in fact, tax benefits—at least so long as they remained in Barclays' hands. Instead, Wells Fargo argues that the Bx payment, despite being derived from and calculated with reference to Barclays' tax benefits, cannot itself be considered a tax

---

[7](...continued)
longer in effect. *Norwest Corp.*, 69 F.3d at 1407-08. As the Eighth Circuit noted, however, the regulation was later codified without substantive change in § 901(i). *Id.* at 1408.

benefit because it is a payment from a private party.  As to that issue, § 901(i) has nothing to say.

Again, § 901(i) applies not just when the *taxpayer* obtains the benefits defined in the regulations, but when *any* party to the transaction obtains those benefits, whether or not the taxpayer receives any benefit at all.  This means that, if § 901(i) applied to the STARS transaction, then it would have been triggered when *Barclays* received the tax benefits even if Barclays never made the Bx payment to Wells Fargo.  In other words, Wells Fargo's § 901(i) argument proves too much; if the argument were correct, then one would have to conclude that the Bx payment was *never* a tax benefit, even when it remained with Barclays.  That is plainly not the case.

Wells Fargo also notes that the regulations under § 901(i) refer to substance governing over form, suggesting that the regulations are coterminous with the common-law sham-transaction doctrine.  But the regulatory language is concerned with determining whether the foreign government has, in substance, provided a subsidy within the meaning of § 901(i).  *See* 26 C.F.R. § 1.901-2(e)(3)(ii) ("Substance and not form shall govern in determining whether a subsidy exists.").  It does not have anything to do with whether the underlying transaction that gave rise to the foreign taxes has economic substance.  In short, "the government's concession that [Wells Fargo]

complied with the literal terms of section 901(i) . . . does not bar the government from arguing that the STARS transaction is an economic sham."  *Salem Fin.*, 786 F.3d at 942.

Finally, Wells Fargo claims that the government's position is at odds with the litigation position it has taken in other cases.  But Wells Fargo does not contend that the government is estopped from arguing that the Bx payment is a tax benefit, and in any event the cases that Wells Fargo cites are not particularly strong authority for its argument that the Bx payment cannot be considered a tax benefit.

*Doyon, Ltd. v. United States*, 37 Fed. Cl. 10 (1996), was a statutory-interpretation case concerning a special provision in the Code that permitted Alaska Native corporations to effectively sell certain unused tax deductions and credits to unrelated third parties.  The taxpayer—an Alaska Native corporation—sold its unused deductions and credits in exchange for a percentage of the resulting tax savings.  *Id.* at 13-15.  The dispute in *Doyon* concerned whether the payments that the taxpayer received should be included in the taxpayer's adjusted net book income ("ANBI"), which in turn was used to calculate the taxpayer's alternative-minimum-tax and environmental-tax liabilities. *Id.* at 11-12.

The relevant statutory scheme provided that "Federal income taxes" should not be included in calculating ANBI.  *Id.* at 17.  The taxpayer argued that, because the

payments it had received derived from tax savings, they were a tax benefit and

therefore an item of "Federal income taxes." *Id.*

The court disagreed with the taxpayer. It first held that, as a matter of statutory

interpretation, tax benefits are not "Federal income taxes." *Id.* at 21. In an alternative

holding, the court ruled that, despite the fact that the payments derived from tax

savings, the payments could not be considered tax benefits because they came from

private parties. *Id.* at 22-23.

So far, so good for Wells Fargo and its argument that a private payment should

not be considered a tax benefit. But there are a couple of problems with Wells Fargo's

reliance on *Doyon*. First, *Doyon* seemingly recognized that, in substance, the private

payments *could* be considered tax benefits. *Id.* at 22-24. This recognition is implicit in

the court's analysis, wherein it rejected the taxpayer's attempt to rely on the economic

substance of the payments. Instead, the court explained, "the economic substance of the

transaction alone is not determinative of its tax consequences" because taxpayers must

accept the tax consequences of the form in which they choose to structure their

transactions. *Id.* at 22-24. This principle is not applicable here, however. While it may

be true that a *taxpayer* is bound by its chosen form, the *government* is certainly not bound

by the taxpayer's choice; that is the whole point of the economic-substance doctrine.

The second (and larger) problem with *Doyon* is that the court's decision was

reversed on appeal.  *See Doyon, Ltd. v. United States*, 214 F.3d 1309, 1315-17 (Fed. Cir.

2000).  True, the Federal Circuit did not need to reach the issue of whether payments by

private parties could be considered "Federal income taxes."  *Id.* at 1315 n.6.

Nevertheless, the reversal renders the lower court's ruling on that issue a dead letter.

Wells Fargo is thus placing a great deal of weight on (1) an alternative holding that is

(2) arguably consistent with the government's position in this case and that was in any

event (3) expressed in a Court of Federal Claims opinion that was reversed on appeal.

The Court finds this authority less than compelling.

Wells Fargo's other cited authority fares no better.  Like *Doyon*, *Wells Fargo & Co.

v. United States*, 91 Fed. Cl. 35 (2010) involved tax-exempt entities essentially selling

their unused tax deductions (although the true nature of the transaction was disguised

through a complex arrangement involving the leasing of depreciable equipment).

Unlike in *Doyon*, however, there was no statutory provision permitting such sales, and

the government challenged the deductions under the sham-transaction doctrine.

The court agreed with the government that the transactions lacked economic

substance.  *Id.* at 85.  In its analysis, though, the court treated the "sale price" of the tax

deductions as an expense to the taxpayer (who purchased the deductions) rather than

as a tax benefit to the tax-exempt entities (who sold the deductions).  *Id.* at 82.  To be

consistent with *Wells Fargo & Co.*, Wells Fargo argues, the government would likewise have to treat the Bx payment as an item of expense to Barclays rather than as a tax benefit to Wells Fargo.

The Court does not agree.  To begin with, it does not appear from the court's opinion in *Wells Fargo & Co.* that the characterization of the sale price was even in dispute.  Instead, the court simply listed it as an expense item without discussion or citation to authority.  *Id.*  Moreover, the characterization of the fee had little effect on the outcome; the court noted that a separate category of expenses, by itself, rendered the transaction a losing proposition.  *Id.*  And finally, the appellate court affirmed without discussing the characterization of the fee.  *Wells Fargo & Co. v. United States*, 641 F.3d 1319 (Fed. Cir. 2011).  In short, *Wells Fargo & Co.* was not focused on the issue presented here and provides little support for Wells Fargo's contention that a private-party payment can never be substantively regarded as a tax benefit.

At the end of the day, then, there is not a lot of authority to aid the Court in determining whether the Bx payment is a tax benefit.  As noted, the two appellate decisions that specifically address STARS transactions disagree about this question, with the Federal Circuit finding that the Bx payment was not a tax benefit in *Salem Financial*, and the Second Circuit finding that the Bx payment was a tax benefit in *Bank of New York*.  This Court is inclined to agree with the Second Circuit that the Bx payment

represented nothing more than a "sharing of tax benefits . . . ." *Bank of N.Y.*, 801 F.3d at 123.  After all, the purpose of the sham-transaction doctrine is to look behind the parties' labels at the true substance of what they did.  At least to this Court, the Bx payment looks like Wells Fargo's share of the tax benefits that the parties to the STARS transaction managed to produce by shifting money around in economically meaningless ways.  The Court is not willing to close its eyes to the lack of economic substance underlying the Bx payment without convincing authority compelling it to do so.

The government has not moved for summary judgment, however, and ultimately this issue may be better left for trial.  Under the sham-transaction doctrine, the transaction must be viewed in its entirety.  Given the complexity and detail of the STARS transaction, the Court will have a better grasp of it after hearing the evidence presented at trial.  In addition, despite Wells Fargo's insistence that there are no facts in dispute, the Court is not convinced that there is nothing for a jury to do.  As the Court has observed, to an outsider the STARS transaction looks as though it was designed to shift money from the U.S. treasury to the U.K. treasury where it could be extracted by Barclays and then shared with Wells Fargo.  In this closed circuit of cash flows, there is no actual economic activity of any substance occurring.

Wells Fargo contends that this view of the transaction is erroneous because Barclays had to pay the Bx payment whether or not it could extract tax benefits from the U.K. treasury.  The likelihood that Barclays would ever find itself having to make Bx payments despite having been denied tax benefits is, however, a factual issue that bears on the characterization of the Bx payment.  *Cf. Wells Fargo & Co. v. United States*, 641 F.3d 1319, 1325-26 (Fed. Cir. 2011) ("We have never held that the likelihood of a particular outcome in a business transaction must be absolutely certain before determining whether the transaction constitutes an abuse of the tax system. . . . Characterization of a tax transaction based on a highly probable outcome may be appropriate, particularly where the structure of the transaction is designed to strongly discourage alternative outcomes.").  The Court therefore denies Wells Fargo's motion on the issue of whether the Bx is pretax profit.

## D.  Expectation of Pretax Profit

Wells Fargo next moves for partial summary judgment that the $1.25 billion loan from Barclays gave it a reasonable expectation of pretax profit from the STARS transaction at the time of closing.  (Recall that the loan was structured as a $1.25 billion purchase of trust units by Barclays.)  The loan carried an interest rate of LIBOR plus 20 points, less the amount of the Bx payment.  For purposes of this motion, however, Wells Fargo accepts the government's contention that the Bx payment was a tax benefit

that had nothing to do with the interest rate on the loan and that the interest rate was therefore LIBOR plus 20 points, or about 1.58 percent.

Even accepting this rate, Wells Fargo argues, it had a reasonable expectation of pretax profit because Wells Fargo's anticipated (and actual) return on capital in the ordinary course of its banking operations during the five-year period of the loan exceeded 5.8 percent. As a result, and taking into account the transactional and operating costs asserted by the government, Wells Fargo argues that, as a matter of law, it had a reasonable expectation of pretax profit on the STARS transaction at the time that the transaction closed.

Wells Fargo's argument finds support—albeit support that is limited in critical respects—in both *Bank of New York* and *Salem Financial*. In both cases, the courts analyzed the "trust" component of the STARS transaction separately from the "loan" component. *See Bank of N.Y.*, 801 F.3d at 121 ("[T]he Tax Court appropriately bifurcated its analysis of the STARS trust transaction from the $1.5 billion loan."); *Salem Fin.*, 786 F.3d at 940 ("For purposes of this appeal, BB&T 'accepts the trial court's holding that the Trust Transaction and the Loan may be bifurcated.'" (citation omitted)). And in both cases, the courts held that the loan component of the STARS transaction— *when viewed in isolation*—was not a sham and therefore resulted in pretax revenue to the bank.

The Federal Circuit explained:

> While it may be true that the Loan operated partly to camouflage the Bx payment, it also resulted in a substantive change in BB&T's economic position.  As a result of the Loan transaction, BB&T obtained unrestricted access to $1.5 billion in loan proceeds.  An impact of that sort cannot be said to have resulted in no change in the economic benefits enjoyed by the taxpayer. . . .

> . . . (1) the loan was not necessary for the STARS structure to produce the disallowed foreign tax credits; (2) the loan proceeds were not used to finance, secure, or carry out the STARS structure; and (3) the loan served a purpose beyond the creation of tax benefits. . . .

> . . . It was therefore error for the trial court to conclude that the STARS Loan had no economic substance and functioned only to camouflage the Bx payment. . . . [T]he STARS Loan in this case functioned to provide financing to BB&T, which is a legitimate business purpose.  Accordingly, we hold that the Loan portion of the transaction satisfies the economic substance test and that BB&T is entitled to claim interest deductions for the interest it paid on the Loan.

*Salem Fin.*, 786 F.3d at 957-58.

The Second Circuit agreed "that the $1.5 billion loan from Barclays had independent economic substance."  *Bank of N.Y.*, 801 F.3d at 123.  According to the Second Circuit, "[u]nder both the objective and subjective prongs of the economic substance doctrine, the loan was no sham:  It constituted $1.5 billion in cash that was available for BNY to utilize in any way it saw fit throughout the duration of STARS."  *Id.* at 124.

In both the Second Circuit and the Federal Circuit—and again before this

Court—the government pressed the argument that because the bank had cheaper

sources of funding available, the loan lacked economic substance.  The Federal Circuit

described the government's argument as follows:

> The government contends that the STARS Loan lacked
> economic reality because, absent the Bx payment, BB&T had
> effectively borrowed the Loan funds at an interest rate that
> was more than 30 basis points higher than the rates on
> comparable sources of funding available to BB&T.  The
> government thus asserts that the STARS Loan provided no
> economic benefit to BB&T (other than tax benefits) because
> the proceeds of a loan from another source would have
> yielded the same return at a lower cost.

*Salem Fin.*, 786 F.3d at 956.  And in both the Second Circuit and the Federal Circuit—and

again before this Court—the government relied heavily on the Sixth Circuit's decision

in *Kerman v. Commissioner*, 713 F.3d 849 (6th Cir. 2013).

Both the Second Circuit and the Federal Circuit rejected the government's

argument.  The Federal Circuit explained:

> While the Sixth Circuit scrutinized the "absurdly high
> interest rate" of the loan transaction in *Kerman* (7000 basis
> points above market rate), it did not find the transaction to
> be a sham based solely on the interest rate.  Rather, the court
> examined the cost and returns of the loan transaction and
> found that, but for the claimed tax benefits, the transaction
> would have resulted in a sure loss. . . . The *Kerman* court thus
> did not hold that a higher-than-market-rate interest or the
> availability of alternative, lower-interest funding alone
> established that the underlying loan transaction was a sham;

> rather, it . . . ask[ed] whether there was something of
> substance to be realized by the taxpayer from the loan
> transaction, other than tax deductions.

*Salem Fin.*, 786 F.3d at 956.  The Second Circuit came to the same conclusion.  *See Bank of*

*N.Y.*, 801 F.3d at 123-24.

This Court does not disagree with anything said by the Second or Federal

Circuits.  In particular, this Court agrees with those courts that, *if the loan to Wells Fargo*

*is viewed in isolation*, the loan has economic substance and (likely) a business purpose,

notwithstanding the fact that Wells Fargo had less-expensive sources of credit available.

The Court therefore agrees that any profits that Wells Fargo earned on the loan through

use of the money in its normal operations is (likely) pretax revenue, and that Wells

Fargo was (likely) entitled to claim interest deductions for interest that it paid on the

loan.  In short, if the question before the Court was whether the loan, *in isolation*, was a

sham, the Court would almost surely answer that question "no."

But that is not the question that is before the Court.  Wells Fargo's motion asks

the Court to rule that, because the *loan* had economic substance, the *entire STARS*

*transaction* had economic substance.  This the Court cannot do.

The first problem is that there is an issue of fact concerning whether the trust and

the loan should be considered as components of a single transaction.  As noted, *Bank of*

*New York* held that the two must be analyzed as separate transactions:

> [T]he Tax Court appropriately bifurcated its analysis of the STARS trust transaction from the $1.5 billion loan.  As we have held, "[t]he relevant inquiry is whether the transaction that generated the claimed deductions . . . had economic substance."  We agree with the Tax Court that "the requirements of the economic substance doctrine are not avoided simply by coupling a routine transaction with a transaction lacking economic substance."  In BNY's case, the disputed tax benefits for the trust transaction and the loan are distinct: foreign tax credits versus interest expense deductions.  We thus cannot say that the Tax Court erred in analyzing the transactions separately.

*Bank of N.Y.*, 801 F.3d at 121 (citations and footnote omitted).  In *Salem Financial*, the bank did not even attempt to argue on appeal that the trust and the loan should be analyzed as part of a single transaction.  *See Salem Fin.*, 786 F.3d at 940 ("For purposes of this appeal, BB&T 'accepts the trial court's holding that the Trust Transaction and the Loan may be bifurcated.'  Appellant's Br. 18.  That is, both sides treat the tax consequences of the Trust and Loan transactions separately, rather than considering them as a single integrated transaction.  We accordingly take the same approach . . . .").[8]

Yet in this case, Wells Fargo *does* argue that the trust and the loan must be considered as part of a single transaction, and cites in support of its argument *IES Industries, Inc. v. United States*, 349 F.3d 574, 581-82 (8th Cir. 2003) (*IES II*).  *IES II* is

---

[8]In *Santander*, when the bank moved for summary judgment on the question of whether the Bx payment was an item of pretax profit, the bank conceded, for purposes of its motion, that analysis of the loan should be bifurcated from analysis of the trust.  *Santander Holdings USA, Inc. v. United States*, 977 F. Supp. 2d 46, 49 n.3 (D. Mass. 2013).

distinguishable, however.  In its earlier appeal, the taxpayer had successfully argued

that its purchase, sale, and receipt of dividends from foreign securities should all be

considered as a single transaction in assessing economic substance.  *Id.* at 582 ("In order

for us to determine, in our first opinion in this case, that the trades were not sham

transactions . . . we considered each trade as a whole, just as IES asked us to.").  But in

its second appeal, the taxpayer changed positions because it wanted to prevent the

application of the "equitable recoupment" doctrine, under which the government could

set off refunds owed to the taxpayer with additional taxes owed as part of the same

transaction.  *Id.* at 582.  Not surprisingly, the Eighth Circuit rejected the taxpayer's

attempt to have its cake and eat it too.  *Id.*

If the government had moved for summary judgment on the bifurcation issue,

this Court would be inclined to agree with the Second and Federal Circuits that analysis

of the trust must be bifurcated from analysis of the loan.  But the government did not

move for summary judgment, and thus the matter will be left for the jury to decide.

Given that the Court is unwilling to hold that the trust and the loan must be analyzed

together as a single integrated transaction, the Court obviously cannot rule as a matter

of law that, because the loan had economic substance, the loan imbued the entire

STARS transaction with economic substance.

Two additional points:

First, even if the loan is considered to be part of the same transaction as the trust, the jury might still find that the integrated STARS transaction lacked economic substance.  The fact that a transaction yielded some pretax profit does not necessarily establish that it had economic substance.  "'Modest profits relative to substantial tax benefits are insufficient to imbue an otherwise dubious transaction with economic substance.'"  *WFC Holdings Corp. v. United States*, 728 F.3d 736, 746 (8th Cir. 2013) (quoting *Salina P'ship LP v. Comm'r*, 80 T.C.M. (CCH) 686, No. 25084-96, 2000 WL 1700928, at *12 (Nov. 14, 2000)); *see also Salem Fin.*, 786 F.3d at 949 ("Even if there is some prospect of profit, that is not enough to give a transaction economic substance if the prospect of a non-tax return is grossly disproportionate to the tax benefits that are expected to flow from the transaction.").  Moreover, the Eighth Circuit has indicated that a taxpayer's ability to achieve the same non-tax purpose through a simpler transaction involving lower transaction costs is an appropriate factor to consider in determining whether the more-complex transaction had economic substance.  *See WFC Holdings*, 728 F.3d at 745-46 (noting the district court's finding that the taxpayer could have obtained the same profit potential without the administrative burdens and transaction costs of the challenged transaction).

Second, even if the trust is considered to be part of the same transaction as the loan, and even if the jury finds that the integrated STARS transaction had *economic*

*substance*, the jury might find that the integrated STARS transaction lacked a *business*

*purpose*.  As explained above, the Eighth Circuit has explicitly left open the question of

whether a transaction that has economic substance, but does not have a business

purpose, is a sham.  Thus, the Court will submit both questions to the jury, and the jury

will make a finding about Wells Fargo's purpose in entering into the STARS transaction

even if the jury finds that the STARS transaction had economic substance.  In

determining whether Wells Fargo was motivated by a business purpose, the jury will be

permitted to consider evidence that Wells Fargo had available much less expensive

sources of funding.

Wells Fargo argues that, as a practical matter, considering the availability of

cheaper sources of funding is tantamount to requiring taxpayers to engage in the most

profitable transaction available or else risk a finding that their dealings lack a business

purpose.  Wells Fargo is free to explain to the jury what business reason it had for

choosing a higher-cost source of funding.[9]  To date, however, Wells Fargo has

---

[9]Wells Fargo cites the general principle that it is not required to structure its transactions in a way that generates the most tax.  This argument is a red herring.  It was not the structure or cost of the loan that minimized Wells Fargo's tax liability; it was Wells Fargo's act of voluntarily subjecting itself to U.K. taxes that gave rise to the tax credits in dispute.  Wells Fargo does not contend that choosing a lower-cost source of funding would have subjected Wells Fargo to higher taxes, except to the extent that such a choice would not have facilitated Wells Fargo's participation in other aspects of the STARS transaction—aspects that two courts of appeals have now found to be shams.

articulated no such reason, other than that the loan was a required feature of the STARS

transaction and was therefore necessary for Wells Fargo to obtain the Bx payment.  As

the Bx payment's status as an item of pretax profit is in dispute, however, the Court

obviously cannot find that this reason constitutes a non-tax-related purpose for the

STARS transaction.

Wells Fargo also cites 26 C.F.R. § 1.183-2(b)(9), which states that "the availability

of other investments which would yield a higher return, or which would be more likely

to be profitable, is not evidence that an activity is not engaged in for profit."  This

regulation concerns whether an activity is "not engaged in for profit" within the

meaning of 26 U.S.C. § 183.  Although some courts have suggested that this inquiry is

related to the economic-substance doctrine, *see Estate of Thomas v. Comm'r*, 84 T.C. 412,

440 n.52 (1985), this Court does not agree.

In layperson's terms, § 183 and its implementing regulations are concerned with

distinguishing between business pursuits (on the one hand) and hobbies (on the other)

in order to determine which associated expenses may be deducted.  These authorities

are not concerned with identifying whether a particular transaction is or is not a sham.

Unlike the economic-substance test, the test for determining whether an activity is

engaged in for profit under § 183 is purely subjective.  *See Keating v. Comm'r*, 544 F.3d

900, 904 (8th Cir. 2008) ("An activity is engaged in for profit if the taxpayer has an

actual, honest profit objective, even if it is unreasonable or unrealistic."). Moreover, § 183 allows certain deductions for non-business pursuits. *See* 26 U.S.C. § 183(b). "Non-business pursuit" therefore cannot be synonymous with "sham," because if the two were equivalents, *no* deductions would be allowed for non-business pursuits. Section 1.183-2(b)(9) is simply not relevant to the economic-substance inquiry.

The Court therefore denies Wells Fargo's motion for partial summary judgment that the $1.25 billion loan from Barclays gave it a reasonable expectation of pretax profit from the entire STARS transaction at the time of closing.

*E.  Section 269*

The parties' next dispute concerns the applicability of 26 U.S.C. § 269.  That provision states, in relevant part:[10]

> (a) In general. —If—
>
>> (1) any person or persons acquire, directly or indirectly, control of a corporation, or
>>
>> (2) any corporation acquires, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring

---

[10]The parties do not contend that § 269 has changed in any relevant respect since the STARS transaction was conceived and implemented.  The current version appears to be substantively identical to the version which was in effect at that time.

> corporation, is determined by reference to the
> basis in the hands of the transferor corporation,
>
> and the principal purpose for which such acquisition was
> made is evasion or avoidance of Federal income tax by
> securing the benefit of a deduction, credit, or other
> allowance which such person or corporation would not
> otherwise enjoy, then the Secretary may disallow such
> deduction, credit, or other allowance.

Generally speaking, § 269 "permits the Commissioner to deny tax exemptions and deductions where an affiliated company was 'acquired' for tax avoidance purposes." *Your Host, Inc. v. Comm'r*, 489 F.2d 957, 959 (2d Cir. 1973).  The prototypical § 269 case involves a profitable corporation acquiring a corporation with existing losses that the profitable corporation can then use to offset its profits. *See, e.g.*, 26 C.F.R. § 1.269-3(b)(1).  For § 269 to apply, three elements must be present: "(1) an acquisition of control of a corporation, (2) with the principal purpose of avoiding Federal income tax, (3) by securing the benefit of a deduction, credit, or other allowance which would not otherwise be enjoyed."[11] *Cromwell Corp. v. Comm'r*, 43 T.C. 313, 318 (1964).

Section 269 is potentially applicable to the STARS transaction because certain steps in the STARS transaction involved the creation or use of Wells Fargo subsidiaries. Specifically, Wells Fargo's transfer of income-producing assets to the U.K. trust was

---

[11] The first element in this list is derived from § 269(a)(1); alternatively, a corporation's acquisition of another corporation's property with a carryover basis also satisfies the first element. *See* 26 U.S.C. § 269(a)(2).

accomplished by Wells Fargo first transferring those assets to an existing Wells Fargo subsidiary, Carnation Asset Management, Inc. ("Carnation"), which then transferred the assets to the trust in exchange for Class A and B trust units.[12]  Carnation then transferred approximately 50 percent of its Class A units to Rigil Finance, LLC ("Rigil"), a newly created entity, in exchange for all of the membership interests in Rigil.

The government contends that § 269 applies to the STARS transaction as a result of (1) the transfers from Wells Fargo to Carnation and from Carnation to the trust, and (2) Carnation's creation and acquisition of Rigil.  According to the government, these transactions were for the "principal purpose" of evading or avoiding taxes "by securing the benefit of a deduction, credit, or other allowance"—namely, the foreign-tax credits—that Wells Fargo "would not otherwise enjoy."

For purposes of its motion, Wells Fargo does not dispute that Carnation's creation of Rigil and Wells Fargo's transfer of assets through Carnation to the trust are acquisitions to which § 269 applies.[13]  Likewise, Wells Fargo concedes for purposes of its motion that the principal purpose of these acquisitions was to evade or avoid taxes. Wells Fargo argues, however, that § 269 is ultimately inapplicable because, even

---

[12]This is a simplified version of the steps used to transfer assets to the trust, but it is sufficient for purposes of analyzing the applicability of § 269.

[13]Because Rigil elected to be treated as a corporation for U.S. tax purposes, § 269 is (potentially) applicable even though Rigil was organized as a limited-liability company.

without the use of these corporate entities, Wells Fargo *would* have "otherwise enjoy[ed]" the foreign-tax credits.

The special master agreed with Wells Fargo. As the special master explained, Wells Fargo's legal entitlement to the foreign-tax credits did not in any way depend on its use of Carnation or Rigil. Both Carnation and Rigil are deemed to be part of Wells Fargo for purposes of Wells Fargo's consolidated U.S. tax return. Accordingly, their separate existence is ignored under the Internal Revenue Code and their actions are treated as the actions of Wells Fargo for purposes of determining Wells Fargo's U.S. income-tax liability. From a legal standpoint, then, Wells Fargo's entitlement to the foreign-tax credits has no connection to the use or creation of these separate entities.

The government argues that the disputed tax benefits need not stem from the § 269 acquisition itself. Instead, the government contends, it is sufficient if the disputed tax benefits arise out of a larger transaction of which a § 269 acquisition is a part. To support its position, the government cites numerous cases—as well as sample transactions described in Treasury regulations—in which the disputed tax benefits did not flow directly from the § 269 acquisition. In other words, the government argues that in these cases and sample transactions, additional steps were necessary over and above the acquisition covered by the language of § 269 to bring about the desired tax benefits. From this, the government derives the general principle that the disputed tax

benefits need not flow directly from the § 269 acquisition but rather need only flow

from the general plan or scheme of which the acquisition is a part.

Having reviewed the cases and regulations on which the government stakes its

position,[14] the Court concludes that the special master and Wells Fargo are correct and

the government is incorrect.  Although these authorities make clear that the tax benefits

need not flow *directly* from the § 269 acquisition, in each of these authorities the § 269

acquisition was nevertheless a "but for" step in either creating the benefits or in getting

the benefits into the hands of the entity that could put them to use.[15]  Put another way,

in each of these authorities the taxpayer could not have obtained the disputed tax

---

[14]The applicability of § 269 to the STARS transaction was not addressed in either *Bank of New York* or *Salem Financial*—nor, for that matter, in *Santander*.

[15]*See* 26 C.F.R. § 1.269-3(b)(1) (profitable corporation acquires corporation with current, past, or prospective losses or other allowances and then engages in whatever further transfers may be necessary to "bring the deduction, credit, or other allowance into conjunction with the income"); 26 C.F.R. § 1.269-3(c)(2) (subsidiary corporation with existing losses acquires profitable business from its parent); 26 C.F.R. § 1.269-6, Ex. 3 (profitable corporation acquires unprofitable corporation, then transfers a profitable business to the unprofitable corporation); *Borge v. Comm'r*, 405 F.2d 673, 677-78 (2d Cir. 1968) (taxpayer transferred assets to new corporation in order to avoid recomputation of taxes that is triggered by incurring large losses for many years in a row); *J.T. Slocomb Co. v. Comm'r*, 334 F.2d 269, 274 (2d Cir. 1964) (taxpayer with existing losses was acquired by two other corporations and the three corporations then merged); *Concord Supply Corp. v. Comm'r*, 37 T.C. 919, 931 (1962) (general contractor organized two corporations to construct and lease a single warehouse in order to claim two corporate-surtax exemptions); *Inductotherm Indus., Inc. v. Comm'r*, 48 T.C.M. (CCH) 167, No. 2857-81, 1984 WL 14935 (T.C. May 29, 1984) (profitable corporation acquired corporation with existing losses), *aff'd*, 770 F.2d 1071 (3d Cir. July 25, 1985) (unpublished table decision).

benefits in any manner that did *not* involve a § 269 acquisition.  Here, by contrast, the

use of Carnation and Rigil to effect the transfers that ultimately gave rise to the foreign-

tax credits was not at all necessary to Wells Fargo's entitlement to those credits.  Indeed,

the separate existence of those entities was ignored for purposes of Wells Fargo's

consolidated tax return.  Thus, even without the § 269 acquisitions, Wells Fargo could

have "otherwise enjoy[ed]" the foreign-tax credits.

The government also relies on a Treasury regulation that states that "it is

immaterial by what method or by what conjunction of events the benefit was sought."

26 C.F.R. § 1.269-3(a).  As Wells Fargo accurately observes, however, the full regulation

makes clear that the method is immaterial *as long as* the "would not otherwise enjoy"

element is met.  *Id.*  The Court therefore finds little support for the government's view

that the § 269 acquisition need not play *any* role in the actual creation or transfer of the

disputed tax benefits to the taxpayer so long as the acquisition was part of a larger

transaction that gave rise to the benefits.

In contrast to the paucity of authority supporting the government's position,

*Commodores Point Terminal Corp. v. Commissioner* supports the view of the special master

and Wells Fargo that the tax benefits must in some manner flow from the § 269

acquisition itself.  In *Commodores Point*, the Tax Court held that the predecessor to § 269

did not apply because the disputed tax credit did not "stem from" and "was in no sense

dependent upon" the taxpayer's acquisition of a controlling interest in the acquired corporation.  11 T.C. 411, 417 (1948).  As the Tax Court pointed out, the taxpayer would have enjoyed the same benefits—albeit in a smaller amount—even without the acquisition of a controlling interest.  *Id.*

The government contends that *Commodores Point* is distinguishable because the Tax Court also held that the acquisition at issue had a real business purpose.  That is true, but irrelevant.  The "purpose" element of § 269 is distinct from the "would not otherwise enjoy" element.  *Commodores Point* found that neither element existed.  But that does not mean (as the government seems to suggest) that a showing of a tax-avoidance purpose somehow obviates the "would not otherwise enjoy" element.  Both elements must be present for § 269 to apply.  *See Cromwell Corp. v. Comm'r*, 43 T.C. 313, 318 (1964) (describing elements under § 269).

The government also contends that, in *Coastal Oil Storage Co. v. Commissioner*, the Fourth Circuit rejected the "stem from" analysis that the Tax Court employed in *Commodores Point*.  The Court does not agree with the government's reading of *Coastal Oil*.  In *Coastal Oil*, an oil supplier and storage corporation created a new corporation and transferred some storage tanks to it in exchange for the new corporation's stock.  242 F.2d 396, 397 (4th Cir. 1957).  As a result, the overall business was able to claim two corporate-surtax exemptions and two excess-profits credits.  *Id.*  This type of case—that

is, a case in which a company artificially splits its business into two corporations so as

to double the exemptions and credits to which it is entitled—is a garden-variety § 269

case. *Cf. James Realty Co. v. United States*, 280 F.2d 394, 396-97 (8th Cir. 1960); *Princeton*

*Aviation Corp. v. Comm'r*, 47 T.C.M. (CCH) 575, No. 2302-77, 1983 WL 14724 (Dec. 12,

1983). Not surprisingly, then, the Fourth Circuit rejected the lower court's reliance on

*Commodores Point* and held that *Commodores Point* was simply inapplicable to the facts in

*Coastal Oil*.[16] *Coastal Oil*, 242 F.2d at 400.

In so holding, the Fourth Circuit did not purport to disagree with the analysis of

*Commodores Point*. Instead, the Fourth Circuit simply pointed out that, unlike the § 269

acquisition in *Commodores Point*, the § 269 acquisition in *Coastal Oil* necessarily gave rise

to the disputed tax benefits. *Id.* ("Here there can be no question but that tax avoidance

*necessarily resulted* from the corporate splitting which was involved." (emphasis

added)). The Fourth Circuit was obviously correct, as the § 269 acquisition—which

entailed splitting the business into separate corporations—was directly responsible for

creating the extra exemptions and credits claimed by the taxpayer. *Coastal Oil* is

therefore consistent with the "stem from" analysis of *Commodores Point*. And as in

*Commodores Point*, Wells Fargo's entitlement to foreign-tax credits does not "stem from"

---

[16]The lower court disallowed some of the claimed credits and exemptions under
a separate provision of the tax code that came into effect a few months after the § 269
acquisition, but held that the credits and exemptions that arose before that provision
came into effect were permissible despite § 269.

and is "in no sense dependent upon" the use of Carnation and Rigil to effect the necessary transfers.

The government next argues that it is not enough that Wells Fargo could *theoretically* have obtained the same foreign-tax credits without using Carnation or Rigil. Instead, the government argues, Wells Fargo must show that, as a *practical* matter, the STARS transaction would still have taken place even without the use of those entities. Wells Fargo cannot make such a showing, the government argues, because the use of those entities was legally necessary for *Barclays* to obtain the U.K. tax benefits that it sought as part of the STARS transaction. The whole point of the STARS transaction (from Barclays' point of view) was to obtain those U.K. tax benefits; without them, Barclays would not have engaged in the transaction. Thus, although the use of Carnation and Rigil did not have anything to do with *Wells Fargo's* legal entitlement to U.S. tax credits, those entities were, from a practical standpoint, necessary to the STARS transaction as a whole. Because the § 269 acquisitions were a practical necessity, the government argues, § 269 applies to disallow Wells Fargo's claimed foreign-tax credits.

Again, having reviewed the authorities on which the government relies, the Court disagrees. The relatively scant case law concerning the "would not otherwise enjoy" element indicates that it is not relevant whether it was feasible or practical for the taxpayer to engage in the transaction even without the § 269 acquisition. Instead,

the relevant question is simply whether there were legally available alternatives that did not involve a § 269 acquisition and that would have resulted in the same tax benefits.

In *Cromwell Corp. v. Commissioner*, the Tax Court held that the "would not otherwise enjoy" element "requires an examination of the alternatives available to the taxpayers." 43 T.C. 313, 320 (1964). Because there were numerous alternative ways in which the taxpayer could have achieved the same tax results without the § 269 acquisition, the Tax Court held, the "would not otherwise enjoy" element was not met and the taxpayer was entitled to claim the disputed benefits. *Id.*

It is true that, toward the end of the opinion, the court opined that the alternative methods were "completely feasible . . . ." *Id.* at 322. Reading this comment in the context of the entire opinion, however, the Court does not interpret it to require an inquiry into the *practical* feasibility of the alternative transactions. *Cromwell Corp.*'s analysis consisted of a detailed discussion of case law in which alternative methods of acquiring a corporation were used and in which a court had accepted the taxpayer's characterization of the transaction. *Id.* at 318-20. The court's focus on case law, rather than the facts of the case, indicates that the court was concerned only with the availability of the alternatives in a legal sense; the court did not engage in any factual

analysis or discuss the practical feasibility of the alternatives from the taxpayer's point of view.  *Id.*

The remaining cases that the government cites for the proposition that practical feasibility is relevant concern the "purpose" element, not the "would not otherwise enjoy" element.  *See Inductotherm Indus., Inc. v. Comm'r*, 48 T.C.M. (CCH) 167, No. 2857-81, 1984 WL 14935 (May 29, 1984) (because the taxpayer could have achieved the same purported non-tax benefit in a much simpler way, the taxpayer's principal purpose must have been to obtain tax benefit);  *Princeton Aviation Corp. v. Comm'r*, 47 T.C.M. (CCH) 575, No. 2302-77, 1983 WL 14724 (Dec. 12, 1983) (noting that the only issue under § 269 was the purpose of the acquisition).  In particular, where alternative arrangements would have been simpler but would *not* have given rise to the disputed tax benefits, courts tend to find that the purpose of choosing the more complex arrangement was tax avoidance.  *See Indoctotherm Indus.*, 1984 WL 14935.

It is axiomatic that the feasibility of alternative arrangements may shed light on the taxpayer's intent in choosing a particular form of a transaction.  But that proposition has nothing to do with whether feasibility is relevant to the "would not otherwise enjoy" element.  The Court therefore rejects the government's argument that the practical feasibility of a transaction is relevant to that element.

Finally, the government places a lot of emphasis on a regulation stating that the "sham character" of a transaction may evidence the kind of distortion of income that § 269 is intended to combat. *See* 26 C.F.R. § 1.269-2(b). The fact remains, however, that the disputed tax benefits must be benefits that the taxpayer "would not [have] otherwise enjoy[ed]" in the absence of the § 269 acquisition. Because that element is not present in this case, the Court agrees with the special master that Wells Fargo's motion for partial summary judgment on the applicability of § 269 should be granted.

## F. Reasonable Basis

The government asserts that Wells Fargo is liable for a negligence penalty under 26 U.S.C. § 6662(b)(1) because it failed to make a reasonable attempt to comply with its tax obligations arising out of the STARS transaction. The government does not seek to recover the penalty, but rather raises it as an offset or recoupment defense against any potential recovery that Wells Fargo might be entitled to under one of its other, non-STARS-related claims. Wells Fargo moves for partial summary judgment on this defense, arguing that it is not liable for a negligence penalty because its tax reporting of the STARS transaction had a "reasonable basis" under 26 C.F.R. § 1.6662-3(b)(1).

Section 1.6662-3(b)(1) states that "[a] return position that has a reasonable basis as defined in paragraph (b)(3) of this section is not attributable to negligence." Subsection (b)(3) provides that a return position "will generally satisfy the reasonable

basis standard" if it is "reasonably based on" certain specified authorities, including applicable statutes, regulations, and judicial decisions.[17]

Wells Fargo argues that its return position had a reasonable basis because (1) Wells Fargo satisfied all of the applicable statutory and regulatory requirements necessary to claim the foreign-tax credits; (2) the Bx payment constitutes pretax revenue under *IES Industries, Inc. v. United States*, 253 F.3d 350 (8th Cir. 2001); (3) another district court has held that the Bx payment is an item of pretax income under *IES, see Santander Holdings USA, Inc. v. United States*, 977 F. Supp. 2d 46 (D. Mass. 2013); (4) the government did not assert any negligence penalty until this litigation; and (5) an internal government memorandum opined that the government's position is "subject to litigation hazards" in light of *IES*.

For the most part, these authorities do not establish that Wells Fargo had a reasonable basis. In most if not all sham-transaction cases, the taxpayer has complied with the technical requirements of the statute and regulations. If such compliance were sufficient to establish a reasonable basis in a sham-transaction case, then a taxpayer who participated in a sham transaction would *never* be subject to a negligence penalty. That is clearly not the law. *See Santa Monica Pictures, LLC v. Comm'r*, Nos. 6163-03, 6164-03,

---

[17]The full list of authorities that can support a "reasonable basis" defense appears in 26 C.F.R. § 1.6662-4(d)(3)(iii), which § 1.6662-3(b)(3) incorporates by reference.

2005 WL 1111792, at *99 (T.C. May 11, 2005) (sustaining negligence penalty for sham transaction despite formal compliance with statutes).[18]

Likewise, evidence indicating that the government knows that its position may not be a slam-dunk—such as the fact that the government did not initially assess a penalty or the fact that the government recognized that its position was subject to "litigation hazards"—is not terribly persuasive.  To begin with, this type of evidence is not listed among the authorities that can establish a reasonable basis.  *See* 26 C.F.R. § 1.6662-4(d)(3)(iii) (list of authorities).  Setting that aside, "litigation hazards" may refer to many things, not the least of which is the risk that the presiding judge will make a mistake (a risk that is very high in a case as complex as this).  The question is not whether Wells Fargo might find a way to prevail; the question is whether Wells Fargo's position was well-grounded in pertinent authority.

As for *Santander*, it is certainly relevant that, in a different STARS case, the district judge held that the Bx payment represented pretax income, just as it is relevant that the Federal Circuit reached the same conclusion in *Salem Financial*, *see* 786 F.3d at 942-46, and just as it is relevant that the Second Circuit reached the opposite conclusion

_____

[18]At oral argument, Wells Fargo also cited *Biddle v. Commissioner*, 302 U.S. 573 (1938).  *Biddle* established the general principle, later codified in regulations, that the relevant inquiry is whether the taxpayer bore the legal liability for the foreign tax. Again, this simply establishes that Wells Fargo complied with the technical requirements for claiming the foreign-tax credit and does not establish that Wells Fargo had a reasonable basis for concluding that the STARS transaction was not a sham.

in *Bank of New York*, *see* 801 F.3d at 121-22.  But none of these cases was decided until many years after Wells Fargo reported the STARS transaction, and the Court does not understand Wells Fargo to contend that a decision issued years after the fact can itself establish that the taxpayer's return position had a reasonable basis.  Instead, *Santander* is relevant insofar as it bolsters Wells Fargo's argument that *IES* establishes a reasonable basis.

As discussed above, however, the Court differs from *Santander* (and the special master) in its assessment of the relevance of *IES*.  For that reason, the Court is not prepared to rule that Wells Fargo's return position had a reasonable basis.  At the same time, though, the Court is not prepared to rule that Wells Fargo *lacked* a reasonable basis.  First, the government did not request such a ruling, and the Court is reluctant to forge ahead of the parties in this blindingly complex case.  In addition, as explained earlier, the Court will have a better grasp of the facts after trial, which will enable the Court to make a better-informed ruling about whether, in light of those facts, Wells Fargo's return position had a reasonable basis.  Additionally, it is worth noting that the Court may never need to resolve this issue.  If Wells Fargo succeeds in proving that the STARS transaction was not a sham—or if Wells Fargo is not entitled to recover on any of its other claims—then the government's defense of offset or recoupment will be moot.

Finally, the Court notes that there are two subsidiary legal issues involved in determining whether Wells Fargo's return position had a reasonable basis.  First, the parties dispute whether a transaction that is ultimately found by a court to be a sham can *ever* have a reasonable basis.  Second, the parties dispute whether the reasonable-basis standard is an objective or a subjective one—that is, they dispute whether Wells Fargo must prove that it actually relied on the authorities that it cites to establish that its return position had a reasonable basis.

Like the reasonable-basis issue itself, both of these issues are purely legal and need not be resolved before trial.  Wells Fargo has limited itself to arguing that, objectively viewed, there was a reasonable basis under § 1.6662-3(b)(3) for its tax reporting.  ECF No. 94.  Wells Fargo has further stipulated that it will make no claim that it exercised reasonable care in the preparation of its tax return or in determining its tax liability.  *Id.*  Accordingly, Wells Fargo has rendered moot any potential jury questions on the issue of whether it acted with reasonable care.  For these reasons, then, the Court denies Wells Fargo's motion for partial summary judgment that its tax reporting had a reasonable basis.

### G.  Business Purpose

Wells Fargo also moves for partial summary judgment that it was motivated by a non-tax business purpose in entering into the STARS transaction.  Wells Fargo reasons

as follows:  The Bx payment is pretax revenue as a matter of law, and there is no

dispute—indeed, the government explicitly argues—that Wells Fargo was motivated to

enter the STARS transaction by the prospect of receiving the Bx payment.  As a result,

Wells Fargo necessarily had a non-tax motive for entering the STARS transaction.

    The problem with this reasoning, of course, is that the Court has disagreed with

the special master and has held that the characterization of the Bx payment must await

trial.  Accordingly, Wells Fargo's motion for partial summary judgment that it had a

non-tax business purpose for entering into the STARS transaction is denied.[19]

*H.  Daubert Motions*

    Finally, Wells Fargo moves to exclude the expert testimony of Dr. David LaRue,

Dr. Ira Kawaller, and Dr. Michael Cragg.[20]  The special master denied these motions

without prejudice, finding that they would be better addressed closer to trial and after

Wells Fargo's other motions are fully resolved.  Wells Fargo objects, contending that the

experts (1) improperly treat the Bx payment as a tax benefit rather than as an item of

_____

[19]The Court also notes that the Federal Circuit, despite finding that the
Bx payment *was* pretax revenue, went on to hold that "the STARS Trust was created
solely to generate tax benefits; it therefore lacked a bona fide business purpose."  *Salem
Fin.*, 786 F.3d at 953 (footnote omitted).

[20]Wells Fargo also filed a renewed motion for a determination of U.K. law.  The
special master denied that motion without prejudice, and Wells Fargo has not objected
to that ruling.

pretax revenue; (2) improperly compare the loan to other potential sources of financing; and (3) "illegally bifurcate" the STARS transaction into two different transactions.

The Court has denied Wells Fargo's motions with respect to the nature of the Bx payment and Wells Fargo's expectation of profit from the loan, however; indeed, the Court has said that it is inclined to agree with the Second Circuit (and thus the government's experts) that the Bx payment was a tax benefit and not pretax revenue. Moreover, the Court has ruled that the question of whether the Bx payment and the loan should be considered part of the same transaction presents a question of fact.  As a result, the premise of Wells Fargo's arguments for excluding the experts' testimony has been rejected.

The Court therefore denies Wells Fargo's *Daubert* motions.  That said, although the government contends that the denial should be "with prejudice," the Court will not preclude Wells Fargo from making specific, targeted objections to portions of the experts' testimony insofar as Wells Fargo may contend that such testimony is objectionable notwithstanding the Court's rulings.  Any such objection may be raised in a motion in limine or at trial.

ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.      Plaintiff's objections [ECF No. 394, 499] to the special master's reports and

orders [ECF Nos. 383, 384, 484, 486, 488] are OVERRULED.

2.      Defendant's objection [ECF No. 500] to the special master's report and

orders [ECF Nos. 482, 483, 485, 486, 488] are SUSTAINED IN PART and

OVERRULED IN PART as follows:

a.      The objection is SUSTAINED as to ECF Nos. 482 and 485, and

plaintiff's motions for partial summary judgment [ECF Nos. 386,

407] are DENIED.

b.      The objection is OVERRULED in all other respects.

Dated:  November 10, 2015                         s/Patrick J. Schiltz
                                                  Patrick J. Schiltz
                                                  United States District Judge