UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| WELLS FARGO & COMPANY, on behalf of itself and the members of its affiliated group filing a consolidated return,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 09-CV-2764 (PJS/TNL)<br><br>ORDER |

B. John Williams, Jr., Alan Swirski, and Nathan Wacker, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP; Walter A. Pickhardt, Charles F. Webber, Deborah A. Ellingboe, and Blake J. Lindevig, FAEGRE BAKER DANIELS LLP; Jeffrey A. Sloan, WELLS FARGO & COMPANY, for plaintiff.

Dennis M. Donohue, William E. Farrior, Harris J. Phillips, and Vassiliki Economides, UNITED STATES DEPARTMENT OF JUSTICE, for defendant.

This long-running tax litigation arises out of an extraordinarily complex transaction that plaintiff Wells Fargo & Company ("Wells Fargo") engaged in with Barclays, a British financial-services company. The transaction—called "Structured Trust Advantaged Repackaged Securities" or "STARS"—included four key elements: (1) Wells Fargo would voluntarily subject some of its income-producing assets to U.K. taxation by placing them in a trust with a U.K. trustee; (2) Wells Fargo would offset those U.K. taxes by claiming foreign-tax credits on its U.S. returns; (3) Barclays would enjoy significant U.K. tax benefits as a result of Wells Fargo's actions; and (4) Barclays

would compensate Wells Fargo for engaging in STARS by making a monthly "Bx payment."

Wells Fargo claimed foreign-tax credits for the U.K. taxes that it paid in connection with STARS. The Internal Revenue Service ("IRS") disallowed the credits on the ground that STARS was a sham. Generally speaking, "a transaction will be characterized as a sham if 'it is not motivated by any economic purpose outside of tax considerations' (the business purpose test), and if it 'is without economic substance because no real potential for profit exists' (the economic substance test)." *IES Indus., Inc. v. United States*, 253 F.3d 350, 353 (8th Cir. 2001) (quoting *Shriver v. Comm'r*, 899 F.2d 724, 725-26 (8th Cir. 1990)). The Eighth Circuit has yet to decide whether a transaction will be characterized as a sham if it fails only one of these two prongs—i.e., if the transaction does not have a business purpose but does have economic substance, or if the transaction does not have economic substance but does have a business purpose. *WFC Holdings Corp. v. United States*, 728 F.3d 736, 744 (8th Cir. 2013) ("this court has not yet adopted a particular approach to the sham transaction test").

This case was tried to a jury, which adopted the government's view that STARS consisted of two separate, independent transactions—a trust structure and a loan. ECF No. 630 at 1. As instructed, the jury then determined whether each transaction had a business purpose and economic substance. The jury found that the trust structure had

neither a non-tax business purpose nor a reasonable possibility of pre-tax profit. ECF No. 630 at 2. There is no dispute, then, that under the jury's findings, the trust structure (which generated the disputed foreign-tax credits) was a sham.[1]

The jury had a different view of the loan, however. The jury found that the loan had a reasonable possibility of pre-tax profit but that Wells Fargo entered into the loan solely for tax-related reasons. ECF No. 630 at 2. The jury's findings thus squarely present the question that the Eighth Circuit has avoided in the past: Will a transaction be disregarded as a sham if it had objective economic substance but the taxpayer lacked a subjective non-tax business purpose?

At the Court's request, the parties have briefed this difficult issue, as well as the equally difficult issue of whether Wells Fargo is subject to a negligence penalty under

---

[1] The jury's findings with respect to the trust structure depended in part on the jury's finding that the Bx payment was a tax benefit rather than an item of pre-tax revenue. ECF No. 630 at 3; ECF No. 625 at 9-10. Wells Fargo has argued throughout this case that the characterization of the Bx payment is an issue of law for the Court. As the Court noted after the jury returned its verdict, however, the Court agrees with the jury's finding. Thus, if the nature of the Bx payment is indeed an issue of law, the Court holds as a matter of law that the Bx is a tax benefit (and not an item of pre-tax revenue) because it is simply the means by which the parties split the tax benefits that STARS generated out of economically meaningless activity. *See* ECF No. 537 at 14-18 (Court's order discussing Wells Fargo's summary-judgment motion concerning the Bx payment); ECF No. 648 at 2298-99 (Court's comments after the jury verdict); *see also Bank of N.Y. Mellon Corp. v. Comm'r*, 801 F.3d 104, 121-22 (2d Cir. 2015) (affirming Tax Court's exclusion of the "tax spread" (i.e., the Bx) from profit because it was "'a device for monetizing and transferring the value of anticipated foreign tax credits generated from routing income through the STARS structure'" (quoting *Bank of N.Y. Mellon v. Comm'r*, 140 T.C. 15, 43 (2013)).

26 U.S.C. § 6662(b)(1) in connection with its claim of foreign-tax credits. Having considered the parties' arguments, the Court finds that (1) the loan was not a sham and (2) Wells Fargo is subject to the negligence penalty.

*A. The Loan*

As noted, the jury adopted the government's view that STARS consisted of two independent transactions: a trust structure and a loan. The loan took the form of a $1.25 billion contribution by Barclays to the Wells Fargo trust; Wells Fargo was obligated to repay that contribution (with interest) after five years. The loan carried an above-market interest rate of LIBOR[2] plus 20 basis points.[3] Wells Fargo seeks to deduct its interest payments under 26 U.S.C. § 163(a), which generally permits the deduction of "all interest paid or accrued within the taxable year on indebtedness." The government resists, arguing that, because the jury found that the loan lacked a non-tax business purpose, the loan is a sham that must be disregarded for tax purposes.

---

[2]"The London InterBank Offered Rate (LIBOR) is a benchmark interest rate disseminated by the British Bankers' Association based on the rate at which certain banks predict they can borrow funds. LIBOR is a reference point in determining interest rates for financial instruments in the United States and globally." *Gelboim v. Bank of Am. Corp.*, 135 S. Ct. 897, 903 (2015).

[3]The parties structured the STARS transaction to offset this interest rate with the Bx payment that Barclays was contractually obligated to make to Wells Fargo each month. Under the jury's finding that the trust structure and the loan are separate, however, the Bx payment is not part of the loan transaction and therefore does not reduce the amount of interest that Wells Fargo can claim on its tax returns (assuming that the loan is not a sham).

Three other cases involving materially identical STARS transactions have worked their way through the federal courts. *See Santander Holdings USA, Inc. v. United States*, 844 F.3d 15 (1st Cir. 2016), *pet. for cert. filed*, Mar. 20, 2017 (No. 16-1130); *Bank of N.Y. Mellon Corp. v. Comm'r*, 801 F.3d 104 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 1377 (2016); *Salem Fin., Inc. v. United States*, 786 F.3d 932 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 1366 (2016). In all three cases, the courts treated the loan as independent from the trust structure (as did the jury in this case[4]). *Santander*, 844 F.3d at 19 & n.4 (taxpayer conceded for purposes of summary judgment and appeal that loan and trust should be bifurcated); *Bank of N.Y. Mellon*, 801 F.3d at 121 (rejecting taxpayer's argument that the Tax Court erroneously bifurcated the transaction); *Salem*, 786 F.3d at 940 (for purposes of appeal, taxpayer did not contest lower court's holding that transaction should be bifurcated). And in all three cases, the courts found that the loan was not a sham. *Santander*, 844 F.3d at 19 & n.4 (government did not contest lower court's holding that loan was not a sham); *Bank of N.Y. Mellon*, 801 F.3d at 123-24 (rejecting government's argument that loan was a sham); *Salem*, 786 F.3d at 955-58 (same).

Notwithstanding the fact that all three courts of appeals to have considered its argument have rejected it, the government continues to insist that the loan is a sham

---

[4]The Court pauses to note that a jury of laypersons resolved this case in a manner that parallels the decisions of three separate federal appellate panels in similar cases—a credit to how seriously the jurors took their responsibilities and how hard they worked to understand the extremely complicated evidence.

and that Wells Fargo is not entitled to deduct its interest expenses. The government contends that, even if a transaction has objective economic substance, it must be treated as a sham unless the taxpayer actually had at least one subjective, non-tax business purpose. To resolve this issue, it is necessary to predict which approach to the sham-transaction doctrine the Eighth Circuit will choose to adopt.

Having considered the parties' arguments, the Court concludes that the Eighth Circuit is likely to treat the objective and subjective components of the sham-transaction test as two factors in a single flexible analysis rather than as two separate, rigid tests. After all, courts created the sham-transaction doctrine in recognition of the fact that taxpayers display endless ingenuity in exploiting the tax code, making it impossible for Congress to anticipate and prevent all abuse. A doctrine that is intended to counter the creative and ever-evolving abuse of the tax code must necessarily be flexible. Reducing the sham-transaction doctrine to two mechanical, all-or-nothing tests would deprive the doctrine of the flexibility needed to accomplish its purpose.[5]

---

[5]The Court acknowledges that, after Wells Fargo's STARS transaction concluded, Congress codified what the government calls the "conjunctive" approach—that is, a requirement that a transaction have *both* objective economic substance *and* a subjective non-tax business purpose. *See* 26 U.S.C. § 7701(o)(1). Importantly, however, the statute states that it applies "[i]n the case of any transaction to which the economic substance doctrine is relevant," and goes on to say that "[t]he determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if this subsection had never been enacted." 26 U.S.C. § 7701(o)(1), (o)(5)(C). This suggests some flexibility in determining a threshold requirement of relevance
(continued...)

A flexible approach also reflects the Supreme Court's often-quoted formulation of the sham-transaction doctrine in *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978):

> [W]here . . . there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties.

*Id.* at 583-84. This language reads more like a list of factors to weigh than a series of boxes to check. Moreover, although some courts read this language to require the taxpayer to have a subjective non-tax purpose, nothing in it refers to a taxpayer's actual subjective motivation; the language can just as easily be read to describe the objective features of the transaction as seen through the lens of what an objectively reasonable taxpayer's purpose would be.

Such a reading makes particular sense in light of the Supreme Court's frequent admonition that taxpayers are allowed to engage in tax planning. *See Gregory v. Helvering*, 293 U.S. 465, 469 (1935) ("The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."). An ironclad requirement that a taxpayer subjectively harbor at least one non-tax reason for engaging in a transaction would

---

⁵(...continued)
before applying the doctrine.

make it harder for taxpayers to engage in legitimate tax planning. It would also lead to the absurd result of two identical transactions being treated differently for tax purposes based solely on the subjective motivations of the two taxpayers.

This is not to say that taxpayers' subjective motives are irrelevant. Contemporaneous evidence that a taxpayer was motivated solely by tax benefits reinforces other objective evidence that the transaction lacked a real potential for pre-tax profit or had any utility aside from tax avoidance. A flexible approach would allow a court to weigh such evidence without giving rise to absurd results.

A flexible approach also reflects how most courts analyze the economic substance of a transaction. It is true, as the government points out, that courts have articulated a variety of approaches, with some explicitly saying that "the absence of a nontax business purpose is fatal." *ASA Investerings P'ship v. Comm'r*, 201 F.3d 505, 512 (D.C. Cir. 2000); *see also United Parcel Serv. of Am., Inc. v. Comm'r*, 254 F.3d 1014, 1018 (11th Cir. 2001) ("Even if the transaction has economic effects, it must be disregarded if it has no business purpose and its motive is tax avoidance."). But the government has cited no case—not one—in which a court has disregarded a transaction that had real and substantial economic substance for the sole reason that the taxpayer's subjective purpose in entering into the transaction was to avoid taxes.

For example, in *ASA Investerings*, the court found *both* that the challenged partnership was not formed for a business purpose *and* that the foreign partner "could make no profit from the transaction . . . ." *ASA Investerings*, 201 F.3d at 514. And in *United Parcel Service*, the court rejected the government's attempt to disregard the taxpayer's tax-motivated restructuring of its business and instead adopted a definition of "business purpose" that allows objective economic substance to trump the taxpayer's subjective tax motives:

> [A] transaction has a 'business purpose,' when we are talking about a going concern like UPS, as long as it figures in a bona fide, profit-seeking business. . . . There may be no tax-independent reason for a taxpayer to choose between these different ways of financing the business, but it does not mean that the taxpayer lacks a 'business purpose.' To conclude otherwise would prohibit tax-planning.

*United Parcel Serv.*, 254 F.3d at 1019. Thus, although some courts have *said* that the lack of a business purpose can by itself invalidate a transaction, the actual results indicate either that this language was dicta (as in *ASA Investerings*) or that the taxpayer's subjective motives became less important when the transaction had substantial objective economic substance (as in *United Parcel Service*).

*Salem Financial* (the STARS case decided by the Federal Circuit) is illustrative of the latter approach. In a previous case, the Federal Circuit had suggested that "the [sham-transaction] doctrine may well also apply if the taxpayer's sole subjective

motivation is tax avoidance even if the transaction has economic substance . . . ." *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1355 (Fed. Cir. 2006). The Federal Circuit repeated that observation in *Salem*. *Salem*, 786 F.3d at 942. Nevertheless, the Federal Circuit overturned the lower court's ruling that the STARS loan was a sham. *Id.* at 955-58. And it did so despite the lower court's finding—a finding that was made after a three-week trial and that had considerable support in the record—that the taxpayer's sole reason for taking out the loan was to provide a pretext of a business purpose for the STARS transaction. *Salem Fin., Inc. v. United States*, 112 Fed. Cl. 543, 587 (2013); *see also Salem Fin. Inc. v. United States*, 119 Fed. Cl. 84, 88 (2014). The Federal Circuit blew past this finding, essentially regarding it as outweighed by the objective economic substance of the loan. *Salem Fin.*, 786 F.3d at 955-58.

Other courts have similarly upheld tax-motivated transactions on the basis of their objective economic substance. *See ACM P'ship v. Comm'r*, 157 F.3d 231, 262 (3d Cir. 1998) ("even where a transaction is not intended to serve business purposes, it may give rise to a deduction to the extent that it has objective economic consequences apart from tax benefits"). Again, there is a gap between what courts say and what courts do: Although courts may say that a subjective non-tax business purpose is essential, courts in fact have been reluctant to disregard economically substantive transactions solely on the basis of the taxpayer's subjective motives.

Finally, it is worth noting that a flexible approach is consistent with the manner in which the Eighth Circuit has applied the sham-transaction doctrine. For example, in determining whether a transaction has economic substance, the Eighth Circuit has focused not merely on *whether* the transaction generated a non-tax-related profit, but on the *size* of that profit. Specifically, the Eighth Circuit has said that "[m]odest profits relative to substantial tax benefits are insufficient to imbue an otherwise dubious transaction with economic substance." *WFC Holdings Corp. v. United States*, 728 F.3d 736, 746 (8th Cir. 2013) (citation and quotations omitted). In other words, the objective component of the test is not a simple bright-line accounting rule under which one dollar in profits equals economic substance. Instead, courts (or juries) must consider all of the circumstances of the transaction.

The Court therefore adopts a flexible approach. Applying this approach, the Court holds that the loan was not a sham and that Wells Fargo is entitled to deduct its interest expenses. As the jury found, the $1.25 billion loan was a real transaction that had substantial, non-tax-related economic effects on the parties. The fact that Wells Fargo would not have entered into the loan but for the opportunity to gain unrelated tax benefits does not change that fact. And although Wells Fargo's purpose in entering the loan was not to borrow money from Barclays but to disguise the sham nature of STARS, the loan was not economically integral to the trust structure and did not play a

role in generating the abusive foreign-tax credits. As the Tax Court in *Bank of New York Mellon* observed:

> Petitioner did not use the loan proceeds to finance, secure or carry out the STARS structure. The loan was not necessary for the STARS structure to produce the disallowed foreign tax credits. Rather, the loan proceeds were available for petitioner to use in its banking business throughout the STARS transaction. Accordingly, the loan served a purpose beyond the creation of tax benefits . . . .

*Bank of N.Y. Mellon Corp. v. Comm'r*, 106 T.C.M. (CCH) 367, 2013 WL 5311057 at *4 (2013), *aff'd*, 801 F.3d 104 (2d Cir. 2015). All of what the Tax Court said about STARS in *Bank of N.Y. Mellon* is true about STARS in this case. Having successfully persuaded the jury (and the Court) that the (real) loan should be analyzed separately from the (sham) trust, the government is now obligated to honor the loan's actual economic substance. *See ACM P'ship*, 157 F.3d at 262 (refusing to "disregard actual, objective economic losses merely because they are incidental to a broader series of transactions that are found to constitute an economic sham whose principal tax benefits must be denied").

### B. The Negligence Penalty

The parties next dispute whether Wells Fargo is subject to the negligence penalty under 26 U.S.C. § 6662(b)(1) for the underpayments associated with the IRS's disallowance of Wells Fargo's claimed foreign-tax credits. Under that statute, a taxpayer is liable for a 20 percent penalty on any portion of a underpayment that is

attributable to negligence. The statute defines "negligence" to "include[] any failure to make a reasonable attempt to comply with the provisions of this title . . . ." 26 U.S.C. § 6662(c).

The Treasury Department ("the Department") has promulgated a regulation—Treas. Reg. § 1.6662–3—that further refines the meaning of "negligence." Among other things, the regulation provides that "[a] return position that has a reasonable basis as defined in paragraph (b)(3) of this section is not attributable to negligence." Treas. Reg. § 1.6662–3(b)(1). Paragraph (b)(3) of the regulation, in turn, states that a return position "will generally satisfy the reasonable basis standard" if it is "reasonably based on one or more of the authorities set forth in § 1.6662–4(d)(3)(iii) (taking into account the relevance and persuasiveness of the authorities, and subsequent developments) . . . ."

In order to limit the scope of discovery, Wells Fargo stipulated that it would assert only two defenses to the government's negligence-penalty claim: (1) that STARS was not a sham and therefore Wells Fargo is not liable at all, and (2) that, even if STARS was a sham, there was an objectively reasonable basis for Wells Fargo's return position under the authorities referenced in § 1.6662–3(b)(3). ECF No. 94 ¶ 2. Wells Fargo further agreed that, in arguing against imposition of the negligence penalty, Wells Fargo would not make "[a]ny contention that relies upon Wells Fargo's efforts to exercise ordinary and reasonable care in the preparation of its tax return, or Wells

Fargo's efforts to determine its proper tax liability under the internal revenue laws arising out of the STARS Transaction, to establish reasonable basis[.]" ECF No. 94 ¶ 3(a). In other words, Wells Fargo cannot argue that it *in fact* exercised ordinary and reasonable care in preparing its tax return, nor can it argue that it *in fact* relied on any of the authorities referenced in § 1.6662–3(b)(3).

The parties' stipulation thus gives rise to a legal question: Is it enough for Wells Fargo to show that its return position had a reasonable basis under the authorities referenced in § 1.6662–3(b)(3)? Or must Wells Fargo prove that it actually consulted those authorities in preparing its tax return? Having carefully considered the parties' arguments, the Court concludes that Wells Fargo must prove that it actually consulted the authorities that purportedly provided a reasonable basis for the position taken in its return.

As the government emphasizes, the penalty that it seeks to impose is a *negligence* penalty. The ordinary meaning of that term indicates that the focus of the inquiry will be on whether the taxpayer exercised due care. The statutory definition of "negligence" comports with this view. *See* 26 U.S.C. § 6662(c) (stating that "the term 'negligence' includes any failure to make a reasonable attempt to comply with the provisions of this title"). Case law likewise confirms that, in determining whether the negligence penalty applies, the focus is on the taxpayer's conduct. *See Chakales v. Comm'r*, 79 F.3d 726, 729

(8th Cir. 1996) ("the burden is on the taxpayer to prove that he did not fail to exercise due care or do what a reasonable and prudent person would do under similar circumstances"); *Goldman v. Comm'r*, 39 F.3d 402, 407 (2d Cir. 1994) (negligence requires a finding of a "lack of due care or the failure to do what a reasonable and prudent person would do under similar circumstances" (citation and quotations omitted)); *Pasternak v. Comm'r*, 990 F.2d 893, 902 (6th Cir. 1993) (same); *Zmuda v. Comm'r*, 731 F.2d 1417, 1422-23 (9th Cir. 1984) (affirming a negligence penalty where the taxpayers "made no reasonable inquiry as to the legality of their plans").

Wells Fargo nevertheless contends that the Treasury regulation establishes the reasonable-basis standard as a purely objective legal defense to the negligence penalty. It is true that the language on which Wells Fargo relies is cast in objective terms: "A return position that has a reasonable basis as defined in paragraph (b)(3) of this section is not attributable to negligence." Treas. Reg. § 1.6662–3(b)(1). Read as a whole, however, the regulation is ambiguous concerning whether a taxpayer must have actually relied on the authorities referenced in paragraph (b)(3).

Paragraph (b)(3) provides that the reasonable-basis standard is generally satisfied "[i]f a return position is reasonably based on one or more" of a set of authorities. Treas. Reg. § 1.6662–3(b)(3). This language suggests that the taxpayer must have actually consulted those authorities. It is the taxpayer who adopts a "return

-15-

position" by determining its tax liability. *See* Treas. Reg. § 301.6114–1(a)(2)(i). A "return position" is, in essence, an opinion regarding what obligations the law imposes on the taxpayer. It is difficult to know how a taxpayer could "base" a return position on a set of authorities without actually consulting those authorities, just as it is difficult to know how someone could "base" an opinion about the best restaurant in town on Zagat ratings without actually consulting any Zagat ratings. It is also worth noting that Treas. Reg. § 1.6662–4(d)(2), which defines the "substantial authority" standard, explicitly states that it is an "objective standard" that involves "an analysis of the law and application of the law to relevant facts." In contrast to this regulation—which makes it clear that the taxpayer's subjective analysis is not relevant—no such language appears in the reasonable-basis regulation.

The reasonable-basis provision in § 1.6662–3(b) is therefore ambiguous. That being the case, the Department's interpretation of its own regulation is controlling. *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000) (*Auer* deference applies when the regulation is ambiguous); *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 292-96 (2009) (deferring to the Treasury Department's interpretation of Treas. Reg. § 1.401(a)–13(c)(1)(ii)).

There are exceptions to this rule, such as when an agency's interpretation is plainly erroneous or inconsistent with the regulation, *Auer*, 519 U.S. at 461, or "when

there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question," *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (citation and quotations omitted). These exceptions do not apply here, however. The Department's interpretation is certainly a reasonable reading of the regulatory language; indeed, the Department's reading reflects the negligence penalty's focus on the reasonableness of the taxpayer's actual conduct. *Cf. Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1337 (2013) ("It is well established that an agency's interpretation need not be the only possible reading of a regulation—or even the best one—to prevail.").

In addition, there is no indication that the Department has advanced a different interpretation in the past or that its current interpretation is a "*post hoc* justification adopted in response to litigation." *Id.* To the contrary, the Department long ago rejected suggestions that it formally rank the "reasonable basis" standard in a hierarchy of standards because "such a comparison would change the focus of the reasonable basis regulations from the taxpayer's obligation to determine his or her tax liability in accordance with the internal revenue laws to the probability of the return position prevailing in litigation." Definition of Reasonable Basis, 63 Fed. Reg. 66433, 66433 (Dec. 2, 1998). In other words, the Department has long emphasized that the

reasonable-basis defense "focus[es]" not on the return position in the abstract, but rather on the conduct of the particular taxpayer in formulating that position.[6]

It is true, as Wells Fargo argues, that the Department's interpretation creates some overlap between the reasonable-basis defense to the negligence penalty and the good-faith defense under 26 U.S.C. § 6664(c)(1). The good-faith defense applies if there was reasonable cause for the underpayment and the taxpayer acted in good faith. The short answer to Wells Fargo's point is that it is impossible to avoid some overlap between the two standards. Under both standards, the nature and reasonableness of the taxpayer's conduct are relevant considerations. That does not mean, however, that the reasonable-basis and good-faith defenses are coextensive. Whereas good faith is broadly available as a defense to most of the penalties listed in 26 U.S.C. §§ 6662 and 6663, the reasonable-basis defense has a more limited application. *Compare* 26 U.S.C. § 6664(c)(1), *with* 26 U.S.C. § 6662(d)(2)(B), *and* Treas. Reg. § 1.6662–3(b), (c)(1). Moreover, there is no dispute that the reasonable-basis standard is a more stringent standard than the reasonable-cause standard applicable under § 6664(c)(1). Treas. Reg. § 1.6662–3(b)(3) ("the reasonable cause and good faith exception in § 1.6664–4 may

---

[6]That said, an agency's interpretation of its regulations may be entitled to deference even if it is advanced for the first time in a legal brief. *See Auer*, 519 U.S. at 462 ("Petitioners complain that the Secretary's interpretation comes to us in the form of a legal brief; but that does not, in the circumstances of this case, make it unworthy of deference.").

provide relief from the penalty for negligence or disregard of rules or regulations, even if a return position does not satisfy the reasonable basis standard").

The Court therefore agrees with the government that, in order to establish the reasonable-basis defense, Wells Fargo would have to prove that it actually relied on the authorities that form the basis of that defense. Because Wells Fargo has waived its right to prove actual reliance, Wells Fargo cannot establish the defense. Wells Fargo is therefore subject to the negligence penalty.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Plaintiff is entitled, under 26 U.S.C. § 163(a), to deduct the interest expenses associated with the loan that was part of the STARS transaction.

2. Plaintiff is subject to the negligence penalty under 26 U.S.C. § 6662(b)(1) for the underpayments associated with the foreign-tax credits that it claimed in its reporting of the STARS transaction.

3. The parties are directed to meet and confer on a proposed form of judgment incorporating these rulings. The parties must submit their proposal to the Court no later than June 30, 2017.

Dated: May 24, 2017                                    s/Patrick J. Schiltz                    
                                                       Patrick J. Schiltz
                                                       United States District Judge